IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | | |
|---|---|---|
| JANE DOE 1, JANE DOE 2, | § | |
| JANE DOE 3, JANE DOE 4, | § | |
| JANE DOE 5, JANE DOE 6, | § | |
| JANE DOE 7, JANE DOE 8, | § | |
| JANE DOE 9, and | § | |
| JANE DOE 10, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | 6:16-CV-173-RP |
| | § | |
| BAYLOR UNIVERSITY, | § | |
| | § | |
| Defendant. | § | |

**ORDER**

Before the Court are Plaintiffs' Motion to Compel Production of Pepper Hamilton

Materials, (Dkt. 93); Defendant's Response, (Dkt. 104); and Plaintiffs' Reply (Dkt. 106). The Court

held a hearing addressing this and other discovery-related motions on June 16, 2017. The parties also

submitted follow-up briefing after the hearing that addressed the motion. (Pls.' Post-Hearing Br.,

Dkt. 117; Def.'s Resp., Dkt. 123). Based on these filings, the relevant law, the parties' arguments,

and the record in this case, the Court issues the following order.

**I. BACKGROUND**

In September 2015, the Baylor University Board of Regents hired the law firm Pepper

Hamilton, LLP, "to conduct an independent and external review of Baylor University's institutional

responses to Title IX and related compliance issues through the lens of specific cases." (Pls.' Mot.

Compel Ex. A, Dkt. 93-1, Client Engagement Letter). Baylor and Pepper Hamilton amended this

agreement in February 2016. (Pls.' Mot. Compel Ex. B, Dkt. 93-2, Re: Engagement). The

amendment to the engagement letter explained:

1

> Specifically, Pepper [Hamilton] has been engaged . . . to provide legal advice and guidance to the University in connection with the independent and external review [previously identified] and other matters related to the institutional response to ongoing matters under Title IX . . . and related authority. It is the shared understanding of Baylor University and Pepper [Hamilton] that all material prepared and communications made by Baylor University, Pepper [Hamilton], and their representatives in the course of the review are in anticipation of litigation and are privileged work product.

(*Id.*). Other than clarifying that Pepper Hamilton was hired to provide legal services, the amendment left the original engagement agreement unchanged. (*Id.*).

In May 2016, a few months after this amendment, Baylor released two documents summarizing the results of the Pepper Hamilton investigation, a thirteen-page summary of the investigation and its conclusions entitled "Findings of Fact," and another ten-page list of recommendations titled "Report of External and Independent Review, Recommendations." (Pls.' Mot. Compel Ex. C, Dkt. 93-3, Findings of Fact; Pls.' Mot. Compel Ex. D, Dkt. 93-4, Report of External and Independent Review). This suit was filed soon after the release of these summaries, in June 2016. (Compl., Dkt. 1).

Plaintiffs seek production of materials provided to and produced by Pepper Hamilton in connection with the investigation.[1] Defendant Baylor University objects to the production of all materials on the bases of attorney-client privilege and work-product privilege. Plaintiffs make two primary arguments in an attempt to overcome Baylor's claims of privilege. First, Plaintiffs argue that the materials are not subject to the attorney-client privilege or work-product privilege because Pepper Hamilton was not providing legal services in anticipation of litigation, but conducting an external investigation to deal with a public relations scandal. Second, Plaintiffs argue that Baylor waived any privilege by making numerous public disclosures regarding the investigation. Finally,

---

[1] Plaintiffs made several document production requests relating to the Pepper Hamilton investigation. (*See* Pls.' Mot. Compel Ex. A, Dkt. 94-1, ¶¶ 9–19). Because the parties have generally not addressed specific requests in their briefing, the Court addresses the subject matter of these requests as a whole.

Plaintiffs argue that even if a privilege applies to some or all of Baylor's communications with Pepper Hamilton, Baylor should not be allowed to use a categorical privilege log.

## II. LEGAL STANDARD

Discovery is outside the scope permitted by the Federal Rules of Civil Procedure if the discovery sought is (1) privileged; (2) not relevant to any party's claims or defense; or (3) not "proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). If the Court finds that the discovery request seeks privileged material, the Court may issue a protective order. *See* Fed. R. Civ. P. 26(c). Furthermore, it is well established that "[m]atters relating to discovery are committed to the discretion of the trial court." *Freudensprung v. Offshore Tech. Servs., Inc.*, 379 F.3d 327, 347 (5th Cir. 2004).

## III. DISCUSSION

Here, there are two "distinct" privileges at issue—the attorney-client privilege and the work-product privilege. *See United States v. Nobles*, 422 U.S. 225, 238 n.11 (1975); *see also Shields v. Sturm, Ruger & Co.*, 864 F.2d 379, 382 (5th Cir. 1989) ("The work product privilege is very different from the attorney-client privilege."). The Court will first address the applicability of the broader privilege, the attorney-client privilege, and then turn to address the applicability of the work-product privilege.

### A. Attorney-Client Privilege

First, Plaintiffs argue that because Pepper Hamilton was hired to conduct an external investigation, Baylor's communications with Pepper Hamilton regarding that investigation are not privileged. Second, Plaintiffs argue that any privilege materials related to the investigation may be entitled to have been waived by repeated public disclosures regarding the investigation. Defendant disputes both of these arguments.

*1. Application of Attorney-Client Privilege*

The attorney-client privilege exists to "encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981). This privilege "rests on the need for the advocate and counselor to know all that relates to the client's reasons for seeking representation if the professional mission is to be carried out." *Id.* (quoting *Trammel v. United States*, 445 U.S. 40, 51 (1980)). While the attorney-client privilege extends to all situations in which counsel is sought on a legal matter, it protects "only those disclosures necessary to obtain informed legal advice which might not have been made absent the privilege." *Fisher v. United States*, 425 U.S. 391, 403 (1976). In other words, the communication must be made "in confidence for the purpose of obtaining legal advice from the lawyer" to fall within the scope of the privilege. *United States v. El Paso Co.*, 682 F.2d 530, 538 (5th Cir. 1982); *see also United States v. Robinson*, 121 F.3d 971, 974 (5th Cir. 1997) ("The party asserting that communication is protected by the privilege must prove: (1) that he made a confidential communication; (2) to a lawyer or his subordinate; (3) for the primary purpose of securing a legal opinion or legal services, or assistance in some legal proceeding."). "Hence, the privilege does not protect documents and other communications simply because they result from an attorney-client relationship." *S.E.C. v. Microtune, Inc.*, 258 F.R.D. 310, 315 (N.D. Tex. 2009). "Moreover, courts generally construe the privilege narrowly because 'assertion of privileges inhibits the search for truth.'" *Id.* (citing *Navigant Consulting, Inc. v. Wilkinson*, 220 F.R.D. 467, 477 (N.D. Tex. 2004)).

"A party asserting a privilege exemption from discovery bears the burden of demonstrating its applicability." *In re Santa Fe Int'l Corp.*, 272 F.3d 705, 710 (5th Cir. 2001). "A general allegation of privilege is insufficient to meet this burden." *Navigant Consulting, Inc. v. Wilkinson*, 220 F.R.D. 467,

473 (N.D. Tex. 2004). Instead, "[t]he proponent must provide sufficient facts by way of detailed affidavits or other evidence to enable the court to determine whether the privilege exists." *Id.*

In this case, the evidence clearly demonstrates that Baylor was seeking legal advice when it engaged Pepper Hamilton in September 2015. The initial engagement letter indicated that Pepper Hamilton was hired "to conduct an independent and external review of Baylor University's institutional responses to Title IX and related compliance issues through the lens of specific cases." (Pls.' Mot. to Compel Ex. A, Dkt. 93-1, Client Engagement Letter). Although the letter does not use the phrases "legal advice," "legal assistance," or the like, there is no magic phrase that must be included in an engagement letter to invoke the attorney-client privilege. The letter plainly indicates that Baylor hired a law firm to review its compliance with federal law—in other words, to obtain legal advice.

The other evidence submitted further supports this conclusion. While the amendment to the engagement letter sought to clarify that Baylor was indeed seeking legal advice when it first engaged Pepper Hamilton, it did not change the scope of the engagement or the work with which Pepper Hamilton was tasked. (Pls.' Mot. Compel Ex. B, Dkt. 93-2, Re: Engagement). This supports Baylor's argument that, at the outset, the university engaged Pepper Hamilton to obtain legal advice. (*Id.*). Baylor also submitted a declaration from the individual working as its general counsel at the time Pepper Hamilton was hired. (Def.'s Resp. Mot. Compel Ex. 1, Dkt. 104-2, Holmes Decl.). He explains that "[t]he communications with Pepper Hamilton in connection with its investigation were made for the purpose of facilitating the rendition of professional legal services for Baylor." (*Id.* ¶ 4).

A declaration of one of the members of Baylor's Board of Regents, an attorney at Haynes and Boone, LLP, further explains the reasons the school engaged Pepper Hamilton. (Def.'s Resp. Mot. Compel Ex. 2, Dkt. 104-3, Harper Decl.). The regent explains that he and another regent worked with Baylor's Office of General Counsel to recommend law firms "that had the expertise to

both conduct the needed factual investigation and advise the Board regarding potential liability arising out of the University's hand[l]ing of allegations of sexual assault and any other claims that could ensure, such as Title IX litigation, employment related litigation, regulatory investigations, or government enforcement proceedings." (*Id.* ¶ 6). After a recommendation by Baylor's president, Pepper Hamilton was hired. (*Id.* ¶ 8).

Finally, an affidavit from one of the Pepper Hamilton attorneys who led the engagement explains that "[c]ommunications between Pepper Hamilton and Baylor . . . [or] employees of Baylor were for the purpose of facilitating Pepper Hamilton's rendition of legal services to Baylor." (Def.'s Resp. Mot. Compel Ex. 3, Dkt. 104-4, Smith Aff. ¶ 6).

Plaintiffs argue that because Pepper Hamilton conducted an "independent investigation" for Baylor, it was not providing "legal representation"—thus, the materials related to the investigation are not privileged. As Baylor notes in response, this distinction has little support in the law. "The research undertaken by an attorney to respond to a client's request [for advice] also falls within the reaches of the privilege." *Nguyen v. Excel Corp.*, 197 F.3d 200, 206 (5th Cir. 1999). One of the leading U.S. Supreme Court cases on the attorney-client privilege, *Upjohn Co. v. United States*, 449 U.S. 383 (1981), addressed an "internal investigation" regarding possible unlawful bribes to foreign governments. Plaintiffs attempt to distinguish the case by saying that the employees interviewed in *Upjohn* were each told that the interviews were arranged so the firm could provide the company legal advice. (Pls.' Reply, Dkt. 106, at 2 (citing *Upjohn*, 449 U.S. at 394)). It is unclear from *Upjohn*, however, that this detail is dispositive when determining the scope of the attorney-client privilege. And in any case, a Pepper Hamilton attorney explained that "Baylor instructed its employees to cooperate and communicate with Pepper Hamilton so that Pepper Hamilton could provide legal services and advice to Baylor." (Def.'s Resp. Mot. Compel Ex. 3, Dkt. 104, Smith Aff. ¶ 5). Plaintiffs

have therefore failed to distinguish this case from *Upjohn* and other cases involving internal investigations where the attorney-client privilege has been recognized.[2]

The attorney-client privilege is meant to encourage clients to obtain "fully informed legal advice" that allows them to better understand their legal obligations, rather than cause clients to be "reluctant to confide in [their] lawyer" because damaging information could be more easily obtained afterward. *See Fisher*, 425 U.S. at 403–04. Here, the evidence shows Baylor sought advice from Pepper Hamilton to better understand its legal obligations and liabilities—the exact sort of behavior the privilege seeks to encourage. The communications between Baylor and Pepper Hamilton are therefore subject to the attorney-client privilege.

*2. Waiver of Attorney-Client Privilege*

Plaintiffs argue that even if the communications at issue were at one time protected by the attorney-client privilege, Baylor waived that protection when it repeatedly released findings and conclusions made by Pepper Hamilton. The Court agrees.

Generally, "[d]isclosure of any significant portion of a confidential communication waives the privilege as to the whole." *Nguyen*, 197 F.3d at 208. "The confidentiality of a client's communications may be compromised either through the publication of evidence of the communications themselves or through the publication of evidence of attorney statements or documents that disclose the client's confidential communications." *Indus. Clearinghouse, Inc. v. Browning Mfg. Div. of Emerson Elec. Co.*, 953 F.2d 1004, 1007 (5th Cir. 1992). "When a party waives the attorney-client privilege, it waives the privilege as to all communications that pertain to the same subject matter of the waived communication." *S.E.C. v. Microtune, Inc.*, 258 F.R.D. 310, 317 (N.D. Tex. 2009).

---

[2] In support of their argument, Plaintiffs reference a Pennsylvania state court opinion concluding that materials related to a Pepper Hamilton investigation into a child abuse scandal at Penn State University were not covered by the attorney-client privilege. (*See* Pls.' Reply, Dkt. 106, at 3). This opinion, while difficult to distinguish, is unpersuasive and has no bearing on the appropriate outcome here.

Plaintiffs argue that three disclosures by Baylor constituted waiver of the attorney-client

privilege. First, Plaintiffs argue that Baylor waived its attorney-client privilege when it released the

Findings of Fact and Recommendations in May 2016. Second, Plaintiffs point to disclosures made in

a filing by Baylor regents in *Shillinglaw v. Baylor University, et al.*, No. DC-17-01225 (Dallas Cty. Dist.

Ct), where, for example, the regents quoted text message exchanges and paraphrased conversations

in which Baylor personnel discussed an alleged rape by a football player and a gang rape reported to

athletic staff. (Pls.' Mot. Compel Ex. E, Dkt. 93-5, at 17, 20–24). The filing explains that all facts and

evidence discussed were revealed by Pepper Hamilton's investigation. (*Id.* at 8–13) Third, Plaintiffs

argue that former Baylor regents were also briefed by Pepper Hamilton about details of the

investigation that have since been kept confidential.[3] (Pls.' Reply Ex. A, Dkt. 106-1, Garland Dep.

144:15–24).

These disclosures were intentional and together provide substantial detail about both what

Baylor and its employees told Pepper Hamilton and what advice Baylor received in return. After

carefully reviewing the documents disclosed, the Court finds that they are much more akin to those

made in cases where waiver was found, than those relied where no waiver was found. *Compare*

*Nguyen*, 197 F.3d at 207 & n.17 (finding waiver where deposition questions to executives "elicit[ed]

information about the substance of [attorney-client] communication, touching on the directions

given to counsel and the legal materials reviewed in addressing the question presented"); *In re Kidder*

*Peabody Sec. Litig.*, 168 F.R.D. 459, 462 (S.D.N.Y. 1996) (finding waiver where an "85–page report for

[a client] summarize[ed] in detail the facts uncovered by the law firm in the course of its

investigation"); *with YETI Coolers, LLC v. RTIC Coolers, LLC*, No. A-15-CV-597-RP, 2016 WL

8677303, at *1 (W.D. Tex. Dec. 30, 2016) (finding no waiver where a single email produced in

---

[3] There remains a dispute about whether anyone who may properly be considered a third-party received the briefing. (*See* Pls.' Post-Hearing Br., Dkt. 117, at 6–7; Def.'s Resp., Dkt. 123, at 9–10). The Court concludes that it need not resolve the dispute, as its decision would be the same absent this alleged disclosure.

discovery stated that "[w]e believe and our attorney has confirmed that we are not infringing"); *Nat'l W. Life Ins. Co. v. W. Nat'l. Life Ins. Co.*, No. A-09-CA-711 LY, 2010 WL 5174366, at *7 (W.D. Tex. Dec. 13, 2010) (finding no waiver where "communications merely note that they have sought advice from their attorneys . . . regarding [a] name change" and "do not disclose the confidential advice and the opinions of their legal counsel").

The Court will, however, address Baylor's arguments that (1) it released only underlying facts, not confidential communications; (2) it released only generic statements about consulting with counsel; (3) it is not simultaneously using the attorney-client communications to defend itself and preventing their complete disclosure; and (4) that even if waiver of the attorney-client privilege is found, the scope of the waiver should be restricted to the released documents.

### a. Previously Confidential Communications Were Disclosed by the Findings of Fact and Recommendations

Baylor argues that waiver results only from revealing confidential communications, not underlying facts, and asserts that the Findings of Fact and *Shillinglaw* answer do not reveal the communications themselves. The documents themselves contradict this argument. The Findings of Fact reveal that all findings were the result of Pepper Hamilton's investigation—a "detailed, thorough and rigorous" investigation based on "unfettered access to personnel and data." (Pls.' Mot. Compel Ex. C, Dkt. 93-3, Findings of Fact at 1–3). Contrary to Baylor's assertion, this connection between Pepper Hamilton and the thirteen pages of findings "reveals" what facts Baylor provided to Pepper Hamilton, not just the underlying facts themselves. In other words, the Findings of Fact are a "publication of evidence of the communications." *Indus. Clearinghouse, Inc.*, 953 F.2d at 1007. The exact contents of the communications need not be revealed to constitute waiver. *See, e.g.*, *In re Kidder*, 168 F.R.D. at 468 (finding waiver of the attorney-client privilege where a report made a factual summary and paraphrased interviews conducted by attorneys); *Nguyen v*, 197 F.3d at 207 (affirming a district court's finding of waiver where executives recounted communications with attorneys in

depositions). Similarly, in *Shillinglaw*, the answer explains that the Pepper Hamilton investigation uncovered the detailed evidence discussed in the answer—again, revealing what was communicated by Baylor and its personnel to Pepper Hamilton. (Pls.' Mot. Compel Ex. E, Dkt. 93-5).

Relatedly, Baylor argues that because the Findings of Fact and Recommendations were drafted for the express purpose of public release, they can reveal no confidential communications. This argument is both unconvincing and unsupported by case law. [4] Baylor chose to publicly release a detailed summary of Pepper Hamilton's investigation that disclosed, among other things, attorney-client communications. While the information contained in these summaries was previously confidential, Baylor's decision to prepare and release a summary of those communications indicates its intentional waiver of that confidentiality. The logical extension of Baylor's argument is that the creation and public release of any document discussing attorney-client communications, no matter how detailed or self-serving, would not constitute waiver. That cannot be the case.

### b. The Disclosures at Issue Were Not Generic Statements About Consulting with Counsel

Next, Baylor argues that generic statements about consulting with an attorney do not constitute waiver. But generic statements are not at issue here. Instead, the thirteen pages of Findings of Fact and ten pages of Recommendations purport to summarize the entire investigation by Pepper Hamilton—both the information provided by Baylor and the factual and legal

---

[4] In the first case Baylor cites in support of this argument, the Fifth Circuit determined that the corporation was either not entitled to the attorney-client privilege for the documents at issue or had waived it. *United States v. El Paso*, 682 F.2d 530, 540 (5th Cir. 1982). In the case, the IRS sought, and the district court ordered, production of a "tax pool analysis"—an analysis prepared for financial reporting purposes to ensure that a corporation sets aside on its balance sheet a sufficient amount to cover contingent tax liability. *Id.* at 535. The corporation argued that the document was subject to the attorney-client privilege because it was prepared by attorneys who were identifying potential soft spots in the company's tax return. *Id.* at 539. The documents were prepared with the knowledge that they would be shown to independent accountants, who would then use the tax pool analysis to accurately portray the financial condition of the company. *Id.* at 540–41. The Court concluded that because the tax pool analysis never had the expectation of confidentiality and was shown to independent accountants, there was no privilege or privilege was waived. *Id.* The case in no way supports Baylor's contention that preparing a document summarizing otherwise confidential communications prepared for public consumption does not waive privilege with respect to the underlying communications. The second case raised by Baylor, *YETI Coolers, LLC v. RTIC Coolers*, LLC, 2016 WL 8677303, 1:15-cv-597-RP (W.D. Tex. Dec. 30, 2016), involved one phrase in an email between a company owner and his manufacturer. The court concluded that the phrase only revealed a legal conclusion, not confidential attorney-client communications.

conclusions that resulted from it. (*See* Pls.' Post-Hearing Br. Ex. A, Dkt. 117-1, at 2 (quoting Baylor's statement that its interim president "would like to reiterate that the Findings of Fact fully reflect the themes, core findings and failings identified in the investigation")). In other words, the documents summarize the complete course of previously confidential communications between Baylor and Pepper Hamilton. The Findings of Fact document even connects several specific factual findings to Pepper Hamilton. (Pls.' Mot. Compel Ex. C, Dkt. 93-3, Findings of Fact at 1–3). As just one example, the findings explain that Pepper Hamilton found instances of university administrators "directly discouraging complainants from reporting or participating in student conduct process" and that, in one instance, an administrator's actions "constituted retaliation against a complainant for reporting sexual assault." (Pls.' Mot. Compel Ex. C, Dkt. 93-3, Findings of Fact at 1–2). The *Shillinglaw* answer includes even more specific details, going so far as to quote text messages and conversations by Baylor personnel about reports of sexual assault and explain that these conversations were uncovered by Pepper Hamilton in the course of its investigation. (Pls.' Mot. Compel Ex. E, Dkt. 93-5, at 13-14, 17-21). The Recommendations document then details over ten pages of guidance and advice provided by legal counsel. (Pls.' Mot. Compel Ex. D, Dkt. 93-4, Report of External and Independent Review). These disclosures are far from a generic statement that Baylor sought legal advice on Title IX compliance.

> c. *Baylor Has Sought to Use the Disclosures as Both a Sword and a Shield*

Baylor also argues that waiver of attorney-client privilege only occurs when the privilege is invoked as both a "sword" and a "shield" in litigation. *See Willy v. Admin. Review Bd.*, 423 F.3d 483, 497 (5th Cir. 2005) ("[W]hen a party entitled to claim the attorney-client privilege uses confidential information against his adversary (the sword), he implicitly waives its use protectively (the shield) under that privilege."). But this is only one form of waiver, sometimes called the "self-defense exception to the attorney-client privilege." *Id.*; *see also* 8 Fed. Prac. & Proc. Civ. § 2016.2 (3d ed.)

11

(describing "putting privileged material in issue" as one of several recurring situations involving privilege waiver). Baylor's argument that a party must invoke the attorney-client privilege as a "sword" in litigation in order for waiver to exist is inaccurate. Instead, "'[d]isclosure of any significant portion of a confidential communication" is enough to "waive[] the privilege as to the whole.'" *Nguyen*, 197 F.3d at 208.

For example, in *Nguyen v. Excel Corp.*, the Fifth Circuit considered whether a district court committed reversible error when it found waiver by the defendant due to its reliance on a good-faith defense in an FLSA action. *Id.* at 205. The defendant argued that "it did not and never intended to raise reliance-on-advice-of-counsel as support for its good faith defense." *Id.* The Fifth Circuit concluded that it need not adopt the district court's position to affirm because "alternative grounds" support waiver. *Id.* at 206. Specifically, the Court noted that the defendant's executives had answered questions in depositions about their communications with counsel. *See id.* 205–08 & n.17. The court found that this supported waiver for two independent reasons. First, the privilege was waived when the defendant failed to raise privilege objections in response to several questions regarding attorney-client communications. *Id.* at 206–07. Second, the privilege was waived because the defendant "selectively disclos[ed] confidential communications" to a third party. *Id.* at 207. Because the defendant had otherwise waived privilege, the Fifth Circuit concluded that it did not matter whether the defendant had put the privileged communications at issue—or used them as a sword—or not. *See id.* ("We conclude that [the defendant] waived the attorney-client privilege by its own failures— its failure to object and its failure to maintain the confidentiality of its communications.").

It is thus unnecessary to determine whether Baylor put its privileged communications directly at issue in the instant case. It is enough that the university selectively disclosed confidential attorney-client communications publicly to warrant a finding that it waived the attorney-client privilege with respect to those communications as a whole.

12

As the above analysis makes clear, fairness is the critical consideration when evaluating whether a party has waived the attorney-client privilege.[5] In considering fairness, the Court asks not merely whether Baylor has simultaneously invoked the Pepper Hamilton investigation as both a sword and a shield in this litigation but rather, "Would it be fair to allow Baylor to protect remaining undisclosed details regarding the Pepper Hamilton investigation when it intentionally, publicly, and selectively released certain details of the investigation, including attorney-client communications?" The Court concludes, with respect to materials covered by the attorney-client privilege, that it would not.

### d. Baylor Waived Attorney-Client Privilege Related to the Pepper Hamilton Investigation

Having concluded that Baylor waived the attorney-client privilege by making repeated disclosures regarding the Pepper Hamilton investigation, the Court must consider the scope of the waiver. Baylor's representatives have repeatedly indicated that the Findings of Fact and Recommendations summarize and represent the full course of Pepper Hamilton's investigation. (*See* Pls.' Post-Hearing Br. Ex. A, Dkt. 117-1, at 2 (quoting Baylor's statement that its interim president "would like to reiterate that the Findings of Fact fully reflect the themes, core findings and failings identified in the investigation"); *see also* Pls.' Mot. Compel Ex. E, Dkt. 93-5 (describing the disclosures about the investigation as "an unprecedented institutional *mea culpa* within higher education" and "a self-critical summary on the subject of Title IX compliance")). Because of these representations, and because of the level of detail publicly released about the investigation as a whole, the Court concludes that the waiver encompasses the entire scope of the investigation, and all materials, communications, and information provided to Pepper Hamilton as part of the

---

[5] Federal Rule of Evidence 502, though not directly applicable here, covers similar concerns and reaches the same conclusion. Following disclosure of information covered by the attorney-client privilege, Rule 502 mandates waiver as "to an undisclosed communication" where the waiver was intentional, "the disclosed and undisclosed communications or information concern the same subject matter," and where "they ought in fairness be considered together." Fed. R. Evid. 502(a).

investigation. To the extent Baylor seeks to withhold any specific communication with Pepper Hamilton or other counsel as responsive to Plaintiffs' requests for production as subject to attorney-client privilege, and not waived pursuant to this order, it must produce an itemized privilege log of these communications.

## B. Work-Product Privilege

Because the Court has concluded that Baylor has waived its claim to attorney-client privilege over materials arising out of the Pepper Hamilton investigation, the Court will address the parties' arguments regarding the work-product privilege. Plaintiffs argue that Baylor is not entitled to the work-product protection because Baylor did not engage Pepper Hamilton in anticipation of litigation. Further, Plaintiffs argue that any work-product protection has been waived. Baylor disputes these arguments.

### 1. *Application of Work-Product Privilege*

Work product typically constitutes "documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative . . . including the other party's attorney." Fed. R. Civ. P. 26(b)(3). In the Fifth Circuit, "the privilege can apply where litigation is not imminent, 'as long as the primary motivating purpose behind the creation of the document was to aid in possible future litigation.'" *In re Kaiser Aluminum & Chem. Co.*, 214 F.3d 586, 593 (5th Cir. 2000) (quoting *United States v. El Paso Co.*, 682 F.2d 530, 542 (5th Cir.1982)). "[F]actors relevant to determining the primary motivation for creating a document [include] the retention of counsel and his involvement in the generation of the document and whether it was a routine practice to prepare that type of document or whether the document was instead prepared in response to a particular circumstance." *Navigant Consulting, Inc. v. Wilkinson*, 220 F.R.D. 467, 477 (N.D. Tex. 2004) (internal quotations omitted).

14

"[T]he work product doctrine insulates a lawyer's research, analysis of legal theories, mental impressions, notes, and memoranda of witnesses' statements from an opposing counsel's inquiries." *Dunn v. State Farm Fire & Cas. Co.*, 927 F.2d 869, 875 (5th Cir. 1991). Like the attorney-client privilege, "[t]he burden of establishing that a document is work product is on the party who asserts the claim." *Hodges, Grant & Kaufmann*, 768 F.2d at 721.

The evidence Baylor submitted demonstrates that its decision to hire Pepper Hamilton to investigate its Title IX compliance was not part of "a routine practice" of the university, but was primarily motivated by its anticipation of litigation. Baylor provides evidence that by August 2015 it had reason to expect litigation related to its Title IX compliance. One of Baylor's football players was convicted of raping a former Baylor soccer player, and the Waco Tribune reported in late August that the victim had retained counsel. (Def.'s Resp. Mot. Compel Ex. 1-A, Dkt. 104-2). Prior to the conviction, Texas Monthly published an article suggesting that "[q]uestions now swirl around what the program knew and when they knew it" and that "Baylor officials either knew, or should have known," of the player's "history of violent incidents" before he ever came to Baylor. (Def.'s Resp. Mot. Compel Ex. 2-1, Dkt. 104-3). In a declaration submitted with Baylor's response to Plaintiffs' motion to compel, Baylor's general counsel explains that the university engaged Pepper Hamilton "in anticipation of litigation" after media reports like these. (Def.'s Resp. Mot. Compel Ex. 1, Dkt. 104-2, Holmes Decl. ¶ 5). Another Baylor regent explains that "we knew we faced potential government enforcement and litigation claims, including one immediate threat of suit," by the end of August. (Def's' Resp. Mot. Compel Ex. 2, Dkt. 104-3, Harper Decl. ¶ 6). He further explains:

> During my tenure with the Baylor Board of Regents, this is the only time I can recall that we retained outside counsel to conduct this scale of investigation related to legal and regulatory issues faced by the university. An investigation of this significance and magnitude was not ordered or conducted as an ordinary matter. The retention or Pepper Hamilton was the product of Baylor anticipating imminent litigation in

15

connection with [victims of sexual assault] who could retain attorneys at any time in the future.

(*Id.* ¶ 14). Baylor formally entered into an engagement with Pepper Hamilton in October 2015.

Plaintiffs argue that because Baylor's public statements about the Pepper Hamilton investigation did not mention potential litigation, such litigation could not have been the primary reason Pepper Hamilton was engaged. As with the attorney-client privilege, however, there are no magic words a party must use to invoke the work-product privilege. Further, it is reasonable that a party would not want to announce that it anticipated litigation when engaging outside counsel for fear that doing so might encourage that very litigation.

Plaintiffs point the Court to *Banneker Ventures LLC v. Graham, et al.*, No. 1:13-cv-00391-RMC, Dkt. 108, at *10 (D.D.C. May 16, 2017), a case involving the Washington D.C. transit authority, WMATA, in which the district court concluded that materials arising out of an external investigation were not protected because the "evidence support[ed] a finding that absent any anticipated litigation WMATA would have conducted the same investigation." (Pls.' Post-Hearing Br., Dkt. 117, at 5). But the evidence in *Banneker* demonstrated that the investigation was initiated more than two years after WMATA became aware of any potential threat of litigation and "was for internal WMATA business purposes." (*Id.* Ex. B, Dkt. 177-2, at 8). While the *Banneker* court found that WMATA would have conducted the same investigation absent the potential litigation, this Court is unable to make a parallel conclusion here. Indeed, the evidence suggests that Baylor would not have engaged Pepper Hamilton to conduct the investigation in question absent the threat of Title IX litigation. The work-product arising out of the Pepper Hamilton investigation is therefore protected.

### 2. *Waiver of Work-Product Privilege*

Waiver is more narrow in the context of the work-product doctrine than in the context of attorney-client privilege. Because the work-product privilege exists "to promote the adversary

system by safeguarding the fruits of an attorney's trial preparations from the discovery attempts of

an opponent," "the mere voluntary disclosure to a third person is insufficient in itself to waive the

work product privilege." *Shields v. Sturm, Ruger & Co.*, 864 F.2d 379, 382 (5th Cir. 1989). Disclosure

typically only waives work-product protection with respect to any document actually disclosed.

*S.E.C. v. Brady*, 238 F.R.D. 429, 444 (N.D. Tex. 2006). Subject-matter waiver is generally limited to

instances where the quality and substance of an attorney's work product have been directly placed at

issue in the litigation by the party asserting the privilege. *See, e.g.*, *Feld v. Fireman's Fund Ins. Co.*, 991 F.

Supp. 2d 242, 255 (D.D.C. 2013) (finding waiver where a party "placed the work of his attorneys

directly at issue"). For example, parties invoking the advice-of-counsel defense in litigation are

routinely ordered to turn over work product supporting this defense. *E.g.*, *Simmons, Inc. v. Bombardier,

Inc.*, 221 F.R.D. 4, 9-10 (D.D.C. 2004) (finding waiver of the work-product privilege with respect to

documents critical to resolving an "advice of counsel" defense).

Although Baylor has impliedly connected the Pepper Hamilton investigation to this

litigation, (*See* Def.'s Mot. P.O., Dkt. 97, at 4–5 (filing in which Baylor concludes its summary of

actions the university has taken to prevent sexual assault on campus with a reference to the Pepper

Hamilton investigation)), it has not directly invoked Pepper Hamilton's work as a defense. Baylor's

answer in this case, for example, includes no reference to the Pepper Hamilton investigation. While

Plaintiffs argue that Baylor will use the investigation as part of its defense in the future, such

speculation is insufficient, at this time, to satisfy Plaintiffs' burden to show broad, subject-matter

waiver. Should Baylor directly invoke the Pepper Hamilton investigation as part of a substantive

defense to Plaintiffs' claims in the future, the Court will entertain a motion by Plaintiffs re-urging

waiver.

*3. Necessity of Work Product to Plaintiffs' Case*

An exception to the work-product privilege exists where a party seeking privileged materials "shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means." Fed. R. Civ. P. 26(b)(3). At this time, Plaintiffs have not made this showing with respect to any work product produced by Pepper Hamilton in the course of its investigation.

The Court will, however, allow Plaintiffs to re-urge necessity at a later date. It reminds Plaintiffs of the very high burden required to prove that they "cannot, without undue hardship, obtain" the materials they seek, or their substantial equivalent. The Court is therefore likely to only entertain narrow and specific requests for necessity where Plaintiffs have evidence demonstrating that they have been unable to obtain the information sought through other means.

## C. Scope of Remaining Protections & Privilege Log

While the scope of the work-product protection is quite broad, it is not as broad as Baylor asserts in its briefing. Baylor cannot withhold the names of individuals Pepper Hamilton interviewed or the documents and data it produced to Pepper Hamilton on the basis of the work-product privilege. As an initial matter, Baylor has not met its burden to demonstrate that this information reveals attorney work product. The fact that a person was interviewed by Pepper Hamilton or that certain documents or cell phone records were produced does not necessarily reveal why the information was part of the investigation or what role it played in the investigation.[6]

Alternatively, even if this information was protected as attorney work product, Baylor has made a limited waiver of that protection. Baylor has released specific names of individuals that were

---

[6] The only statements in the declarations made by the attorneys who worked on the investigation that relate to this argument are that "Pepper Hamilton gathered information from and conducted interviews of Baylor employees" and the assertion that the "the mechanical compilation of information" reveals the thought process of counsel. (*See* Def.'s Resp. Mot. Compel. Ex. 3–4, Dkts. 104-4–104-5). These vague references to data collection do not demonstrate that it was counsel who decided who to interview and what information to collect nor that any release of that information would reveal the mental impressions of Baylor's counsel.

interviewed and revealed specific sources of data reviewed by Pepper Hamilton. (Pls.' Mot. Compel Ex. E, Dkt. 93-5). Just as Baylor could not release half of a memo written by Pepper Hamilton and withhold the other half as protected, Baylor cannot release the names of certain individuals who were interviewed and certain data sources and withhold the rest as protected attorney work product.

In light of this analysis, the Court concludes that interview memoranda, notes, emails, presentations, and other "documents and tangible things that [were] prepared" as part of Pepper Hamilton's investigation, and have not been released, are protected. Additionally, questions that directly seek the mental impressions of Baylor's counsel need not be answered. For example, Baylor did not name specific individuals and data sources in its Findings of Fact or Recommendations and thus need not reveal which documents and interviews formed the bases for those documents.[7] In addition, the documents selected by Pepper Hamilton to be used in an interview, recordings of interviews conducted by Pepper Hamilton, and interview notes made by Pepper Hamilton need not be produced.

Baylor argues that, because such a large volume of materials were collected and produced to Pepper Hamilton, the burden of completing the same production to Plaintiffs—and the requisite privilege review[8]—would be out of proportion with the needs of this case. Baylor also argues that many of the documents produced to Pepper Hamilton are not relevant to Plaintiffs' claims. However, Baylor also argues that any narrowing based on the scope of documents reviewed or used by Pepper Hamilton reveals their attorneys' mental impressions and work product.

Baylor cannot have it both ways. Pepper Hamilton was hired to review Baylor's institutional response to matters under Title IX and related authorities. Presumably, Baylor and Pepper Hamilton

---

[7] For example, Baylor need not respond to RFP 12 because doing so would reveal the mental impressions of counsel, but must respond to RFP 11. (*See* Pls.' Mot. Compel Ex. A, Dkt. 94-1).

[8] Although the Court has deemed the attorney-client privilege arising out of the Pepper Hamilton investigation waived, there may still-protected attorney-client communications within the documents produced arising out of other communications between Baylor and its counsel.

did not collect documents or conduct interviews that they did not expect to reveal information about the school's compliance under Title IX. The data collection and interviews conducted are therefore likely to be relevant to Plaintiffs' claims. To the extent Baylor can agree with Plaintiffs on the production of a smaller subset of that data based on ESI terms, they may do so. While the Court encourages Plaintiffs to engage in negotiations regarding a reasonable limiting of the scope of documents to be produced, the Court will not entertain requests by Baylor for further protection based on relevance or burden.[9]

Next, Plaintiffs argue that they cannot properly challenge Baylor's claim of work-product privilege without a more detailed privilege log. Baylor contends that anything more than a categorical privilege log will reveal the mental impressions and strategy of their counsel.

Federal Rule of Civil Procedure 26(b)(5) requires that, when a party withholds information under the work-product privilege, they must "describe the nature of the documents, communications, or tangible things not produced or disclosed--and do so in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim." Fed. R. Civ. P. 26(b)(5). The Court agrees with Baylor that much of its work product cannot be itemized in a privilege log because doing so could reveal core attorney work product, such as litigation strategy. The Court will, however, order that Baylor produce an itemized privilege log for attorney work product that is primarily fact-investigation oriented. This includes interview recordings, notes, and summaries; notes and summaries based on the review of documentary evidence; and any other documents that summarize or synthesize evidence, such as chronologies or timelines. As the Court ruled earlier, any documents responsive to a request involving Pepper Hamilton that are withheld or redacted on the basis of attorney-client privilege must also be included in an itemized privilege log.

---

[9] For documents already produced to Plaintiffs, Baylor need not produce the documents a second time, but may identify them by bates number as part of the documents produced to Pepper Hamilton.

Finally, production of documents and information due to this order shall not be considered waiver with respect to claims of privilege in any other case in state or federal court. Documents produced by Baylor pursuant to this order shall be subject to the protective orders already entered in this case where applicable. In addition, the privilege logs Baylor produces pursuant to this order shall be treated as Classified Information.

## IV. CONCLUSION

Plaintiffs' Motion to Compel Pepper Hamilton Materials, (Dkt. 93), is **GRANTED IN PART AND DENIED IN PART** in accordance with this Order.

**SIGNED** on August 11, 2017.

_____
ROBERT PITMAN
UNITED STATES DISTRICT JUDGE