UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | | |
|---|---|---|
| JANE DOE 1, *et al.*, | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| vs. | § | Cause No. 6:16-cv-173-RP |
| | § | |
| BAYLOR UNIVERSITY, | § | |
| | § | |
| *Defendant.* | § | |

**BENCH BRIEF IN SUPPORT OF MOTION FOR PROTECTIVE ORDER**

The Court should enter a protective order sealing specific statements in the deposition of Thomas Hill from public disclosure. Mr. Hill's deposition testimony contains slanderous, double-hearsay statements about Mr. Willis and Mr. Peña that are unsupported by any evidence. Mr. Willis has submitted an affidavit denying making these statements. [Affidavit of Richard Willis, Ex. 1]. Mr Peña is travelling but is in the process of also submitting an affidavit denying making these statements. These statements contained in Mr. Hill's deposition should be sealed.[1]

As non-parties to this litigation, Mr. Willis and Mr. Peña did not have counsel present for Mr. Hill's deposition that could cross-examine and challenge Mr. Hill on the veracity of his slanderous statements. Further, as non-parties, Mr. Willis and Mr. Peña will not have the chance to litigate the veracity of Mr. Hill's slanderous statements during trial or in open court. Public release of Mr. Hill's false statements would harm the reputations of Mr. Willis and Mr. Peña.

---

[1]Mr. Willis's Motion for Protection originally asked the Court to seal the entire deposition of Thomas Hill. Mr. Willis, however, modifies his request and asks the Court to only seal the portions of Mr. Hill's deposition that attribute false, defamatory, racist, and anti-Semitic statements to Mr. Willis and Mr. Peña. Once the deposition transcript for Mr. Hill is available, Mr. Willis and Mr. Peña will identify the specific portions of Mr. Hill's deposition that they ask the Court to seal.

Further, public release of these statements would also harass Mr. Willis and Mr. Peña and cause them embarrassment.

On the other hand, sealing these deposition statements causes no hardship to Plaintiffs as Mr. Hill's slanderous statements are irrelevant to the Plaintiffs' claims. Sealing Mr. Hill's statements merely prevents Plaintiffs from using the press for the improper purpose of tainting the jury pool and harassing Mr. Willis and Mr. Peña. For these reasons, Mr. Willis and Mr. Peña ask the Court to enter a protective order under Rule 26 of the Federal Rules of Civil Procedure that seals these statements in Thomas Hill's deposition from the public absent court order and prohibits counsel for any party in this litigation from discussing these statements with the public or the media.

## I. Mr. Willis and Mr. Peña have standing to pursue a protective order to seal portions of the deposition of Mr. Hill.

There is no Article III standing requirement when "the ultimate relief sought by a [nonparty] is also being sought by at least one subsisting party with standing to do so." *Fulbright & Jaworski, L.L.P. v. Mariner Health Care, Inc.*, No. SA-05-CA-1127-FB, 2006 WL 3447688, at *4 (W.D. Tex. Nov. 2, 2006). Here, Baylor University also seeks to have Mr. Hill's deposition statements sealed. As a party to the lawsuit, Baylor has standing to seek a protective order sealing portions of Mr. Hill's deposition. Fed. R. Civ. P. 26(c). Because Baylor has standing to move for a protective order sealing the deposition of Mr. Hill, there is no Article III standing issue with Mr. Willis and Mr. Peña seeking the same relief.

In the alternative, Mr. Willis and Mr. Peña should be allowed to permissively intervene under Rule 24 of the Federal Rules of Civil Procedure for the limited purpose of sealing these statements in Mr. Hill's deposition. The Fifth Circuit has held that permissive intervention under

Rule 24(b) is the appropriate procedure for a nonparty to challenge, modify, or vacate a protective order. *See In re Beef Indus. Antitrust Litig.*, 589 F.2d 786, 789 (5th Cir. 1979) (stating that "the procedurally correct course" for a nonparty to challenge a protective order is through intervention). Permissive intervention is also the appropriate procedure for a nonparty to seek a protective order. *See S.E.C. v. Dowell*, 144 F.App'x 716, 722–23 (10th Cir. 2005) (finding no reason to distinguish precedent in which a nonparty sought to challenge a protective order from a nonparty's attempt to move for a protective order).

The Court should exercise its discretion to permit Mr. Willis and Mr. Peña to intervene under Rule 24(b). "Permissive intervention is left to the discretion of the district court, and is appropriate when the intervention request is timely, the intervenor's claim or defense and the main action have a question of law or fact in common, and granting intervention will not unduly delay or prejudice the original parties in the case." *U.S. v. City of New Orleans*, 540 Fed. App'x 380, 381 (5th Cir. 2013).

Although Mr. Willis and Mr. Peña had not intervened prior to filing their motion for protection, they do so now. The unique circumstances of this case required Mr. Willis and Mr. Peña to file their motion for protective order sealing portions of Mr. Hill's deposition as soon as possible. As the Court is aware, Plaintiffs in this litigation have previously found reasons to publish deposition excerpts containing embarrassing hearsay despite this Court's protective order prohibiting such action. In particular, the deposition of Ian McCaw took place on June 19th, 2018. Mr. McCaw made damaging statements about Baylor and certain members of its Board of Regents. Although this Court's protective order requires depositions be treated confidential for a period of fourteen days [Docket 156], Plaintiffs filed motions publicly containing quotes of Mr. McCaw's deposition eight days later on June 27, 2018. On that same day, local media published

reports containing the quotes of Mr. McCaw contained in the motion. [Ex. 2]. That afternoon, national media had published reports with Mr. McCaw's quotes as well. [Ex. 3].

After the deposition of Mr. Hill concluded, counsel for Mr. Hill, Don Riddle, requested an immediate copy of a specific portion of Mr. Hill's deposition transcript. To prevent Plaintiffs from publishing this specific deposition testimony prior to the passage of fourteen days, Mr. Willis and Mr. Peña immediately filed an emergency motion for protection, which they did on the morning after Mr. Hill's deposition. They now formally request permissive intervention to seek the same relief. Permissive intervention is timely as Mr. Hill's deposition occurred just seven days ago, and this Court's Protective Order still treats Mr. Hill's deposition as confidential.

Second, although the rule "appears directed toward intervenors who seek to become involved in the main action by its requirement that there be a common question of law or fact," courts "generally have interpreted their discretion under the rule broadly and have held that it can be invoked by nonparties who seek to intervene for the sole purpose of challenging confidentiality orders." WRIGHT & MILLER, 7C FED. PRAC. & PROC. CIV. § 1911 (3d ed.). The intervenor's claim need not involve the same legal theory that was raised in the main action when the intervenors are not becoming parties to the litigation. *Beckman Industries, Inc. v. International Ins. Co.*, 966 F.2d 470, 474 (9th Cir. 1992). Due to the limited purpose of the intervention, "[t]here is no reason to require such a strong nexus of fact or law." *Id.* Finally, there is no threat that intervention will unduly delay or prejudice the original parties. Mr. Willis and Mr. Peña seek intervention for a single, discrete purpose and its involvement will not delay or otherwise harm proceedings. *See Heaton v. Monogram Credit Card Bank of Georgia*, 297 F.3d

416, 422 (5th Cir. 2002) (citation omitted) ("Federal courts should allow intervention where no one would be hurt and the greater justice could be attained.").

**II. The Court should exercise its discretion under Rule 26(c) to seal portions of Mr. Hill's deposition testimony.**

Rule 26(c)(1) authorizes protective orders, for good cause shown, "to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including . . . requiring that a deposition be sealed and opened only on court order." FED. R. CIV. P. 26(c)(1). A protective order is warranted in those instances in which the party seeking it demonstrates good cause and a specific need for protection. *Landry v. Air Line Pilots Ass'n*, 901 F.2d 404, 435 (5th Cir. 1990). ).

Among the factors to consider for issuance of a protective order are whether: (1) disclosure will violate privacy interests, disclosure will cause a party embarrassment, (2) confidentiality is being sought for information important to public health and safety, (3) the party benefiting from the confidentiality is a public entity or official, (4) the case involves issues of importance to the public, (5) each party's position is taken in good faith, and (6) the order provides adequate protection. *Atser Research Techs., Inc. v. Raba-Kistner Infrastructure, Inc.*, 2007 WL 9706986, at *3 (W.D. Tex. Sept. 13, 2007). "Rule 26(c) confers broad discretion on the trial court to decide when a protective order is appropriate and what degree of protection is required." *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 36 (1984); *see also Harris v. Amoco Prod. Co.*, 768 F.2d 669, 684 (5th Cir. 1985). "The trial court is in the best position to weigh fairly the competing needs and interests of parties affected by discovery." *Seattle Times Co.*, 467 U.S. at 36.

When discovery is irrelevant to the claims and defenses in the case, then a protective order is warranted. *See Murillo Modular Group, Ltd. v. Sullivan*, 3:13-CV-3020-M, 2016 WL 6139096, at *9 (N.D. Tex. Oct. 20, 2016). Good cause also exists to seal a deposition when the deponent does not testify at trial. *United States v. $9,041,598.68 (Nine Million Forty One Thousand, Five Hundred Ninety Eight Dollars & Sixty Eight Cents)*, 976 F. Supp. 654, 657 (S.D. Tex. 1997) (citing FED. R. CIV. P. 26(c), "court may 'make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense.'").

Here, Mr. Hill's statements are not relevant to any claim brought by Plaintiffs in this case. Moreover, they are inadmissible double hearsay. *United States v. Montes-Salas*, 669 F.3d 240, 243 (5th Cir. 2012) (statement by "unindicted co-conspirator was inadmissible double hearsay because the agent was merely repeating what another agent had told him and the other agent, in turn, had merely repeated information provided by the sister of one of the illegal aliens apprehended with Montes–Salas."). This case is a Title IX lawsuit. False, double-hearsay, racist, and anti-Semitic statements do nothing to prove Plaintiffs' claims in this case and are not admissible in trial or for the purposes of summary judgment. On the other hand, these statements could harm the reputations of Mr. Willis and Mr. Peña if released publicly. Mr. Willis is an entrepreneur that owns many businesses. Mr. Peña is a pastor that ministers to thousands of people each week. Both rely on their character to maintain their success. Public disclosure of these slanderous statements plainly threatens to embarrass them and injure their reputations. FED. R. CIV. P. 26(c).

Two additional factors present here enhance the need for a protective order. First, the privacy interests pertain to a nonparty. The Second Circuit has held that "the privacy interest of

innocent third parties should weigh heavily" in a court's decision whether to impose protective measures. *United States v. Amodeo*, 71 F.3d 1044, 1050 (2d Cir. 1995)); *see also Avirgan v. Hull*, 118 F.R.D. 252, 255 (D.D.C. 1987) (stating individual's privacy concerns "are more weighty because he is not a party to the underlying action"). Second, the intensive media coverage this case has garnered make it far more likely that failure to protect privacy interests "would result in prompt and injurious disclosure of person or sensitive information about this third party in the next day's newspaper." *Flagg ex rel. Bond v. City of Detroit*, 268 F.R.D. 279, 302 (E.D. Mich. 2010). In light of these realities, the court should exercise its discretion under Rule 26(c) to prevent the disclosure of information which "if publicly release could be damaging to reputation and privacy." *Seattle Times*, 467 U.S. at 35.

What is more, there is little public interest in keeping the deposition of Mr. Hill unsealed. The public common law right of access carries less weight with regard to pretrial depositions, which "are not public components of a civil trial." *Seattle Times Co.*, 467 U.S. at 33. "Public access [to judicial records] serves to promote trustworthiness of the judicial process, to curb judicial abuses, and to provide the public with a more complete understanding of the judicial system, including a better perception of its fairness." *S.E.C. v. Van Waeyenberghe*, 990 F.2d 845, 849–50 (5th Cir. 1993). With that said, "[p]ublic access to the discovery process does not play a significant role in the administration of justice." *United States v. $9,041,598.68 (Nine Million Forty One Thousand, Five Hundred Ninety Eight Dollars & Sixty Eight Cents)*, 976 F. Supp. 654, 658 (S.D. Tex. 1997). As the First Circuit has stated:

> Indeed, if such access were to be mandated, ***the civil discovery process might actually be made more complicated and burdensome than it already is*** ... The public's interest is in seeing that the process works and the parties are able to explore the issues fully without excessive waste or delay. ***But rather than facilitate an efficient and complete exploration of the facts and issues, a public***

> ***right of access would unduly complicate the process.*** It would require the court to make extensive evidentiary findings whenever a request for access was made, and this could in turn lead to lengthy and expensive interlocutory appeals ...

*Anderson v. Cryovac, Inc.*, 805 F.2d 1, 12 (1st Cir. 1986) (emphasis added).

"Every court has supervisory power over its own records and files, and access has been denied where court files might have ***become a vehicle for improper purposes***." *Van Waeyenberghe*, 990 F.2d at 848 (quoting *Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 598 (1978) (emphasis added)). Courts have traditionally held that pre-judgment records are not privileged public records because a civil lawsuit "involve[s] private dealings between private parties" until made public in open court, or until "***their truthfulness has been determined by the judgment or decree of the court***." *In re Reporters Comm. for Freedom of the Press*, 773 F.2d 1325, 1335 (D.C. Cir. 1985) (emphasis added) (Scalia, J)). Further:

> One of the reasons why parties are privileged from suit for accusations made in their pleadings is that ***the pleadings are addressed to courts where the facts can be fairly tried, and to no other readers....*** The public have no rights to any information on private suits till they come up for public hearing or action in open court; and, ***when any publication is made involving such matters, they possess no privilege, and the publication must rest on either nonlibelous character or truth to defend it. A suit thus brought with scandalous accusations may be discontinued without any attempt to try it, or on trial the case may easily fail of proof or probability. The law has never authorized any such mischief.***

*Id.* (quoting *Park v. Detroit Free Press*, 40 N.W. 731, 734 (Mich. 1888) (emphasis added)). Pretrial discovery is not a proceeding in open court. *Id.* "Knowledge of [the discovery] throws no light upon the administration of justice." *Id.* "Both form and contents depend wholly on the will of a private individual, who may not be even an officer of the court." *Id.*

Here, Mr. Willis and Mr. Peña are non-parties to this litigation. They did not have counsel present to challenge the veracity of Mr. Hill's slanderous statements. As non-parties they lack the ability to litigate the merits of Mr. Hill's statements in this case. Mr. Hill's statements

are irrelevant to the claims in this case, and no other evidence in this case supports the truth of Mr. Hill's statements. Further, these statements have only been made in pre-trial discovery. They have not been admitted in open court, and the Court has not issued a judgment or order based on these statements. The public interest in these statements is therefore minimal at best. Plaintiffs have no need to keep these statements unsealed, and releasing these statements to the public would allow Mr. Hill's deposition to "become a vehicle for improper purposes." *Van Waeyenberghe*, 990 F.2d at 848.

For these reasons, the Court should enter a protective order preventing public disclosure of these select statements in Mr. Hill's deposition, sealing these portions of Mr. Hill's deposition, requiring all future pleadings referencing these statements be filed under seal, and preventing Plaintiffs and their attorneys from talking to the media about these statements in Mr. Hill's deposition.

Respectfully submitted,

SCOTT DOUGLASS & McCONNICO LLP
303 Colorado Street, Suite 2400
Austin, Texas 78701
(512) 495-6300 Telephone
(512) 495-6399 Facsimile

By: */s/ Steve McConnico*
Steve McConnico
State Bar No. 13450300
smcconnico@scottdoug.com
Ryan Squires
State Bar No. 24044951
rsquires@scottdoug.com

**ATTORNEYS FOR RICHARD WILLIS AND RAMIRO PEÑA**

**CERTIFICATE OF SERVICE**

I hereby certify that on August 27, 2018, a true and correct copy of the foregoing has been served via email on counsel of record as noted below:

***VIA EMAIL***
*jimdunnam@dunnamlaw.com*
Jim Dunnam
Dunnam & Dunnam, L.L.P.
4125 West Waco Drive
Waco, TX 76710

***VIA EMAIL***
*chad@brazilanddunn.com*
Chad W. Dunn
K. Scott Brazil
Abbie J. Kamin
Brazil & Dunn, L.L.P.
4201 Cypress Creek Parkway, Suite 530
Houston, Texas 77068

***VIA EMAIL***
*lbrown@thompsonhorton.com*
Lisa A. Brown
Thompson & Horton LLP
Phoenix Tower, Suite 2000
3200 Southwest Freeway
Houston, TX 77027-7554

***VIA EMAIL***
*hmcintush@thompsonhorton.com*
Holly G. McIntush
Thompson & Horton LLP
400 West 15th Street, Suite 1430
Austin, TX 78701-1648

By: */s/ Steve McConnico*
Steve McConnico

4852-0562-2129

# EXHIBIT 1

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | | |
|---|---|---|
| JANE DOE 1, *et al.*,<br>*Plaintiffs*,<br>vs.<br>BAYLOR UNIVERSITY,<br>*Defendant.* | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Cause No. 6:16-cv-173-RP |

## AFFIDAVIT OF RICHARD WILLIS

BEFORE ME, the undersigned authority, a Notary Public in and for the State of Texas, on this day personally appeared Richard Willis, known to me to be a credible person of lawful age, and who, after first being sworn, did depose and state that the following is true and correct and within his personal knowledge:

"My name is Richard Willis. I am over the age of twenty-one and wholly competent to testify. I have personal knowledge of the facts stated herein, and they are true and correct.

I have reviewed excerpts from the deposition of Thomas Hill, which was taken on August 20, 2018 in the above-captioned case. Mr. Hill stated that Greg Klepper told him that I made racist and anti-sematic comments. Specifically, Mr. Hill stated that Greg Klepper told him that I referred to Judge Ken Starr's wife, Alice Starr, as a, "Jew bitch." Further, Mr. Hill stated that Mr. Klepper told him that I said, "the reason Baylor has good nigger football players is because they have the best blonde-haired, blue-eyed pussy in Texas."

I have never said either of these two statements to Mr. Klepper or any other person. If Mr. Klepper did tell Mr. Hill that I said these things, then Mr. Klepper's statements about me are false and defamatory."

Further, Affiant sayeth not.

SIGNED this 27th day of August, 2018.

Richard Willis

STATE OF TEXAS §
§
COUNTY OF DALLAS §

SUBSCRIBED and SWORN to before me this 27th day of August, 2018, by ____________

Notary Public, State of Colorado

EILEEN O'DONOGHUE
Notary Public
State of Colorado
Notary ID # 20164048119
My Commission Expires 12-21-2020

# EXHIBIT 2

https://www.wacotrib.com/news/higher_education/mccaw-baylor-regents-displayed-racism-preferred-misleading-report-on-rape/article_d6017176-142e-582d-a3bd-98c4a8e46e02.html

# McCaw: Baylor regents displayed racism, preferred misleading report on rape scandal

By PHILLIP ERICKSEN pericksen@wacotrib.com Jun 27, 2018

Liberty University Athletics Director Ian McCaw walks among Baylor players after Liberty's win in Waco last season. McCaw was sanctioned and resigned from BU in 2016.

Buy Now

Staff photo — Jerry Larson, file



Autoplay: On | Off

Liberty University Athletics Director Ian McCaw in a deposition said Baylor University undertook "an elaborate plan that essentially scapegoated black football players and the football program for being responsible for what was a decades-long, universitywide sexual assault scandal," according to a motion filed Wednesday in Waco's U.S. District Court.

McCaw said he was "disgusted" by Baylor regents' racism and by a "phony" 13-page document held up by the board as a summary of a nine-month investigation into how Baylor responded to reports of sexual assault. He was questioned June 19 by lawyers representing 10 women who allege Baylor denied them educational opportunities protected by Title IX after they were assaulted. The motion includes excerpts from McCaw's sworn testimony.

McCaw spent 13 years as Baylor's athletics director and accepted the same role at Liberty in November 2016. At the height of the scandal in May 2016, Baylor regents sanctioned McCaw and placed him on probation, and McCaw resigned days later.

McCaw said he resigned because he "did not want to be part of some Enron cover-up scheme," according to Wednesday's motion.

"It's bad for business. ... It's bad for Baylor's brand, bad for admission, bad for tuition revenue," McCaw allegedly said of the board's motivations about the scandal. "And obviously you know Baylor is heavily reliant, it does not have a large

endowment, so it's heavily reliant on tuition revenue. So if there's a dip in admissions, a dip in tuition revenue, that severely affects the university."

In a statement, the university pushed back on the motion and said it plans to file a written response with the court.

"The plaintiffs' counsel have grossly mischaracterized facts to promote a misleading narrative in an effort to deflect attention away from the actual facts of the case pending before the court," the statement said. "Baylor has complied and will continue to comply with all court rules in this case. We will maintain our diligent efforts to keep discovery focused on this specific case while steadfastly protecting the privacy of our students and their records that are uninvolved in this matter. As permitted by the court's rules, Baylor will be filing a written response to the plaintiffs' motion."

"Much of the testimony of Mr. McCaw that is selectively quoted in the motion is based on speculation, hearsay and even media reports," the university added.

McCaw was subpoenaed in January along with two other Liberty employees who formerly worked at Baylor, Deputy Athletics Director Todd Patulski and associate general counsel Ian McRary. Patulski held the same role at Baylor, and McRary was a Title IX investigator.

McCaw also revealed damning testimony surrounding the sexual assault investigation at Baylor from September 2015 to May 2016, which ended when Ken Starr was removed as president and head football coach Art Briles was fired.

McCaw said Pepper Hamilton attorneys told him there would be three potential outcomes to the investigation Baylor hired them to conduct: a "detailed document," a "summary report," or "to whitewash the whole thing." He said it was ultimately decided that Baylor regent J. Cary Gray would write a "false" and "misleading finding of fact skewed to make the football program look bad and cover up the campus-wide failings."

According to the university, Baylor regents, including Gray, were not present during the drafting of the "findings of fact" document released in May 2016. Gray did not return a request for comment Wednesday.

McCaw said former Baylor Police Chief Jim Doak had discouraged reporting of sexual assaults and ignored rape reports, according to the motion. He said former high-level administrator Reagan Ramsower, who also took heavy criticism during the scandal, once said that "if Chief Doak was still here, we wouldn't fire him. We'd have to execute him."

Doak resigned in 2013 and was thrown a retirement party. McCaw's description of Doak's responsibility aligns with that of former interim President David Garland's. In a deposition last year, Garland told the same attorneys that Doak had discouraged rape victims from making the cases.

McCaw said he learned of rape allegations involving Baylor athletes through media reports, and also said a Baylor police dispatcher once put a woman reporting that she had been raped on hold to order himself a meal.

Doak's attorney, David Deaconson, declined to comment.

According to the motion, McCaw charged that labels like "300-pound black football player" were used to deflect from a universitywide sexual assault reporting problem. McCaw's deposition indicates regents, including four-time board chair Richard Willis, sought to deflect attention away from the board and "shaped (the Pepper Hamilton investigation) to accomplish the goals he was seeking."

## Public relations

McCaw told lawyers the public relations firm G.F. Bunting + Co. encouraged him to lie about when athletics department officials learned of an athletics-related rape allegation, the motion states. Bunting said it would be "mutually beneficial" to Baylor and McCaw to give a false account of the situation, according to the motion.

McCaw said company founder Glenn F. Bunting hung up on him after McCaw said he would not agree to the proposal.

In an interview Wednesday, Bunting said McCaw made an untrue claim.

"Mr. McCaw's claims are absurd and a complete fabrication," Bunting said. "Our consistent advice and counsel to the university was to be transparent and to disclose the facts and details of the investigation. We embarked on a proactive strategy through the media to proactively tell the truth about the findings of the Pepper Hamilton report."

Jim Dunnam, a Waco attorney representing the plaintiffs in the lawsuit, said Baylor's response to the motion "is as pathetic and phony as what McCaw himself calls their 'phony' findings and their attempts to cover up for the actions of its regents to conceal sexual assault."

"Baylor could easily allow excerpts of Mr. McCaw's deposition that reveal no private student information but instead Baylor has triggered hiding the whole thing," Dunnam said by email. "A fair release of McCaw's deposition will show that our filing is both true and in context, and it would provide even further testimony of McCaw that Baylor does not want known."

Briles' attorney, Ernest Cannon, told the Associated Press the motion "validates what Art has been trying to say from the first day. Baylor had a campuswide problem. It was not unique to the athletic department. ... Baylor needed two things: a bus and someone to throw under it."

The suit is one of six active Title IX lawsuits Baylor faces. The university has already settled several others. It is also under investigations from the Big 12, the NCAA, the U.S. Department of Education and the Texas Rangers.



Brice Cherry: For Baylor's departed leaders, a #NotMe culture persists



McCaw pushes back on claim that Baylor tried to influence his testimony



**Baylor: McCaw's claims of racism, cover-up 'bizarre, blatantly false'**

McCaw alleges 'smear campaign' against Baylor athletics, more regent misconduct



Discovery debates continue in Baylor Title IX lawsuit

## Phillip Ericksen

Phillip Ericksen joined the Tribune-Herald in March 2015 as a sports copy editor. That November, he joined the news team. He has covered higher education, city hall, politics and crime.

# EXHIBIT 3

8/27/2018 Ex-Baylor AD Ian McCaw: School's Regents Displayed Racism During Rape Scandal | Bleacher Report | Latest News, Videos and Highli...

By using this site, you agree to the Privacy Policy and Terms of Use.

B/R NFL NBA World Football MLB CFB NHL CBB MMA WWE Tennis More

BAYLOR FOOTBALL

# Ex-Baylor AD Ian McCaw: School's Regents Displayed Racism During Rape Scandal

TIMOTHY RAPP
JUNE 27, 2018

*Rod Aydelotte/Associated Press*

Former Baylor athletic director Ian McCaw said in a deposition that the university orchestrated "an elaborate plan that essentially scapegoated black football players and

https://bleacherreport.com/articles/2783220-ex-baylor-ad-ian-mccaw-schools-regents-displayed-racism-during-rape-scandal 1/5

By using this site, you agree to the Privacy Policy and Terms of Use.

McCaw, who resigned from the school in May 2016 after 13 years as athletic director, did so because he "did not want to be part of some Enron cover-up scheme," per a motion filed in the Waco U.S. District Court on Wednesday.

The deposition came as part of a Title IX lawsuit filed against Baylor by 10 women who said they were sexually assaulted while attending the university.

McCaw claimed the school's regents released a "phony" 13-page report of the university's findings after an investigation into sexual assault at the school, adding that Baylor regent J. Cary Gray was tasked with writing a "false" and "misleading finding of fact skewed to make the football program look bad and cover up the campus-wide failings."

Baylor responded to McCaw's statements, per David Smoak of ESPN:

*"The plaintiffs' counsel have grossly mischaracterized facts to promote a misleading narrative in an effort to deflect attention away from the actual facts of the case pending before the court. Baylor has compiled and will continue to simply with all court rules in this case. We will maintain our diligent efforts to keep discovery focused on this specific case while steadfastly protecting the privacy of our students and their records that are uninvolved in this matter. As permitted by the court's rules, Baylor will be filing a written response to the Plaintiffs' motion. Much of the testimony of Mr. McCaw that is selectively quoted in the motion is based on speculation, hearsay and even media reports."*

The university ultimately fired head football coach Art Briles and president Ken Starr amid the scandal, in which it was discovered by Philadelphia law firm Pepper Hamilton that administrators "directly discouraged" women from reporting instances of sexual

By using this site, you agree to the Privacy Policy and Terms of Use.

The Pepper Hamilton report added:

*"In certain instances, including reports of a sexual assault by multiple football players, athletics and football personnel affirmatively chose not to report sexual violence and dating violence to an appropriate administrator outside of athletics. In those instances, football coaches or staff met directly with a complainant and/or parent of a complainant and did not report the misconduct."*

But McCaw said former Baylor Police Chief Jim Doak discouraged and ignored reports of rape during his time at the school, adding that "a Baylor police dispatcher once put a woman reporting that she had been raped on hold to order himself a meal," according to Ericksen.

McCaw noted that the cover-up was orchestrated to avoid negative PR.

"It's bad for business... It's bad for Baylor's brand, bad for admission, bad for tuition revenue," he said. "And obviously you know Baylor is heavily reliant—it does not have a large endowment, so it's heavily reliant on tuition revenue. So if there's a dip in admissions, a dip in tuition revenue, that severely affects the university."

McCaw has claimed he found out about the sexual assault allegations through the media, though a civil suit against the school and the Pepper Hamilton report contradict those statements, per a report from Andy Staples of SI.com in May 2017:

*"According to the newest suit, [McCaw] was alerted to the gang rape allegation in 2013, about a year after the incident that prompted it. According to filing by members of Baylor's board of regents in response to a suit filed by one of the staffers fired in the wake of the scandal, the investigation by law firm Pepper Hamilton found that McCaw claimed to Baylor's Title IX coordinator in 2015 that he hadn't been alerted to any accusations of gang rapes by football players.*

8/27/2018 Ex-Baylor AD Ian McCaw: School's Regents Displayed Racism During Rape Scandal | Bleacher Report | Latest News, Videos and Highli...

By using this site, you agree to the Privacy Policy and Terms of Use.

*Baylor football player accused of assaulting and threatening a non-athlete in a different case."*

COMMENTS

## Sponsored Content

**Only 1 in 10 Americans Can Name All These 1980s Icons**
*@TopixStars*

**Photos Show Why She Caused A Huge Line At Walmart**
*Offbeat*

**[Gallery] Michael Oher Tells A Whole Different Story About 'The Blind Side'**
*Ice Pop*

**[Pics] 20 NFL Stars Who Practically Live At The Gym**
*The Sports Drop*

https://bleacherreport.com/articles/2783220-ex-baylor-ad-ian-mccaw-schools-regents-displayed-racism-during-rape-scandal 4/5

Case 6:16-cv-00173-RP Document 503 Filed 08/28/18 Page 30 of 34

CBSSPORTS.COM 247SPORTS MAXPREPS SCOUT SPORTSLINE SHOP GOLFBOOK STUBHUB

NCAA FB

HOME SCORES SCHEDULE STANDINGS RANKINGS ...

LOG IN

SHEIN

SHOP NOW

# Ex-Baylor AD Ian McCaw takes aim at Board of Regents in scathing deposition

McCaw said in a deposition that Baylor's regents 'scapegoated black football players'

by Ben Kercheval @BenKercheval Jun 27, 2018 • 2 min read

USATSI

If you get creative with apps
You Chromebook
Get Info

2018 College Football Schedules

Check out the 2018 college football schedules for every team.

Ian McCaw is no longer the athletic director at Baylor, meaning he has no qualms about going scorched earth on his former employer.

The *Waco Tribune* reports that McCaw, now the AD at Liberty, gave a sworn testimony in June to attorneys representing 10 alleged victims from Baylor's sexual assault scandal. In his deposition, McCaw spoke harshly of the schools regents, accusing them of racism and an "Enron cover-up scheme."

The eye-popping statement from McCaw is that Baylor had "an elaborate plan that essentially scapegoated black football players and the football program for being responsible for what was a decades-long, university-wide sexual assault scandal."

McCaw said he was "disgusted" by the racism, as well as the Board of Regents' Findings of Fact following the release of the Pepper Hamilton findings. In particular, he claims regent J. Cary Gray was tasked with writing it in such a way that it was "skewed to make the football program look bad and cover up the campus-wide failings."

However, McCaw did not stop at the Board of Regents. The equally damning accusation from the deposition is that former Baylor Police Chief Jim Doak,

who retired in 2013, discouraged the reporting of sexual assaults and/or otherwise ignored rape accusations.

Ad

Parents Tribune

17 Makeup Routines All Women Over 50 Should Know That Will Knock Years Off Your Look

Baylor has since released a statement to the *Tribune* rebuking what it calls a mischaracterization of the facts of the case.

> The plaintiffs' counsel have grossly mischaracterized facts to promote a misleading narrative in an effort to deflect attention away from the actual facts of the case pending before the court. Baylor has complied and will continue to comply with all court rules in this case. We will maintain our diligent efforts to keep discovery focused on this specific case while steadfastly protecting the privacy of our students and their records that are uninvolved in this matter. As permitted by the court's rules, Baylor will be filing a written response to the plaintiffs' motion.

McCaw was placed on probation in May 2016 and quickly resigned at the height of the scandal. University president Ken Starr was reassigned and eventually resigned. Coach Art Briles was suspended and later terminated.

It's not surprising that McCaw's deposition would make him sound like a saint by comparison. If McCaw is to be believed, Baylor was pushing a school-wide cover up and he wanted no part of it, going so far as to tell lawyers that he was instructed to lie about who knew what by public relations firm G.F. Bunting.

Still, the words from any higher ups now feel hollow. Baylor is in this position in the first place – under a microscope from the NCAA and up to its eyeballs in lawsuits -- because it takes a lot of people to screw up this badly. But it only takes one person to blow a whistle.

CBS SPORTS
HQ
DAILY
CBS Sports HQ Daily Newsletter
Get the best highlights and stories - yeah, just the good stuff handpicked by our team to start your day.
Email Address
Sign Up
I agree that CBS Sports can send me the "CBS Sports HQ Daily Newsletter" newsletter.
See All Newsletters

 



Getty Images

# More bombshell allegations, these made by ex-AD, dropped on Baylor

By John Taylor | Jun 27, 2018, 2:58 PM EDT

205

6 Comments

Even as Baylor **sees light at the end of the NCAA investigative tunnel**, the university is bracing itself for yet another wave of negative headlines.

According to multiple media outlets in the area, former Baylor athletic director **Ian McCaw** was deposed earlier this month by lawyers representing nearly a dozen women who have filed a lawsuit against the university. In the deposition, McCaw, now the athletic director at Liberty University, claims that university officials had engaged in "an elaborate plan that essentially scapegoated black football players and the football program for being responsible for what was a decades-long, university-wide sexual assault scandal," the ***Waco Tribune*** wrote.

McCaw **resigned as BU's athletic director** in May of 2016, in the midst of the **sexual assault scandal** that rocked both the Bears football program specifically and the university in general. It was further claimed in the deposition by McCaw that his resignation was triggered by his "[disgust]... with the regents, the racism, the phony finding of fact" and "[not wanting] to be part of some Enron coverup scheme." The resignation came despite the fact that he was urged by university officials to remain at his post, McCaw further claimed.

McCaw's deposition was part of a motion filed Wednesday in connection to the women's lawsuit, which alleges in part that BU "denied them education opportunities protected by Title IX after they were assaulted" both physically and sexually by, some of the plaintiffs allege, football players. McCaw claimed that the university actively engaged in a conspiracy to scapegoat the athletic department, and the football program in particular, to cover up what he represented as a school-wide problem

From ***KWTX-TV***:

> ***"McCaw expressed disgust at the coordinated effort to conceal the University-wide failures by instead focusing exclusively on African-Americans... with racially charged labels like '300-pound black football player' being freely thrown around to the exclusion of other instances of University-wide misconduct," the motion says."***

In late January of 2017, damning details in one of the handful of the lawsuits facing the university emerged, with that suit alleging that 31 Bears football players had committed 52 acts of rape over a period of four years beginning in 2011.

Not long after, a legal filing connected to the libel lawsuit filed by a former BU football staffer produced emails and text messages that paint a picture of former head coach **Art Briles** and/or his assistants as unrestrained rogue elements concerned with nothing more than the image of the football program off the field and its performance on it. The details in a damning document dump included allegations that Briles attempted to circumvent BU's "judicial affairs folks" when it came to one player's arrest... and on Briles asking, in response to one of his players brandishing a gun on a female, "she reporting [it] to authorities?"... and asking "she a stripper?" when told one of his players expected a little something extra from a female masseuse... and stating in a text "we need to know who [the] supervisor is and get him to alert us first" in response to a player who was arrested on a drug charge because the apartment superintendent called the police.

In reference to a woman who alleged she was gang-raped by several Bears football players, Briles allegedly responded, "those are some bad dudes. Why was she around those guys?"

In this latest deposition, McCaw alleged that the Baylor Police Department, its former chief in particular, ignored reports of rape. Additionally, McCaw levied damning claims at attorneys for Pepper Hamilton, the law firm retained to conduct an "independent" investigation into the sexual assault allegations.

From *the Tribune*'s report:

> *"McCaw said Pepper Hamilton attorneys told him there would be three potential outcomes to their report: a "detailed document," a "summary report," or "to whitewash the whole thing." He said it was ultimately decided that Baylor regent J. Cary Gray would write a "false" and "misleading finding of fact skewed to make the football program look bad and cover up the campus-wide failings."*
>
> *McCaw said former Baylor Police Chief Jim Doak had discouraged reporting of sexual assaults and ignored rape reports, according to the motion. He said former high-level administrator Reagan Ramsower, who also took heavy criticism during the scandal, once said that "if Chief Doak was still here, we wouldn't fire him. We'd have to execute him.*
>
> ...
>
> *McCaw said he learned of rape allegations involving Baylor athletes through media reports, and also testified that a Baylor police dispatcher once put a woman reporting that she had been raped on hold to order himself a meal."*

In response to McCaw's explosive allegations, Baylor released a statement in which the university attempted to downplay their former athletic director's claims.

"The plaintiffs' counsel have grossly mischaracterized facts to promote a misleading narrative in an effort to deflect attention away from the actual facts of the case pending before the court," the statement began. "Baylor has complied and will continue to comply with all court rules in this case. We will maintain our diligent efforts to keep discovery focused on this specific case while steadfastly protecting the privacy of our students and their records that are uninvolved in this matter. As permitted by the court's rules, Baylor will be filing a written response to the Plaintiffs' motion."

"Much of the testimony of Mr. McCaw that is selectively quoted in the motion is based on speculation, hearsay and even media reports."

Sports WATCH NFL NHL NBA MLB SOCCER NASCAR MOTORS GOLF OLY NCAA FB
FOLLOW US NBC Sports Social Directory GET NEWSLETTERS & ALE
SIGN UP

©2018 NBC Universal

Ad Choices | Advertise | Independent Programming Report | Privacy Policy | Sports Jobs | NBC Sports Terms of Use |
NBC Sports Gold Terms of Service | Live FAQ

Powered by WordPress.com VIP