**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION**

| | | |
|---|---|---|
| **JANE DOE 1, JANE DOE 2,** | § | |
| **JANE DOE 3, JANE DOE 4,** | § | |
| **JANE DOE 5, JANE DOE 6,** | § | |
| **JANE DOE 7, JANE DOE 8,** | § | |
| **JANE DOE 9, and JANE DOE 10** | § | |
| *Plaintiffs,* | § | |
| | § | |
| **vs.** | § | **Cause No. 6:16-cv-173-RP** |
| | § | **JURY TRIAL DEMANDED** |
| **BAYLOR UNIVERSITY** | § | |
| *Defendant.* | § | |

**PLAINTIFFS' RESPONSE TO
BAYLOR UNIVERSITY'S MOTION FOR PROTECTIVE ORDER
RELATING TO SUBPOENA TO NON-PARTY G.F. BUNTING + CO. (ECF 705)**

TO THE HONORABLE JUDGE PITMAN:

COME NOW PLAINTIFFS and file this Response to Baylor University's untimely Motion for Protective Order Relating to Subpoena to Non-party G.F. Bunting + CO. In support thereof, Plaintiffs would show the Court as follows:

**INTRODUCTION**

The Court should deny the requested Protective Order. As shown below, Baylor again follows a well-established playbook - work behind the scenes to obstruct production with a third-party subpoena recipient (who is represented by Baylor-aligned counsel)[1], hold back on timely making Baylor's objections, have Baylor or the third-party seek extensions of the relevant deadlines (something that Plaintiffs attempt to accommodate), and then have both Baylor and the third-party spring wholesale objections at the third-party's deadline for compliance. This latest motion comes as the parties are hopefully emerging from the Pepper Hamilton ("PH") quagmire, yet unfortunately, the

---

[1] Bunting is now represented by the law firm of Rusty Hardin, whose involvement in multiple areas in this matter advocating for Baylor and its Regents is well documented. See ECF 93-5

sanctions levied on PH have neither ceased Baylor's discovery obstruction nor informed the third-party subpoena recipients under Baylor's direction.[2]  The Court should deny Baylor's last-minute effort to assert untimely objections and should order Bunting to comply with the subpoena without delay.

## Background on G.F. Bunting + Co.

Bunting is a PR firm, including former journalists, who help the powerful in their efforts to smear reporters of sexual assault. Here is how Bunting's own website describes their Title IX work:[3]

> As veteran journalists with decades of experience, including covering higher education in California and around the nation, we specialize in helping academic institutions deal with hostile media inquiries while showcasing their improvements and strengths in investigating sexual assaults under Title IX. Whether it is for a small liberal arts college or a Division I university football powerhouse, we fashion creative responses that tell the college's story without violating the Family Educational Rights and Privacy Act. Our forte is working on background with journalists to educate them about such matters as the client's internal Title IX proceedings; victim-centered approaches to sexual assault and the complexities of high-profile cases. We also serve as forceful advocates for getting unfair or erroneous Title IX stories corrected.[4]

This carefully worded description of Bunting's values obscures, but nevertheless communicates, their specialized strategy. In short, one of Bunting's strategies has been to attack and tarnish victims of sexual assault in the media. Other overviews of the strategies of Bunting are readily found.[5] The fact that Bunting has historically been brought in by universities to cover up for assailants and those institutions who protect them was known, and even touted, to the Baylor Regents before they were hired by Baylor.[6] An example of just some of Bunting's purported assault clients are:

---

[2] Virtually every law firm Baylor is paying to obstruct the third-party subpoenas of current or former Baylor employees have still taken no action since the many Court orders of late.

[3] Bunting made revisions to its website after Plaintiffs published this excerpt to the Court in a Motion to Enforce filed October 12, 2016.  See ECF 44.

[4] http://www.gfbunting.com/when/titleIX (accessed September 12, 2019).

[5]  http://www.huffingtonpost.com/mary-wald/sexual-assault-this-is-ho_b_8814968.html  (accessed September 12, 2019).

[6] E.g. Exhibit A - 10/6/2016 Email from Karen E Kemp to Baylor President David Garland re Bunting and FSU.

1)  a preschool worker under fire after a two-year old's feet and legs were tied together for failing to nap;[7]
2)  a former corporate CEO accused of sexual harassment;[8]
3)  Occidental College for allegations it under-reported sexual assault reports to the federal government (including digging up dirt of personal relationships of a Los Angeles Times reporter);[9] and
4)  Florida State University when it was facing criticism for its campus sexual assaults.[10]

The Court will recall that Bunting was hired by Baylor when its global public relations firm, Ketchum, suddenly quit. In resigning, Ketchum told Baylor "...in good conscience we can no longer be effective on your behalf. We do not feel like we have been provided full information on a timely basis. We also have concerns about the resolve and accountability required to make meaningful and important changes in athletics."[11] Fundamentally, Ketchum, founded in 1923, refused to go along with how Baylor wanted to address, or rather mislead, the public regarding decades of Title IX/Clery Act violations and gender-based discrimination. So, Baylor turned to a PR firm that was well-versed in "the black arts of crisis communications."[12]

Baylor Regent Mark Hurd, who was within the small group of Regents dealing with PH, suggested that Baylor hire Bunting, his personal publicist.[13] Bunting had helped Hurd through his

---

[7]   http://patch.com/california/pleasanton/2-year-old-tie-up-at-centerpointe-preschool   (accessed September 12, 2019).
[8]   http://www.businessinsider.com/mark-hurd-jodie-fisher-hp-2011-12(accessed   September   12, 2019).
[9] https://www.washingtonpost.com/blogs/erik-wemple/wp/2014/03/18/los-angeles-times-and-its-fired-investigative-reporter-a-critical-look/?utm_term=.24215fd3f183 (accessed September 12, 2019).
[10]   http://www.hollywoodreporter.com/news/cnn-defends-campus-rape-movie-841413   (accessed September 12, 2019).
[11] Exhibit B – 10/4/2016 Email from Ketchum to Baylor.  It is interesting that even *after* Baylor announced the firing of Briles, Ketchum knew there were not sufficient "meaningful and important changes in athletics."
[12] https://fortune.com/2015/06/08/redemption-of-mark-hurd-oracle/
[13] *Id.*; ECF 483, McCaw Deposition 124:11-20

personal scandal involving sex and dishonesty going back to his days at Hewlett Packard,[14] during which time Hurd remained unimpeded in his leadership position as a Baylor Regent.

Retained in October 2016, Bunting immediately got to work. In the first 6 months, Bunting billed Baylor $1.23 million. During this time, Baylor rolled out its efforts to trash some Plaintiffs, an issue for which Plaintiffs sought protection from the Court.[15] Baylor also went on the attack against Patty Crawford and doubled down on attacks on football, ignoring non-athletic assaults and others responsible. Bunting helped Baylor Regents and Reagan Ramsower in their interviews on 60 Minutes Sports (Bunting himself can even be seen on camera and Bunting's relationship with 60 Minutes was noted by David Garland to Regents).[16] Bunting's participation in both Hardin's answer in the *Schillinglaw* litigation and in Hardin's February 7, 2017 editorial in the Houston Chronicle asking for Baylor to "receive credit, not sanctions"[17] will be noteworthy.

In short, while Baylor was trying to take credit for the PH investigation, and at the same time denying the existence of an actual PH report (a report PH's lawyer acknowledged in open Court this summer existed and which includes hyperlinks to evidence such as recordings and witness videos), Bunting undertook a strategy that Ketchum refused – re-direct all blame onto athletics, cover for Regents and Senior Administrators, and go on the offensive against victims. Discovery will further reveal Bunting's involvement throughout Baylor's cover-up and attempts to mislead the public about transparency and enactment of legitimate reforms.

Buntings' materials are highly relevant to the earnestness of Baylor's protestations of reform as well as multiple other issues in this case. Baylor's defense of meaningful reform is relevant to all

---

[14]       E.g.          https://www.businessinsider.com/mark-hurd-jodie-fisher-hp-2011-12; https://spinsucks.com/communication/public-relations-how-mark-hurds-online-reputation-changed/  (accessed September 12, 2019).
[15] ECF 44
[16] Exhibit B – 10/05/2016 6:26:50 PM. Email from Garland to Murff.
[17]       https://www.houstonchronicle.com/opinion/outlook/article/Hardin-For-actions-Baylor-deserves-credit-not-10915879.php (accessed September 12, 2019).

claims. If Baylor was willing to pay hundreds of thousands of dollars each month for a consultant to attack assault victims and do things Ketchum would not do, the jury could reasonably conclude that Baylor had and has intentional policies of sex discrimination that violate Title IX. At a minimum, the jury could conclude that Baylor was "deliberately indifferent" to Plaintiffs' reports of assault. Certainly, the jury could conclude that Baylor was deliberately indifferent to Doe 11's's reported assault which occurred *after* Bunting's work began. What all did Baylor provide to Bunting as it sought to block and tackle the media and the public? Was Bunting given information on assault victims while Baylor used FERPA as a shield as its defense against these Plaintiffs? What are the communications prior to and during Bunting's work regarding doing what Ketchum would not?

There is no question that Bunting was hired to avoid meaningful Title IX compliance and to mislead. David Garland told a Regent, "Bunting will take quite a different approach. I have received compliments for our more aggressive tack yesterday in our announcement."[18] These decisions and others in the record, demonstrate that Regents decided to pull back from the transparency and reform plan for which Ketchum was advocating and instead retrench into old ways and retaliate against reporters of sexual assault. Another example is the testimony of Ian McCaw, who described his interactions with Hurd and Bunting as follows:

> Mark Hurd called me one day and said that Glenn Bunting is a friend of his, and he had helped him through his relationship crisis at HP when he resigned there, and said he was a good guy, and asked if I would speak to him by phone.  He thought he could come up with something that would be mutually beneficial for Baylor and for me . . . Mr. Bunting called me . . . I'm going to say it was approximately October of 2016 . . . So Mr. Bunting called and said I think we can do something that'll benefit both of us.  If you admit that you didn't report the volleyball incident, we will admit that we didn't have anything in place in terms of a Title IX office, education or training or reporting. And he thought that that would be something that would be a win, he proposed a win-win outcome. . . I said that's not true . . . so I'm not going to agree to what he proposed, and he hung up on me."[19]

---

[18] Exhibit B – 10/05/2016 6:26:50 PM Email from Garland to Murff.
[19] ECF 483, McCaw Deposition at 180:16—182:2

This is the tip of the iceberg in Bunting's involvement with Baylor.  One would presume Ketchum was unwilling to falsify information that Hurd and Bunting felt would be a "win-win."

## Procedural History

On July 25, 2018, Plaintiffs served notice on Baylor of the subpoena to Bunting.[20] No response of any kind was made by Baylor for the next year. By mid-August 2018, Plaintiffs had made more than a dozen service attempts on Bunting.[21] During these exact same weeks, Plaintiffs and Baylor were busy filing briefing with the Court on the Ketchum materials.[22] Also during this time, Baylor was paying law firms around the state to fight nearly every third-party subpoena. Realizing that the legal issues the Court was considering with respect to Ketchum were the same as for Bunting, and knowing the subject matter requested was virtually the same, Plaintiffs elected not to docket yet another motion until the Court ruled on the Ketchum issues.

Early in discovery Plaintiffs' sought information from Ketchum regarding its work with Baylor, as well as that of Bunting.[23] Bunting was even part of a Protective Order request by Plaintiffs on October 12, 2016.[24] After Baylor filed its Ketchum motion, those issues were heavily briefed.[25] In October 2018, the Court found that "Communications with public relations firms related to anticipated or pending litigation" was a topic properly within the scope of discovery.[26] On April 16,

---

[20] Exhibit C; ECF 442.

[21] Exhibit D.  Baylor asserts in its Motion that Plaintiffs had the wrong address.  ECF 705 at ¶ 3. This assertion ignores that Plaintiffs, as shown by the service affidavit, tried the address on the Bunting website and addresses found by the process server on Mr. Bunting.  Baylor ignores that it did nothing to inform Plaintiffs of this supposedly wrong address.  Indeed, even as of now, Baylor has yet to identify Bunting in its disclosures where it plainly was required to provide an address.  *See* Fed. R. Civ. P. 26(a)(1)(A)(i).

[22] ECF 426, 434, and 447.

[23] The Court should note that discovery requests to Baylor request Bunting-related materials in Baylor's possession. E.g. see Requests No. 26, 27, 32, 33, 34, 35, 37, 40, 51, 52, and 57 in Plaintiffs' first RFPs to Baylor alone. These RFPs are part of the Court's rulings and not included among those still disputed in recent Court filings. Despite this, Baylor's responses are entirely lacking.

[24] ECF 44.

[25] ECF 182, 188, 250, 256, 264, 426, 434, 447.

[26] ECF 565

2019, the Court issued its first ruling compelling the Ketchum materials Baylor had claimed as privileged to be produced, with a May 7, 2019 deadline for production.[27] As with now, and consistent with its practice to sit on its objections until the last minute, Baylor filed for reconsideration of the Ketchum order on May 3rd, calling it a "clarification."[28] Then on June 17th, counsel appeared before the Court, and Baylor began a new strategy of blaming its Houston law firm and extolling how its Austin law firm, years into the case, was new and would begin to turn over a new leaf regarding discovery obstruction. A week later, the Court dispatched the Ketchum "clarification" motion.[29]

With the Ketchum rulings concluded, the next day, Mr. Dunn emailed Ms. Springer, Ms. Brown and Mr. Weisbart to inquire about the Bunting subpoena. In light of the unexplained difficulty of serving Bunting, Plaintiffs asked Baylor to arrange a location for the subpoena to be served.[30] In response, Ms. Springer inquired about the extent of the service efforts and Plaintiffs provided the service affidavit showing the multiple attempts. Counsel further discussed this issue in one of their many attorney conferences. On June 27th, Baylor informed Plaintiffs that Rusty Hardin and Lara Hollingsworth would "be representing Bunting in connection with the subpoena you issued," but no commitment on accepting service issue was provided.[31] At this point, Mr. Hardin had been counsel of record for Baylor Regents in the *Schillinglaw* matter, his editorial in the Houston Chronicle referenced above and had even been identified since April 2017 in Plaintiffs' Initial Disclosures as a material witness. Nevertheless, Plaintiffs made contact with him to discuss the subpoena. Just as it had not done in the previous year, not once did Baylor let on that it had objections to the Bunting subpoena.

---

[27] ECF 616
[28] ECF 628.
[29] ECF 671.
[30] Exhibit E.
[31] *Id.*

Conferring with Mr. Hardin and Ms. Hollingsworth, Plaintiffs agreed to several extensions of the performance deadline to facilitate Mr. Hardin's vacation. Upon his return, Plaintiffs allowed even more time to handle the request. Given the representations by Baylor at the recent hearings, the lack of a timely objection by Baylor, and Mr. Hardin's representations on the first telephone conferences that Bunting was preparing the documents and fully planned to produce them, Plaintiffs believed meaningful production was on its way. In fact, in one conference Mr. Hardin even brought up the PH orders in giving assurance that Bunting would comply, saying "we don't have a death wish."

But by July 31st, the cooperation rhetoric changed when Ms. Hollingsworth sent an extensive email that appeared to begin erecting obstacles.[32] For one, the email claimed counsel had discussed things they hadn't on their recent call. The email also stated that Plaintiffs had not provided the subpoena to Mr. Hardin's office, despite a transmittal email from Mr. Dunnam on June 27th.[33] Evidently, the supposed issue of not having a copy of the subpoena was that Hardin's office did not have the *AO 88B subpoena form* that went with the request for documents, so Plaintiffs sent the form to Hardin on July 29th. The Court will recall that this "we don't have the cover sheet" was the excuse Baylor lodged when attempting to block the deposition of Gabriella Lyons back in October 31, 2017, and excuse this Court rejected.[34] But Hollingsworth's July 31st email also requested, for the first time, that Plaintiffs *re-issue the Bunting subpoena* to supposedly correct typos. Given all the water under the bridge with this subpoena and given the fact the subpoena was valid as is, Plaintiffs refused to re-issue it. Since Bunting's counsel had waited almost a month from when they agreed to accept service to bring up this issue, it was clear that the excuses for delay would keep coming. In retrospect, it seems plain now that the request to reissue the subpoena was designed to allow Baylor a chance to lodge the objections it had waived by ignoring the subpoena for a year. In any event, Plaintiffs waited until the

---

[32] Exhibit F.
[33] Exhibit G.
[34] See ECF 224, 225 and 228.

agreed subpoena deadline of September 5, 2019 to see what Bunting would actually do before bringing these issues before the Court.

Then on September 4th, the day before Bunting was to hand over its materials, Baylor's Houston counsel sent an email to confer on the Bunting subpoena – almost 13 months after Baylor's deadline to file objections to that subpoena.[35] Although neither Mr. Weisbart nor counsel for Bunting were copied by Ms. Brown, Plaintiffs' counsel called Mr. Weisbart that same day as he'd instructed be done on disputes. An extensive phone conference revealed that an agreement on Baylor's filing late objections to the Bunting subpoena would not be reached. The next day, Bunting responded to the subpoena with 175 pages of materials, primarily the contract and billing records for work performed, but no documents showing communications or work actually performed. Instead, Bunting lodged numerous global objections plus cookie-cutter objections *to every separate request*.[36] That Bunting, like PH, will avoid meaningful production at Baylor's insistence – and this months after feigning cooperation and Plaintiffs having given Bunting 4 extra weeks to comply as good faith accommodation – is now before the Court.[37] Same playbook and déjà vu all over again . . .

### The Court Should Overrule Baylor's Untimely Objections

The Court should overrule Baylor's objections for multiple reasons. First, the objections are untimely, and Baylor's discovery conduct to date fully justifies the Court overruling these objections. The materials are also responsive to written requests to Baylor upon which this Court has already issued rulings.[38] Baylor, even at this late stage, has not arranged to log or inventory the materials responsive to the Bunting subpoena it now claims as privileged, itself another reason to deny the protective order. Even had Baylor been diligent in protecting these materials – materials Baylor has

---

[35] Exhibit H.

[36] Exhibit I.

[37] Plaintiffs are currently attempting to arrange a conference with Bunting on its objections prior to filing any motion, for which optimism is difficult to come by.

[38] See FN 23.

had over a year to prepare for – the Court has already ruled regarding Ketchum on the applicability of the privileges and objections Baylor again claims.

"It is well settled that, to be timely, a motion to quash a subpoena must be made prior to the return date of the subpoena."[39] Motions to quash under Rule 45(d)(3)(A)(iii), such as this, are required to be filed in a "timely" fashion, which courts have read to mean before the compliance date designated in the subpoena.[40] Without question, "[A]s a general rule, when a party fails to object timely to interrogatories, production requests, or other discovery efforts, objections thereto are waived."[41]

The performance date under the subpoena was August 15, 2018. Baylor received at least two notices of this subpoena on July 25th, one by ECF and one directly from Plaintiffs' counsel. Unless Baylor was working with Bunting to avoid service, Baylor would have had no way to know that Bunting would not be producing documents on or before August 15, 2018. Baylor apparently saw no reason to object to the subpoena, for it lodged no objections by Baylor's deadline. The alternative is that Baylor was working with Bunting behind the scenes to avoid service, otherwise for all Baylor knew, Plaintiffs had received full production under the subpoena back in August of 2018.

---

[39] *Estate of Ungar v. Palestinian Authority*, 451 F.Supp.2d 607, 610 (S.D.N.Y. 2006).

[40] *See, e.g., United States ex rel. Pogue v. Diabetes Treatment Ctrs. of Am., Inc.*, 238 F. Supp. 2d 270, 278 (D.D.C. 2002) *cited for other reasons: In re Clients and Former Clients of Baron & Budd, P.C.*, 478 F.3d 67, 671 (5th Cir. 2007). *See also, MetroPCS v. Thomas,* 327 F.R.D. 600, 615 (N.D. Tex. 2018); *In re Ex Parte Application of Grupo Mexico SAB de CV for an Order to Obtain Discovery for Use in a Foreign Proceeding*, 2015 WL 12916415 (N.D. Tex. 2015); *N. Am. Co. for Life & Health Ins. v. Philpot, No.* 08CV270-BEN(NLS), 2010 U.S. Dist. LEXIS 124577, at *6-7 (S.D. Cal. Nov. 24, 2010); *Anderson v. Abercrombie & Fitch Stores, Inc.,* No. 06CV991-WQH(BLM), 2007 U.S. Dist. LEXIS 47795, at *26 (S.D. Cal. July 2, 2007);

[41] *In re United States*, 864 F.2d 1153, 1156 (5th Cir. 1989). The baseline rule is that Baylor's objections are overruled due to being untimely should not be excused. "However, in unusual circumstances and for good cause ... the failure to act timely will not bar consideration of objections." *In re Denture Cream Products Liability Litigation*, 292 F.R.D. 120, 124 (D.D.C. 2013) (internal quotations and citation omitted). "Unusual circumstances" exist when "(1) the subpoena is overbroad on its face and exceeds the bounds of fair discovery; ... (2) the subpoenaed witness is a nonparty acting in good faith; ... and (3) counsel for witness and counsel for subpoenaing party were in contact concerning the witness' compliance prior to the time the witness challenged [the] legal basis for the subpoena." *Id.* (alterations in original) (citation omitted). Baylor can meet none of these elements in this case.

After the Court ruled on Ketchum and Plaintiffs approached Baylor's counsel to work out the subpoena service issues, Baylor also did not raise objections to the subpoena. When Plaintiffs' counsel was referred to Mr. Hardin and Ms. Hollingsworth as counsel for Bunting, Baylor again did not raise any objections. After Bunting agreed to one subpoena deadline, Baylor again did not lodge any objection, electing instead to wait until the last possible day before Bunting's extended deadline to request conference about a motion for protection concerning Bunting.  The Court should have no trouble finding a waiver under these facts.

Even had Baylor filed timely objections, the Court has ruled on these matters. Although Baylor analogizes to the accountant-client privilege adopted by some courts, the Fifth Circuit "does not recognize an accountant/client privilege." *United States v. Richardson*, 106 F.3d 396 (5th Cir. 1997). Seeing no legal basis to extend the privilege to Baylor's communications with a PR firm, the Court proceeds with the traditional analysis for attorney-client privilege and work product privilege."[42] The Court has reviewed Ketchum documents that Baylor had submitted *in camera* and found them to not be protected.[43] There is no reason to believe now that Baylor's logging of its replacement third-party PR firm's document production will result in any smaller number of incorrectly withheld documents.

## CONCLUSION

For the foregoing reasons, the Court should deny the Motion for Protective Order.

Respectfully submitted,

  /s/ Chad W. Dunn
**BRAZIL & DUNN, L.L.P.**
Chad W. Dunn
State Bar No. 24036507
K. Scott Brazil
State Bar No. 02934050
3303 Northland Drive, Suite 205
Austin, Texas 78731
Telephone: (512) 717-9822

---

[42] ECF 616 at p. 5 (citation omitted).
[43] *Id.*

Facsimile: (512) 515-9355
chad@brazilanddunn.com

**AND**

**DUNNAM & DUNNAM, L.L.P.**
Jim Dunnam
State Bar No. 06258010
4125 West Waco Drive
Waco, Texas 76710
Telephone: (254) 753-6437
Facsimile: (254) 753-7434
jimdunnam@dunnamlaw.com

ATTORNEYS FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the above and foregoing has been filed by ECF and sent to counsel of record via electronic notification on September 12, 2019.

/s/Chad W. Dunn
CHAD W. DUNN