**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

| | | |
|---|---|---|
| **JANE DOE 1, ET AL.** | § | **6:16-CV-173-RP-AWA** |
| | § | |
| **v.** | § | *Consolidated with* |
| | § | **6:17-CV-228-RP-AWA** |
| **BAYLOR UNIVERSITY** | § | **6:17-CV-236-RP-AWA** |

## <u>ORDER</u>

Before the Court is Plaintiffs' Motion to Compel Pepper Hamilton Work Product. Dkt. 795. In what is the latest battle in the war over Pepper Hamilton's work product, Plaintiffs ask the Court to compel Baylor to produce all work product materials relating to the Pepper Hamilton investigation and implementation of reforms. They argue that by putting that work product at issue in this litigation, Baylor has waived the material's protection from discovery. Baylor disputes it has done any such thing (Dkt. 805), and has filed a Motion for Leave to Amend its Answer in *Jane Doe 11* to remove any explicit reference to Pepper Hamilton. Dkt. 815. The parties filed responsive briefing, and the Court held a hearing on the motions on May 5, 2020. Dkt. 837.[1]

### I.  BACKGROUND

**A.   Pepper Hamilton's Work for Baylor**

The Baylor University Board of Regents engaged the Pennsylvania law firm Pepper Hamilton LLP in August 2015, "to conduct an independent and external review of Baylor University's institutional responses to Title IX and related compliance issues through the lense of specific cases."

---

[1]  In setting the hearing, the Court directed Baylor to demonstrate how it would present its defense at trial "in a fashion that is both factually sincere and fair to the Plaintiffs' right to question and respond to this defense." Dkt. 823. In addition to its statements at the hearing, Baylor submitted a list of the witnesses it would call at trial on the topic of the investigation and reforms (Baylor's Ex. 1, Dkt. 835), and after the hearing Plaintiffs filed an excerpt from the deposition of Regent William K. Robbins, Jr. (Pls.' Ex. 1, Dkt. 833).

Dkt. 93-1 at 2-3 (Engagement Letter).[2]  The engagement letter said nothing about Pepper Hamilton bring hired in relation to any litigation, anticipated or actual.  Five months later, however, Baylor and Pepper Hamilton amended their agreement to state specifically that "[i]t is the shared understanding of Baylor University and Pepper that all material prepared and communications made by Baylor University, Pepper, and their representatives in the course of the review are in anticipation of litigation and are privileged work product."  Dkt. 93-2 (Addendum).  Based on this, as well as on declarations of Baylor's general counsel and members of the Board of Regents, the Court concluded in 2017 that Baylor retained Pepper Hamilton to conduct its investigation in anticipation of litigation. Dkt. 168 at 15-16.

The investigation was extremely detailed, covering Baylor's Title IX practices and compliance during the three academic years immediately prior to the firm's hiring.  The investigation was led by two Pepper Hamilton partners, Leslie Gomez and Gina Maisto Smith.  Leslie Gomez described their investigative approach as follows:

> One of the things that was critically important in our investigation is that it be extremely document intensive, document focused; and that was part of our reason for identified employee PST files from records custodians and pulling the cell phone records from particular records custodians, and that's where that very large terabyte number comes from.

> In terms of the preparation for our work, prior to every interview . . . we, of course, created investigative chronologies, interview memos for interviewing witnesses, and then the context of that document in our interviews.

> We necessarily view an investigation as iterative, that you don't understand all of the places it may go at the outset and so there was a continual refinement process.

---

[2]  The formal engagement letter is dated October 5, 2015. *See* Dkt. 93-1. But former Pepper Hamilton partner Leslie Gomez has testified that the firm was "engaged in August 2015."  Hr'g Tr., Dkt. 672 at 40:6.

> It was very apparent to us from very early on that Baylor clearly wanted us to be transparent, open, forthcoming, to call it as we see it. And my partner, Gina Maisto Smith, and I worked very hard to maintain that reputation across the country. We are not litigators. We don't sue schools. We don't defend schools. We exist in a policy, auditing, investigative, regulatory compliance space.[3]

Dkt. 672 at 40-41.  Pepper Hamilton made two presentations of its investigative findings to the Baylor Board of Regents.  Dkt. 672 at 41:12-13; 21-23.  Gomez explained:

> On May 2nd we did a very detailed  presentation that included our work-product presentation aids, our draft findings and our draft recommendations and draft chronology. And that chronology included tabs and links to documents for us to do about a ten-hour presentation to the board. And that was a subset of the Board's.

> Following that, on May 11th and May 12th, we came to Baylor and we presented our findings of fact and our recommendations. That was done with the presentation aid of a PowerPoint that included reference to documents. All of those documents that we relied on underlying have been provided and produced as the raw data that we collected.

Dkt. No. 672 at 41-42.  It is not clear from the record how the later presentation differed from the first presentation on May 2, or if the Board members who viewed the first presentation provided any direction to Pepper Hamilton for the second presentation.

Later that month, Baylor published two documents summarizing Pepper Hamilton's investigative findings and recommendations.  First, on May 26, 2016, Baylor published a thirteen-page summary of the investigation and its conclusions entitled "Findings of Fact," which described

---

[3] As noted earlier, though Baylor's original engagement letter with Pepper Hamilton said nothing about litigation, five months into Pepper Hamilton's work the parties amended the engagement letter to explicitly state that their "shared understanding" was that everything Pepper Hamilton was doing was in anticipation of litigation.  Gomez's 2019 testimony undercuts the statement inserted into the amended engagement letter in 2016.  The fact that she and Smith "work very hard" to maintain a reputation for transparency, and doggedly avoid getting engaged in litigation, operating solely in a "policy, auditing, investigative, regulatory compliance space," supports the arguments Plaintiffs originally made in 2017 when they sought production of this material. But the parties have not re-urged the question of whether the investigation and implementation were conducted in anticipation of litigation, nor will the Court re-visit it here.

findings based on "a high-level audit of all reports of sexual harassment or violence for three academic years from 2012-2013 through 2014-2015." Dkt. 93-3 at 1. Second, Baylor published a list of 105 recommendations—on Pepper Hamilton letterhead—titled "Baylor University Report of External and Independent Review Recommendations." Dkt. 93-4.[4]

After Pepper Hamilton's presentation to the Regents, the Baylor administration classified Pepper Hamilton's 105 recommendations as "mandates" and created a Sexual Assault Task Force. Dkt. 805 at 2; Holmes Decl., Dkt. 805-1. On November 3, 2017, Baylor published a 755-page External Report on the Completion of the 105 Recommendations. Dkt. 617-2.[5] It was written by Gomez and Smith, who began implementation of the 105 recommendations while they were still partners at Pepper Hamilton and continued to do so when they left to join the law firm Cozen O'Connor in February 2017. *Id.* at 7 n.1. The 2017 External Report was therefore published under Cozen O'Connor's name, but refers to Pepper Hamilton's work throughout much of the implementation process. *See id.*

As has been detailed in several prior pleadings and orders, there is discussion in Pepper Hamilton emails and billing records—not produced by Baylor until mid-2019—suggesting that Pepper Hamilton prepared one or more documents chronicling its investigative findings, and stating that the attorneys sent Baylor a "draft report." *See, e.g.* Dkt. 618 at 8; 636 at 8 n.14. When they became aware of these documents, Plaintiffs sought production of any "report," regardless of its

---

[4] Both were published on Baylor's website. *See* BAYLOR UNIVERSITY BOARD OF REGENTS FINDINGS OF FACT (May 26, 2016), available at https://www.baylor.edu/thefacts/doc.php/266596.pdf; BAYLOR UNIVERSITY REPORT OF EXTERNAL AND INDEPENDENT REVIEW RECOMMENDATIONS (undated), available at https://www.baylor.edu/thefacts/doc.php/266597.pdf.

[5] The report was published on Baylor's website. *See* EXTERNAL REPORT RE: COMPLETION OF 105 RECOMMENDATIONS (Nov. 3, 2017), available at https://www.baylor.edu/thefacts/doc.php/301337.pdf.

form.  *See* Dkt. 618 at 8; Dkt. 795 at 8. Despite the emails and billing records, Baylor and Pepper

Hamilton insisted that "[b]eyond the presentation of the findings to the Board and assisting with the

preparation of the written "Findings of Fact" [that Baylor released publicly], Pepper Hamilton did

not prepare a written narrative 'report.'"  Dkt. 622-2 at ¶ 3 (Declaration of Leslie Gomez).  The

dispute regarding the phantom "report" ultimately led to Gomez appearing before the Court to

respond to these concerns.  After explaining that the references in the emails and billing records

related to notes used to make the presentation, and an internal Pepper Hamilton post-representation

report, Gomez stated "there was—never has been—as far as I understand, never will be—a further

narrative written report, whatever word we want to assign it, beyond the Findings of Fact." Dkt. 672

at 44.  Following the hearing, the Court did not make specific findings on the issue, other than to

state that:

> the Court asked Baylor to explain references to a report in certain billing records and
> emails. At the hearing, Baylor proffered statements by a Pepper Hamilton attorney
> who testified that [the references to a report] *refer to internal attorney work product*.
> If Plaintiffs have remaining concerns about this issue, they may raise that with the
> Court.

Dkt. 667 at 3 (emphasis added).  Among other records, the present motion once again raises the

Plaintiffs' request for any report Pepper Hamilton made to the Regents.

## B.    This Litigation

The lead case in this lawsuit was filed in June 2016, about a month after Baylor released the

Findings of Fact.  *See* Dkt. 1.[6]  After this litigation began, Plaintiffs served subpoenas on Pepper

Hamilton and moved to compel production of all materials provided to and produced by Pepper

---

[6] *Jane Doe 11* and *Jane Doe 12–15* followed in 2017, and the Court consolidated the three cases for
all discovery and pre-trial proceedings on February 6, 2019.  *Jane Doe 11*, 6:17-cv-228 (Dkt. 21).

Hamilton in connection with the investigation.  Dkt. 93.  Baylor objected on the basis of attorney-client privilege and work product protection.  Dkt. 104.

In an Order on August 11, 2017, the Court ruled that Baylor waived its attorney-client privilege by making repeated public disclosures regarding the Pepper Hamilton investigation, and found that the waiver encompassed "the entire scope of the investigation, and all materials, communications, and information provided to Pepper Hamilton as part of the investigation."  Dkt. 168 at 13-14 (reported as  *Doe 1 et al. v. Baylor Univ.*, 320 F.R.D. 430, 440 (W.D. Tex. 2017)). Noting that it requires more to waive work product protection than the attorney-client privilege, the Court found that Baylor had *not* waived its work product protection at that time because "[a]lthough Baylor has impliedly connected the Pepper Hamilton investigation to this litigation"—for example, by including Pepper Hamilton's work in a summary of actions taken by the University—"[Baylor] has not directly invoked Pepper Hamilton's work as a defense."  *Id.* at 17 (*see Doe 1*, 320 F.R.D. at 442).  The Court warned: "Should Baylor directly invoke the Pepper Hamilton investigation as part of a substantive defense to Plaintiffs' claims in the future, the Court will entertain a motion by Plaintiffs re-urging waiver."  *Id.*

Nearly two years later, the Court found that Baylor had also waived attorney-client privilege for the portion of Pepper Hamilton's representation that involved the implementation of reforms.[7] Dkt. 653.  The Court found that when Baylor published the External Report on November 3, 2017, Baylor waived attorney-client privilege for "the entire scope of the implementation of Pepper Hamilton's recommendations, and all materials, communications, and information provided to

---

[7] Specifically, the Order resolved Pepper Hamilton's Motion for Reconsideration, Baylor's Motion for a Protective Order Regarding Pepper Hamilton's Work Separate From the Investigation, and Plaintiffs' Amended Motion to Compel and Motion for Sanctions.  Dkts. 653, 677.

Pepper Hamilton as part of the implementation of the recommendations and preparation of the 755-page External Report re: Completion of 105 Recommendations." Dkt. 653 at 21-22 (citing 2017 External Report, Dkt. 617-2). With regard to any protection for Pepper Hamilton's work product regarding the implementation of reforms, the Court made no finding of waiver, noting that "[n]either party has provided any detailed briefing or evidence to assist the Court in determining what materials . . . might be protected work product, or what work product protection Baylor might have waived." *Id.* at 22-23.[8]

In summary, the Court has already concluded that Baylor waived the attorney-client privilege for both the investigation and the implementation of reforms conducted by Pepper Hamilton. *See* Dkts. 168, 653. The motion before the Court seeks the production of Pepper Hamilton's work product for the same two matters. Dkt. 795.[9] Throughout discovery, Baylor has asserted the work product doctrine to withhold a large volume of material. Though the precise number is not available

---

[8] The Court noted that "[t]o the extent that Baylor has 'actually disclosed' any documents to any third party, including the public, in the course of preparation and publication of the 2017 External Report (or with respect to any of the Other Matters), Baylor has waived work product privilege for those documents." Dkt. 653 at 23. Baylor maintains it has made no such disclosures. Dkt. 805 at 7 n.3.

[9] For absolute clarity in the record, the materials at issue here concern the two aspects of Pepper Hamilton's work for Baylor that it designated for billing purposes as "Matter 2" and "Matter 3." Pepper Hamilton provided a series of legal services for Baylor and designated each with a separate matter number. *See* Mot. Reconsid., Dkt. 612 at 5-6; Order, Dkt. 653 at 10-11. "Matter 1" is purely administrative and addressed only the law firm's internal process to register Baylor as a new client. "Matter 2" referred to the "independent and external review" Pepper Hamilton conducted of Baylor's Title IX practices "through the lense of specific cases." "Matter 3" concerned "legal advice on Title IX matters including implementation of recommendations and Title IX policies and practices." "Matter 4" concerned legal advice and electronic discovery for various third party litigation and investigations, and "Matter 5" concerned legal advice and electronic discovery for the Office for Civil Rights investigation. *Id.* The Plaintiffs' motion asks the Court to order production of "all the PH materials, except for 'Matter 4.'" Since Plaintiffs never mention the Office of Civil Rights investigation (Matter 5) in their briefing the Court assumes the inclusion of Matter 5 in the motion was a typographical error. Thus, what is at issue in the motion to compel is Pepper Hamilton's work product as to Matters 2 and 3.

from the record, Baylor has designated thousands, and perhaps tens of thousands, of documents as Pepper Hamilton work product. Plaintiffs advise that as of February 11, 2020, Baylor's privilege log listed over 23,000 documents. Dkt. 795 at 11 . It is difficult for the Court to estimate what proportion of the 23,000 documents might be withheld as Pepper Hamilton work product.  On a number of occasions in recent hearings, Plaintiffs have complained that Baylor's privilege logs did not change after the Court found Baylor had waived its attorney-client privilege; instead, they claim that Baylor merely changed the designation of the basis for the claim of privilege from "attorney-client" to "work product." *E.g.,* Dkt. 837 at 24.  As will be discussed below, throughout this case Baylor has taken an expansive view of what is attorney-client privileged and work product protected, and has at least twice either "misread" orders or "accidentally" failed to produce Pepper Hamilton materials the Court had ordered produced.

Baylor's basic claim is, and has been, that "all of Pepper's work (including the Investigation) is protected as work product."  Dkt. 621 at 4.  It has thus withheld Pepper Hamilton memoranda, emails, and the presentations to the Board of Regents, contending that these contain the attorneys' mental impressions.  To the extent the documents also contain discoverable facts, Baylor claims "Plaintiffs have or will have been provided *all* the underlying documents and facts."  Dkt. 805 at 2. It is not entirely clear to the Court how Baylor defines "underlying facts," because Baylor has asserted, and continues to assert, work product protection for what is clearly fact work product. Baylor argues, for example, that "Plaintiffs can ask Regents about facts of which they were aware or on which they relied to form the basis of any of the specific findings, as long as [Plaintiffs] do not directly ask what [facts] Pepper Hamilton attorneys presented to them as part of its presentation." Dkt. 805 at 10 n.6.  Baylor takes the position that the facts the attorneys chose to present to Baylor

or a Regent amount to the mental impression of the attorney, as it demonstrates which, of the terrabytes of factual data Pepper Hamilton gathered in its investigation, the attorney thought was worthy of inclusion.  Plaintiffs have argued throughout discovery that this has prevented them from questioning the Regents about the most basic facts regarding their knowledge and decision making because the Regents relied very heavily on Pepper Hamilton for factual information.  *See, e.g.*, Dkt. 529 at 10; Dkt. 792 at 2; Dkt. 795 at 5.

**C.      Plaintiffs Impacted by this Order**

It is important to note before getting too far that this motion does not pertain to all fifteen of the Doe cases, as Pepper Hamilton's work product is not even potentially relevant to some of the plaintiffs.  Almost all of Baylor's briefing, and much of its hearing argument, focused on the Jane Doe 11 case.  Baylor notes that Jane Doe 11 is the only plaintiff whose alleged assault occurred after Pepper Hamilton had completed its investigation and implemented most of its reforms. *See, e.g.*, Dkt. 837 at 6:11-14 ("The Jane Doe 11 case is different from other cases in that the alleged assault took place on April the 3rd of 2017.  It is the only alleged assault that is post the work that was done by Pepper Hamilton.").  As far as it goes, that is a correct statement.  But Baylor's telescopic focus on Jane Doe 11 appears to have caused it to lose sight of the details of the other plaintiffs' claims. For example, Baylor asserted at the hearing that "[t]he other women, Jane Does 1 through 10 and 12 through 15, *all of those alleged rapes occurred before Pepper Hamilton was either on the scene or before any findings at issue*." *Id.* at 46:6-9 (emphasis added). That is incorrect.  Jane Does 3, 10, 11, 12, 14, and 15 all allege they were assaulted after August 2015, when Pepper Hamilton was engaged.

9

Of the fifteen claims consolidated for discovery and pre-trial proceedings, the earliest is based on a sexual assault in September 2004 (Dkt. 56 ¶ 74) and the latest on an assault in April 2017 (*Jane Doe 11*, 6:19-cv-228 (Dkt. 14 at 5)).  The majority of the alleged assaults on which the Plaintiffs base their claims took place in 2012 or later.[10]  Though Baylor did not hire Pepper Hamilton until August 2015, Pepper Hamilton's investigation looked back three years, covering the 2012-2013 through 2014-2015 academic years.  Dkt. 93-3 at 1.  Thus, not only is it incorrect to say that only Jane Doe 11 bases her claim on an alleged assault that took place after Pepper Hamilton was hired, it is also incorrect to use the hiring date as a starting point for relevance purposes.  For plaintiffs whose alleged assaults occurred as far back as September 2011 or later, the investigation may provide evidence of Baylor's practices, policies, or customs at the time of those assaults and during the one year period following them (the "post-reporting" period).[11]  So, for example, a plaintiff allegedly assaulted in September 2011 could point to Pepper Hamilton's findings related to what was happening in September 2012 as evidence of Baylor's practices at what would be the end of her post-reporting period.  This means the Pepper Hamilton materials may be relevant to all of the plaintiffs' claims except those of Jane Doe 2 (*see* Dkt. 56 ¶ 74 (alleged assault in September 2004)), Jane Doe 5 (*see id.* ¶ 152 (November 2005)), Jane Doe 6 (*see id.* ¶ 177) (during the 2007-2008 academic year)), and Jane Doe 7 (*see id.* ¶ 192 (May 2009)).  For these four plaintiffs, their

---

[10]  Jane Does 1, 3, 4, 8, 9, 10, 11, 12, 13, 14, and 15 allege that they were assaulted in 2012 or later. *See Jane Doe 1–10* (Dkt. 56 ¶¶ 54, 74, 107, 124, 211, 235, 254); *Jane Doe 11* (Dkt. 1 ¶ 51); *Jane Doe 12–15* (Dkt. 14 ¶¶ 69, 78, 84, 96, 106-09, 136).

[11]  The Court assumes that the relevant post-reporting period for each plaintiff was approximately one year from the date of the alleged assault. The Court adopted the same time period for post-reporting claims in the recent Final Order on ESI and Custodians for the Extended ESI Period. Dkt. 819 at 5. That assumption does not preclude the parties from arguing at trial that a post-reporting period might be different for a particular plaintiff.  *See id.* at 6 n.7.

post-reporting periods all expired in May 2010 or earlier, well before the beginning of Pepper Hamilton's investigation period in September 2012. But for the remaining plaintiffs (Jane Does 1, 3, 4, and 8-15), the Pepper Hamilton materials are potentially relevant to their claims.[12]

## II.  PEPPER HAMILTON'S WORK PRODUCT

Plaintiffs argue that by relying on the materials as part of Baylor's substantive defense in this litigation, Baylor has waived work product protection for all Pepper Hamilton materials pertaining to its investigation and the implementation of the reforms it recommended. Dkt. 795 at 1. As one example of how Plaintiffs contend Baylor has put this work product at issue, they point to Baylor's Answer to Jane Doe 11's complaint, which repeatedly references the Pepper Hamilton investigation and implementation of reforms. *Id.* at 9 (citing *Jane Doe 11*, 6:17-cv-228 (Dkt. 17 at 6-8)). Baylor raises the same defense in its Answer to Jane Does 12, 13, 14 and 15. *Jane Doe 12–15*, 6:17-CV-236 (Dkt. 40 at 6-7). Plaintiffs also argue that because "central fact questions for the jury relate to the intent of Baylor and Baylor's notice of student on student harassment," a jury cannot fairly evaluate Baylor's defense if Baylor is permitted to release some information about Pepper Hamilton's investigation and reforms for Baylor, but withhold the rest. *Id.* at 8-10. Plaintiffs note

---

[12]  Though very close to what the Plaintiffs proposed in their briefing, this conclusion is slightly broader. Plaintiffs argued that the Pepper Hamilton materials are relevant for Plaintiffs who were assaulted during the period of the investigation and for Plaintiffs who were assaulted after the issuance of the Findings. Dkt. 795 at 8-9. By including a period of time for each Plaintiff's post-reporting claims, the Court's conclusion captures one claim that Plaintiffs' proposal does not: the first alleged assault in Jane Doe 13's case. She alleges that she was sexually assaulted on three separate occasions, in April 2012, Fall 2012, and some time before November 2014. *Jane Doe 12–15* (Dkt. 14 ¶¶ 78, 84, 96; Dkt. 35 at 27). Because the first assault took place before September 2012 (the earliest date contained within the scope of Pepper Hamilton's investigation), Plaintiffs' proposal would exclude the materials being relevant to that assault. Under the Court's conclusion, the materials are relevant to that claim, because her post-reporting period would extend into April 2013, when Pepper Hamilton *was* investigating the university's practices. Accordingly, the Court finds that the materials are relevant for all of the alleged assaults for Jane Does 1, 3, 4, and 8-15, without any exceptions.

that Baylor has repeatedly invoked the Pepper Hamilton investigation and implementation to limit questioning in depositions.  Dkt. 795 at 5 (citing Dkt. 529 at 2).  Plaintiffs contend that, as a result, Baylor is using the work product doctrine to block discovery and testimony on essential relevant facts.  Many Regents have testified that they relied on Pepper Hamilton for their information, yet Baylor has objected to the discovery of any facts a Regent was told by Pepper Hamilton, claiming such material is work product.  *See, e.g.*, Dkt. 529 at 10; 792 at 2.  "Because of this shield, Plaintiffs still have not learned the who, what, where, when, why, and how behind the Findings of [Fact] by the Regents, because the Regents learned those facts from the PH investigation."  Dkt. 792 at 2.  In their motion to compel regarding the deposition of former Baylor Regent Phil Stewart, Plaintiffs stated:

> [W]hen Plaintiffs ask 'who were the 'senior administrators' responsible for the failure' that a Regent found, Baylor can object that the facts and information the Regent learned to identify that 'senior administrator' came from PH's work-product. When Plaintiffs question 'how did Baylor use the Code of Conduct to retaliate against sexual assault victims,' Baylor can object that Plaintiffs cannot ask that question since the information the Regent learned to answer the question came from PH's work-product. The same goes for any fact behind each Finding of failure—if the Regent obtained those facts from PH, then Plaintiffs cannot ask what those facts were.

Dkt. 792 at 2.  Stewart's deposition transcript confirms this. *See* Dkt. 529-2 at 89:23-91:13.

Baylor counters that it has not put any of the Pepper Hamilton work product at issue in this case, and its assertion of the doctrine is proper:

> Baylor is not relying on the investigation as a defense in any way. And while Baylor will rely on its *own* implementation efforts, it is not relying and will not rely on *Pepper Hamilton's* role in the implementation or Pepper Hamilton's ultimate conclusion that Baylor had, in fact, successfully implemented reforms.

Dkt. 805 at 2 (emphasis original).  To further buttress this position, after the briefing on Plaintiffs'

motion was complete, Baylor filed a Motion for Leave to Amend its Answer in *Jane Doe 11* to

remove any explicit reference to Pepper Hamilton.  Dkt. 815.

## A.    Legal Standard

"The scope of discovery is broad and permits the discovery of 'any nonprivileged matter that

is relevant to any party's claim or defense.'" *Crosby v. La. Health Serv. & Indem. Co.*, 647 F.3d 258,

262 (5th Cir. 2011) (citing FED. R. CIV. P. 26(b)(1)). "Ordinarily, a party may not discover

documents and tangible things that are prepared in anticipation of litigation or for trial." FED. R.

CIV. P. 26(b)(3)(A). "The work product doctrine is not an umbrella that shades all materials prepared

by a lawyer . . . . The work product doctrine focuses only on materials assembled and brought into

being in anticipation of litigation." *United States v. El Paso Co.*, 682 F.2d 530, 542 (5th Cir. 1982).

"The work-product doctrine is distinct from and broader than the attorney-client privilege." *United

States v. Nobles*, 422 U.S. 225, 238 (1975) (citing *Hickman v. Taylor*, 329 U.S. 495 (1947)). "The

attorney-client privilege exists to protect confidential communications and to protect the

attorney-client relationship," while "[t]he work product privilege . . . does not exist to protect a

confidential relationship but to promote the adversary system by safeguarding the fruits of an

attorney's trial preparations from the discovery attempts of an opponent."  *Shields v. Sturm, Ruger

& Co.*, 864 F.2d 379, 382 (5th Cir. 1989); *see also In re Grand Jury Subpoena*, 220 F.3d 406, 409

(5th Cir. 2000).

The work product doctrine applies to "documents and tangible things that are prepared in

anticipation of litigation or for trial by or for another party or its representative." FED. R. CIV. P.

26(b)(3)(A); *Hickman v. Taylor*, 329 U.S. 495, 511-12 (1947). The doctrine does not place work

product outside the scope of discovery, but instead "creates a form of qualified immunity from discovery" for materials prepared in anticipation of litigation. *Chiasson v. Zapata Gulf Marine Corp.*, 988 F.2d 513, 514 n.2 (5th Cir. 1993).  The level of protection depends on whether the materials constitute "opinion" work product or non-opinion, "fact" work product.  *In re Grand Jury Subpoena*, 870 F.3d 312, 316 (4th Cir. 2017); *In re Int'l Sys. & Controls Corp. Sec. Litig.*, 693 F.2d 1235, 1240 (5th Cir. 1982). The "mental impressions, conclusions, opinions or legal theories of an attorney" are opinion work product subject to a higher showing for production.  *In re Int'l Sys.*, 693 F.2d at 1240 (citing FED. R. CIV. P. 26(b)(3)(B)).  Fact work product, on the other hand, is any material "prepared in anticipation of litigation or for trial by or for another party or its representative" under Rule 26(b)(3)(A) but "not the 'mental impressions, conclusions, opinions or legal theories of an attorney'" under subsection (b)(3)(B). *In re Int'l Sys.*, 693 F.2d at 1240 (quoting FED. R. CIV. P. 26(b)(3)).  Rule 26(b)(3) recognizes that a party may obtain non-opinion, fact work product if the party "shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means." FED. R. CIV. P. 26(b)(3)(A)(ii); *In re Int'l Sys.*, 693 F.2d at 1240-41.  Importantly, and as discussed in detail below, while opinion work product is afforded a higher level of protection, it is not beyond discovery, and may be waived when a party discloses it, or places it at issue in the case.

The party seeking discovery bears the burden to demonstrate waiver of work product.  *In re Grand Jury Proceedings*, 43 F.3d 966, 970 (5th Cir. 1994) (citing *Hickman v. Taylor*, 329 U.S. 495, 512 (1947)).  "What constitutes a waiver with respect to work-product materials depends, of course, upon the circumstances." *Mir v. L-3 Commc'ns Integrated Sys., L.P.*, 315 F.R.D. 460, 467 (N.D. Tex. 2016) (quoting *United States v. Nobles*, 422 U.S. 225, 239 n. 14 (1975)).  In general, there are

three distinct grounds on which a party may seek the production of work product: disclosure to a third party, placing the material "at issue," and "substantial need" under FED. R. CIV. P. 26(b)(3). *See, e.g.*, *In re Itron, Inc.*, 883 F.3d 553, 558 (5th Cir. 2018). These often overlap in practice.[13]

The Fifth Circuit has not addressed the precise test for "at issue" waiver of work product, but a consistent standard has been applied by district courts in the Circuit as well as by other Circuits. "Like the attorney client privilege, opinion work product may be disclosed when the holder waives the protection by placing the protected material 'at issue' in the litigation." *Mir*, 315 F.R.D. at 470 (citation omitted); *see also Feld v. Fireman's Fund Ins. Co.*, 991 F. Supp. 2d 242 (D.D.C. 2013) ("Allowing the privilege to shield documents at the heart of the proponent's case would undermine the adversary system, and would let the work-product privilege be used as a tool for manipulation of the truth-seeking process."); *In re Grand Jury Proceedings*, 219 F.3d 175, 182 (2d Cir. 2000) ("[A] party cannot partially disclose privileged communications or affirmatively rely on privileged communications to support its claim or defense and then shield the underlying communications from scrutiny by the opposing party."); *Koumoulis v. Indep. Fin. Marketing Group, Inc., LPL*, 295 F.R.D. 28, 40-41 (E.D.N.Y. 2013) ("Both the attorney-client privilege and work product privilege may be waived if a party puts the privileged communications at issue by relying on it to support a claim or

---

[13] "At issue" waiver is sometimes called "subject matter waiver" or "implied waiver," while waiver resulting from voluntary disclosure of privileged material is sometimes termed "express waiver." *See In re Tron*, 883 F.3d at 558 (considering waiver in the context of attorney-client privilege) (citing *Bittaker v. Woodford*, 331 F.3d 715, 718–20 (9th Cir. 2003) (en banc)). "In practice, however, the two often overlap, and it is unclear that the differing labels are of material significance." *Id.*; *see, e.g.*, *S.E.C. v. Brady*, 238 F.R.D. 429, 444 (N.D. Tex. 2006) ("Subject matter waiver of work product immunity occurs when it would be inconsistent with the purposes of the work product privilege to limit the waiver to the actual documents disclosed, for example when the facts relevant to a narrow issue are in dispute and have been disclosed in such a way that it would be unfair to deny the other party access to other facts relevant to the same subject matter.") (cleaned up)).

defense. Such a waiver may be implied in circumstances where it is called for in the interests of fairness.") (cleaned up).[14]

To place work product at issue in litigation, a party must "rely on" the work product "to prove its claims in the case." *Windsor Securities, LLC v. Arent Fox LLP*, 273 F. Supp. 3d 512, 518-19 (S.D.N.Y. 2017) (finding no waiver because plaintiff client "made clear that it does not intend to rely on any communications with its replacement counsel in order to prove its claims in this case"). Mere relevance is not sufficient to place work product at issue. *Id.* at 518 (citations omitted) ("If the rule were otherwise, that would gut the privilege."). A party also does not "rely on" work product to prove its claims if it only uses the work product for the purposes of impeachment or corroboration. *Mir*, 315 F.R.D. at 471-72.

Courts have held that when a party refers to work product in its pleadings it is "relying on" work product. *See, e.g.*, *Hager v. Bluefield Regional Medical Center, Inc.*, 170 F.R.D. 70, 79 (D.D.C. 1997) (finding plaintiff waived work product protection for attorney opinion letters and draft memoranda by referring to the opinion letters throughout the complaint, and it was undisputed that one of the attorneys could be called as an expert witness). The court explained in *Hager* that without discovery of the work product, the defendant would be "unable to ascertain the basis and facts upon which the [attorney's] opinions are based," and this would "undoubtedly impair [the defendant's]

---

[14] Some courts have confused this area by incorrectly treating "substantial need" as an element of proof for obtaining work product based on it being at issue, or having been disclosed. But at issue waiver is a totally separate basis from "substantial need" for obtaining work product. *See, e.g.*, *Mir v. L-3 Commc'ns Integrated Sys., L.P.*, 315 F.R.D. 460, 472 (N.D. Tex. 2016) (treating at-issue waiver and substantial need as wholly separate bases for work product waiver); *Feld v. Fireman's Fund Ins. Co.*, 991 F. Supp. 2d 242, 254 (D.D.C. 2013) ("if the work-product protection has been waived, the moving party is entitled to discovery of such work product, even without showing substantial need."). Further, the adoption of Rule 26(b)(3) made clear that substantial need is an independent basis for obtaining work product, and is not part of a claim of either waiver by disclosure or by putting the work product "at issue." *See* FED. R. CIV. P. 26(b)(3).

ability for effective cross-examination on a crucial issue." *Id.* (quoting *Handgards, Inc. v. Johnson & Johnson*, 413 F. Supp. 926, 930 (N.D. Cal. 1976)).

Here, the issue is raised not by what the Plaintiffs are intending to use to prove their claims, but instead by the facts Baylor intends to rely upon to defend against those claims. In the context of attorney-client privilege, which is instructive here, the Fifth Circuit has ruled that "[r]aising a good-faith defense does not effect waiver when there is no assertion of reliance on the advice of counsel." *In re Itron*, 883 F.3d at 564 (citing *United States v. Newell*, 315 F.3d 510, 525 (5th Cir. 2002)). In that context, courts have held that waiver does not occur unless a party "'explicitly relies' on the existence or absence of privileged communications." *Id.* (citing *In re Burlington N., Inc.*, 822 F.2d 518, 533 (5th Cir. 1987)). The law is less clear regarding what happens when a defendant affirmatively disclaims any advice of counsel defense, but nonetheless intends to offer evidence that directly or indirectly implicates the work product of their attorney. That is the situation here.

While the Fifth Circuit has not addressed this question, many district courts have ruled that a party waives work product when it asserts a claim or defense that relies on work product to prove its intent, knowledge of the law, or the reasonableness of its conduct.[15] Courts in our circuit have found that when a party cites to an investigation "to show that it exercised reasonable care to

_____

[15] *See, e.g., Koumoulis v. Indep. Fin. Mktg. Grp., Inc.*, 295 F.R.D. 28, 47 (E.D.N.Y. 2013), *aff'd*, 29 F. Supp. 3d 142 (E.D.N.Y. 2014) (finding defendant waived work product waiver by asserting, as an affirmative defense in its Answer "the reasonableness of their efforts to 'prevent and correct promptly any discriminatory behavior' and the reasonableness of their 'policies and procedures for investigating and preventing discrimination'"); *The Navajo Nation v. Peabody Holding Co.*, 255 F.R.D. 37, 44 (D.D.C. 2009) (A party waives work product privilege when it "raises an affirmative defense that makes [its] intent and knowledge of the law relevant.") (citations omitted); *Liberty Mut. Ins. Co. v. Tedford*, 644 F. Supp. 2d 753, 764 (N.D. Miss. 2009) (finding waiver of work product where allegations in counterclaim that "put[] into question the attorneys' opinions and work product," including whether the attorney's advisement of rights to an employee was adequate, and whether an insurance carrier relied on deficient legal services when it allegedly mishandled insurance claim).

promptly correct any harassing behavior," the party waives work product "with respect to the investigative report and any underlying documents." *Mir*, 315 F.R.D. at 470-71 (citing *Tedford*, 644 F. Supp. 2d at 764 (finding waiver of work product where allegations in counterclaim "put into question the attorneys' opinions and work product"); *Williams v. United States Envtl. Servs.*, LLC, 2016 WL 617447, at *5 (M.D. La. Feb. 16, 2016) (finding that defendant waived work product protection by citing to sexual harassment investigation in its briefing on a motion to compel "to show that it exercised reasonable care to promptly correct any harassing behavior" after receiving reports of harassment, and thereby defend against plaintiff's sexual harassment and retaliation claims); *Butler v. La. Dep't of Pub. Safety & Corr.*, 2014 WL 3866100, at *5 (M.D. La. Aug. 6, 2014) (finding, in a disability discrimination case, that defendant waived work product for an attorney memo regarding the plaintiff's fitness for employment where defendant voluntarily disclosed the memo to a healthcare provider and placed the memo at issue by raising a business necessity defense based in part on the healthcare provider's recommendation, which may have relied on the attorney memo).

At least one court has specifically applied this principle in a Title IX case comparable to this one. *See Doe v. USD No. 237*, 2019 WL 1925107, at *7 (D. Kan. Apr. 30, 2019), *affirmed,* 2019 WL 2612941 (D. Kan. Jun. 26, 2019).  There, the magistrate judge rejected a school district's argument that it had not waived work product protection for a pre-litigation investigation report because it was not affirmatively asserting the investigation or report as a defense, and concluded that the school district had waived work product by putting at issue the actions it took "as a result of" the investigation.  2019 WL 1925107, at *7-8.

B.      **Plaintiffs' Claims**

All but five Plaintiffs assert two Title IX claims.[16]  First, they assert a claim that even before

their own reports of sexual assault, Baylor maintained discriminatory practices in handling student

reports of sexual assault—such as discouraging victims from reporting assaults and failing to

investigate claims or punish assailants.  They contend that these actions amounted to a policy or

practice of intentional discrimination on the basis of gender, and substantially increased Plaintiffs'

risk of being sexually assaulted.[17]  Second, Plaintiffs assert that Baylor's response to their reports

of sexual assault was deficient, and deprived them of educational opportunities and benefits on the

basis of their gender.[18]

To describe these briefly, a plaintiff may seek to hold a university liable for discrimination

by showing it had an "official policy" that violated Title IX.  This requires proof of the existence of

a discriminatory policy or custom in much the same way that a § 1983 plaintiff demonstrates the

liability of a municipality under the *Monell* line of cases.  *See Gebser v. Lago Vista Indep. Sch. Dist.*,

524 U.S. 274, 290 (1998) (distinguishing claims involving an "official policy" of discrimination

from those seeking to hold an institution liable for discriminatory acts by individual employees);

*Simpson v. Univ. of Colo. Boulder*, 500 F.3d 1170, 1177 (10th Cir. 2007) ("The [Supreme] Court

---

[16]  *See Jane Doe 1 et al. v. Baylor University*, No. 6:16-cv-173 (W.D. Tex. Jun. 15, 2016) (*"Jane Doe 1-10"*) (Am. Compl., Dkt. 56), *Jane Doe 11 v. Baylor University*, No. 6:17-CV-228-RP (W.D. Tex. Aug. 21, 2017) (*"Jane Doe 11"*) (Compl., Dkt. 1), and *Jane Doe 12 et al. v. Baylor University*, No. 6:17-cv-236 (W.D. Tex. Sept. 1, 2017) (*"Jane Doe 12-15"*) (Am. Compl., Dkt. 14).  There are five plaintiffs whose post-reporting claims are time-barred. *See Jane Doe 1–10* (Dkt. 78) (dismissing post-reporting claims by Jane Does 2, 5, 6, and 7 as time-barred); *Jane Doe 12–15* (Dkt. 35) (dismissing Jane Doe 13's post-reporting claim as time-barred).

[17]  Throughout the case these claims have been referred to as the "heightened risk" claims.

[18]  These have been referred to as the "post-reporting" claims.

did not elaborate on what it meant by 'involve official policy,' but the essence of the point is suggested by its reliance in the following paragraph on the doctrine regarding the imposition of liability on municipalities under 42 U.S.C. § 1983 for civil rights violations."). The Tenth Circuit explained in *Simpson* that "the standard [for Title IX liability] changes when the claim 'involve[s] official policy,' although the underlying principle—liability only for intentional acts by the institution itself—remains the same." *Simpson*, 500 F.3d at 1178 (citing *Gebser*, 524 U.S. at 290).

The Plaintiffs' post-reporting claims, on the other hand, rely on the assertion that Baylor "itself intentionally acted in clear violation of Title IX by remaining deliberately indifferent to acts of . . . harassment of which it had actual knowledge." *Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 642 (1999) (citations omitted).  Liability arises from "an official decision by the [educational institution] not to remedy the violation [of Title IX]." *Id.* (quoting *Gebser*, 524 U.S. at 290).  For example, in *Pederson v. Louisiana State University*, the Fifth Circuit found that LSU intentionally violated Title IX when it "ma[de] a decision not to provide equal athletic opportunities for its female students because of paternalism and stereotypical assumptions about their interests and abilities."  213 F.3d 858, 880 (5th Cir. 2000).

All of which is to say that the facts that Baylor and its Board of Regents were aware of, and the intentions of Baylor and the Board, are central liability facts under both of the Title IX theories Plaintiffs are pursuing, which  means that Pepper Hamilton's work is potentially relevant to both the claims raised in this case.  Although Baylor has argued that evidence for post-reporting claims should be limited to the university's specific actions in response to each Plaintiff's report of sexual assault, *see, e.g.*, Dkt. 837 at 46:23-47:3, the knowledge and policy decisions of the Regents could provide evidence that Baylor adopted sincere and comprehensive reforms, or that any

mismanagement of a reported sexual assault was an isolated misstep.  On the other hand, the evidence could show that Baylor's policymakers knowingly took actions that contributed to systemic failures in response to a Plaintiff's later report of sexual assault.

**C.      Baylor's Prior Reliance on Pepper Hamilton's Work**

At the hearing, Baylor maintained that it will not mention Pepper Hamilton at trial and would even file a motion in limine to prohibit all parties and witnesses from mentioning the law firm or its work during trial proceedings.  Dkt. 837 at 60:23-61:11.  This is a significant departure from Baylor's defense strategy up until this point. For most of the four years these cases have been pending, Baylor has repeatedly cited to the Pepper Hamilton investigation and subsequent implementation of reforms to demonstrate that the University was not deliberately indifferent to reports of sexual assault and did not intentionally discriminate against female students.  Significant examples come from answers filed in five of the cases, and Baylor's motion to dismiss in Jane Doe 11's case.  Importantly, all of these pleadings were filed *after* Judge Pitman specifically warned Baylor that it would risk waiving work product protection if it "directly invoke[d] the Pepper Hamilton investigation as part of a substantive defense to Plaintiffs' claims in the future." Dkt. 168 at 17.

To be specific, on February 5, 2018, Baylor filed its Motion to Dismiss Jane Doe 11's complaint, which cited the Pepper Hamilton investigation and implementation of reforms to dispute causation for Jane Doe 11's claims: "the alleged assault in this case occurred in April 2017—after the Pepper Hamilton investigation, after Baylor implemented Pepper Hamilton's recommendations, and after adoption of a brand new [Title IX] policy." *Jane Doe 11*, 6:17-CV-228 (Dkt. 7 at 1). Baylor continued: "Plaintiff does not allege that her alleged assailant assaulted her because of

21

Baylor's [revised Title IX] policy. In light of the Pepper Hamilton investigation and the resulting recommendations, the extensive press coverage of Baylor's efforts to implement the recommendations, and the fact that sexual assault is a crime under Texas law, such an attenuated causation allegation would not be plausible anyway." *Id.* at 19.[19]  On October 25, 2018, Baylor filed an Answer to Jane Does 12, 13, 14, and 15 that referred to the Pepper Hamilton investigation again. *Jane Doe 12-15*, 6:17-CV-236 (Dkt. 40). In support of its statement that "Baylor did not maintain a policy or practice that caused Plaintiffs or other female students to be sexually assaulted or that created a substantial risk of sexual assault," Baylor stated that "[d]uring the time that Jane Does 12, 13, 14, and 15 attended Baylor University—a period of time between 2011 and 2016—Baylor University was actively engaged in activities aimed at reducing the risk of sexual assault and providing resources and assistance to students who may have been assaulted."  *Id.* at 4.  Among these, Baylor referred to the fact that "the Board of Regents engaged a law firm to investigate the handling of sexual assault claims during the period between 2012-2013 and 2014-2015."  *Id.* at 6-7. "Although the investigation found deficiencies during the period under review, the investigation also demonstrated that some areas of concern already had been addressed prior to the investigation."  *Id.* at 7.  This reference again relies on the Pepper Hamilton investigation in order to show that Baylor was acting in a way that was non-discriminatory, *i.e.*, even if there were deficiencies in its Title IX practices, Baylor was working to investigate and address sexual assault issues on campus.

---

[19]  The Court denied the motion to dismiss, stating: "Baylor's investigation and implementation of certain reforms do not preempt Plaintiff's claim as a matter of law. If, in fact, Baylor did take meaningful action that brought the university into compliance with Title IX, that factual finding is for a later stage of this case—it is not the question before the Court in a motion to dismiss." *Jane Doe 11*, 6:16-cv-228 (Dkt. 14 at 18).

On January 25, 2019, Baylor filed an Answer to Jane Doe 11's complaint that repeatedly references Pepper Hamilton's investigation and reform implementation. *Jane Doe 11*, 6:17-cv-228 (Dkt. 17). There, Baylor states that "[d]uring and leading up to the time that Jane Doe 11 attended Baylor, from 2014 through 2017, Baylor was actively engaged in activities aimed at reducing the risk of sexual assault and providing resources and assistance to students who may have been assaulted." *Id.* at 4. Among these, "[i]n 2016, the Board of Regents published findings, based on an investigation conducted by the law firm Pepper Hamilton, stating that Baylor's Title IX compliance efforts during the period from 2012-2015 had been slow, uncoordinated, and ultimately deficient." *Id.* at 6. "However, the investigation also demonstrated that some areas of concern had already been addressed prior to the investigation." *Id.* Baylor's Answer continues: "Pepper Hamilton's investigation made 105 recommendations to improve Baylor's Title IX efforts, which the Board adopted in their entirety . . . . The same lawyers who conducted the Pepper Hamilton investigation and made the 105 recommendations worked with the University to meaningfully implement the changes." *Id.* Further, Baylor states that in October 2017, "the same lawyers who made the 105 recommendations published a draft detailed report of Baylor's improvements," and in November 2017, the same lawyers published a "finalized" report that "confirmed that all 105 recommendations had been implemented." *Id.* at 7-8. In sum, Baylor specifically points to the Pepper Hamilton investigation and implementation work to assert that Baylor was not deliberately indifferent or intentionally discriminatory—rather, Baylor alleges that it was actively engaged in activities aimed at reducing the risk of sexual assault and providing resources and assistance to students, that the Baylor Board of Regents adopted 105 reform recommendations designed by Pepper Hamilton, that Baylor meaningfully implemented the reforms by working with Pepper Hamilton, and that Pepper

Hamilton confirmed to Baylor that the reforms had been implemented. Baylor's Answer to Jane Doe 11 also refers to specific documents prepared by Pepper Hamilton: the "105 recommendations," a "draft report of Baylor's improvements" in October 2017, and the "finalized" report in November 2017. *Id.* at 7-8. Both the 105 recommendations and the Final Report are public documents, and, as discussed above, the Final Report was the basis of the Court's finding that Baylor waived attorney-client privilege for Pepper Hamilton's implementation of Title IX reforms. It is not clear from the record whether the draft report has ever been published or produced.[20]

These are just three examples drawn from Plaintiffs' briefing and the immediate recollection of the Court. A review of the voluminous record in these cases would likely identify more instances where Baylor has pointed to Pepper Hamilton's work to negate liability or support a defensive claim. Even assuming these are Baylor's only references in the record to Pepper Hamilton's work, it is difficult to take at face value the claim that "Baylor is not relying on the investigation as a defense in any way." *See* Dkt. 805 at 2.

**D.     Baylor's Current Position on Pepper Hamilton's Work**

Baylor's position in its response to the motion to compel, which it repeated multiple times at the hearing, is that it will not rely at trial on any of the extensive work Pepper Hamilton had done. It also has requested leave to amend its answer in the Jane Doe 11 case, to make clear it is not relying on Pepper Hamilton's advice. Dkt. 815 at 2. This argument raises a series of questions—Is it possible for Baylor to omit any reference to Pepper Hamilton in its trial presentation without (at

---

[20]   Given that the Final Report indicates that the draft report was presented to Southern Association of Colleges and Schools Commission on Colleges (SACSCOC), disclosure to that third party waives work product for the draft report to the extent that Baylor has asserted the privilege for that document. *See Jane Doe 11*, 6:17-CV-228 (Dkt. 17-27 at 11) ("On October 2, 2017, we prepared a preliminary draft of this report for the SACSCOC in anticipation of the special committee site visit.").

least) stretching the truth?  And, would it be appropriate for the Court to affirmatively prevent the Plaintiffs from mentioning Pepper Hamilton in their case in chief, or in their cross examination of Baylor's witnesses?  Finally, even if Baylor is not explicitly raising an advice of counsel defense, does Baylor's proposed trial approach still implicitly rely on Pepper Hamilton's work product?

To address these questions, the Court invited Baylor at the hearing to demonstrate its ability to carry out its plan at trial "in a fashion that is both factually sincere and fair to the Plaintiffs' right to question and respond to this defense." Dkt. 823.  To begin, Baylor does not dispute that it intends to rely on the factual findings of the investigation, and the recommended reforms, to defend itself at trial. *See* Dkt. 805 at 2. At the hearing, Baylor explained that it intends to show that the University acted reasonably and without deliberate indifference through testimony by current and former Baylor employees, representatives of the Baylor University and Waco Police Departments, and former students. *See* Baylor Ex. 1, Dkt. 835 (Proposed Witness List).  Baylor repeated multiple times that it is not asserting an advice of counsel defense.  Instead, Baylor stated that it will present evidence of "the objective verifiable actions that were taken, not that it received advice from its lawyers to [take those actions]." Dkt. 837 at 6:6-9.

Thus, although Baylor has not pled an "advice of counsel" defense, it admits that, in an effort to demonstrate that Plaintiffs cannot make out the elements of a Title IX claim, it will explicitly rely on evidence that the university conducted an investigation, though performed solely by Pepper Hamilton, and instituted reforms, albeit implemented entirely under Pepper Hamilton's direct supervision and guidance.  But, in an effort to avoid raising an advice of counsel defense and triggering the resulting disclosure of work product, Baylor proposes that in telling the jury this narrative, it will simply leave out the fact that the investigation and reform work was conducted by

Pepper Hamilton.  What Baylor is proposing is that it be permitted to explicitly rely on the work and advice of Pepper Hamilton, while leaving the Pepper Hamilton "branding" off the work.  So the jury will hear testimony that an extensive investigation into Baylor's Title IX policies and practices covering three academic years was conducted, and will hear that from this investigation 105 proposed reforms were developed.  And Baylor will argue to the jury that this evidence rebuts the Plaintiffs' assertions that it failed to implement adequate Title IX policies, or intentionally adopted policies or customs it knew were inadequate, or was deliberately indifferent to sexual assaults it was aware of.

**E.      Analysis**

So where does this leave matters?  Plaintiffs must demonstrate by a preponderance of the evidence that Baylor had policies or practices regarding responding to student reports of sexual assault that created an environment that heightened the risk of female students being assaulted, and that it intentionally discriminated against women in the manner in which it responded to reports of sexual assault, or that it was deliberately indifferent to those reports.  It is the Plaintiffs' burden to demonstrate that the actions Baylor relies on—the investigation and the implementation of reforms—are not enough to rebut the Plaintiffs' evidence.  This necessarily includes questioning the integrity, scope and conduct of the investigation, as well as the quality of the implementation of reforms.  But to criticize the investigation, Plaintiffs must criticize the work of Pepper Hamilton. The same is the case for the reform implementation.  Trying to do so through the Baylor witnesses would be pointless, as it would inevitably lead to those witnesses invoking Pepper Hamilton's work. The deposition testimony of one of the Baylor Regents lays this fact plain:

Q.      And do you view the sexual assault issues at Baylor to have been resolved?

26

A.      I don't know what you mean by resolved.

Q.      Well, the board passed a resolution in May of --

A.      You're talking about the 105 recommendations and all that have been put into place? Yeah.

Q.      You believe that to have been done?

A.      Yes, sir.

Q.      Based on what knowledge?

A.      Based upon what we've been assured by Pepper Hamilton and others on behalf of the university administration itself, by Pepper Hamilton assuring us that it's been done and then implemented and carried out. And is being carried out today.

Q.      And you trust those representations?

A.      I do, yes, sir.

Q.      And you haven't done anything to look behind them to see if they're accurate?

A.      No, sir.

Dkt. 833-1 at 77:1-20.

Because Baylor cannot separate its investigation and reform efforts from Pepper Hamilton's, Baylor's proposed defensive case explicitly relies on Pepper Hamilton's work product. This supports a finding of waiver. *See In re Itron*, 883 F.3d at 564 (citing *In re Burlington*, 822 F.2d at 533) ("Waiver does not occur unless a party "'explicitly relies' on the existence or absence of privileged communications."). The record indicates that this is not a situation where a university conducted its own investigation and implemented its own reforms, while consulting with a law firm for guidance. Pepper Hamilton, not Baylor, conducted the investigation, designed the reforms, and implemented many if not most of the changes, and Baylor's policymakers depended heavily on Pepper Hamilton for knowledge of the relevant facts and for advice in how to respond to those facts. Given this, it is impossible for the Court, the parties, or a jury to separate Baylor's efforts from Pepper Hamilton's, much less to do as Baylor proposes, and pretend that Pepper Hamilton's efforts *were* Baylor's.

27

At least one court has confronted a similar scenario in a Title IX case.  *See Doe v. USD No. 237*, 2019 WL 1925107, at \*7, *affirmed, Doe v. USD 237*, 2019 WL 2612941.  There, the magistrate judge rejected a school district's argument that it had not waived work product protection for a pre-litigation investigation report because it was not affirmatively asserting the investigation or report as a defense.  The judge concluded that the school district had waived work product by putting at issue the actions it took "as a result of" the investigation.  2019 WL 1925107, at \*7-8.  Specifically, the court found the school district "[placed] the investigation, and therefore the Report, at issue by asserting the defense that it 'exercised reasonable care to prevent and correct promptly any sexually harassing behavior,' took action [against responsible parties] after the investigation, and took other 'personnel actions,' including by providing training, as a result of the investigation."  *Id.* at \*7.  The court rejected the school's claim that it did not intend to rely on the report: "[t]o the extent Defendants argue they do not intend to affirmatively rely on the Report itself but rather the corrective actions taken, that argument 'misses the point.'"  *Id.* at \*7.

In affirming the magistrate judge's order, the district court found that by relying on the reasonableness of the corrective actions it took after the investigation, the school district implicitly put the reasonableness of the investigation at issue and thus waived work product protection with respect to the contents of the investigation.  *Doe v. USD 237*, 2019 WL 2612941, \*6 (D. Kan. June 26, 2019).  The district court also later rejected the school district's attempt to amend its answer to withdraw the defense in order to preserve its work product protection.  *Doe v. USD No. 237*, 2019 WL 3996413, at \*3 (D. Kan. Aug. 23, 2019).  The court found that even though the school district "purported to withdraw" the investigation as a defense, the school continued to rely on it implicitly, which was "manifestly unfair to Plaintiffs."  *Id.* at \*5-6.

The Southern District of Texas rejected a similar attempt to disclaim the advice of counsel defense in *Edwards v. KB Home*, 2015 WL 4430998 (S.D. Tex. July 18, 2015). The defendant in an FLSA action argued that it acted in good faith in its classification of employees and attempted to avoid waiver of attorney-client privilege by asserting that it was "not relying on advice of counsel in its defenses." *Id.* at *1. The defendant proposed that witnesses would testify that they classified employees based on their "independent judgment" of various sources, including some legal guidance, but witnesses would not say "lawyers advised us that the employees do not qualify as outside salespeople." *Id.* at *2. The court concluded that "pars[ing] its defense to rely solely on its own nonlawyers' understanding of the FLSA's outside sales exemption and thus maintain as privileged the attorney communications on the same topic" was "drawing too fine a line." *Id.*

Similarly here, Baylor is asking the court to parse its defense so that Baylor can rely on its policymakers' and administrators' "independent" assessment of sexual assault problems at the University, and their "independent" ideas for reform. Allowing Baylor to present a defense that it conducted an investigation and implemented reforms, but omit all reference to Pepper Hamilton, does not solve Baylor's problem, as it still implicitly relies on Pepper Hamilton's work product. Indeed, doing so would be allowing Baylor to present what is, for all intents and purposes, a narrative everyone but the jury would know to be false, as the Court has thus far seen no evidence in the record that Baylor originated *any* findings or reforms without Pepper Hamilton's assistance. Baylor's proposed witness list, for example, contains witnesses who "ha[ve] knowledge" of topics such as "Title IX policies and procedures," but includes no one who adopted those policies or procedures. *See* Dkt. 835. To prove their case, the Plaintiffs must put on evidence of Baylor's policies, and the decisions of Baylor's policymakers. The policymakers at Baylor are its Regents,

and yet not a single Board member, past or present, was included on Baylor's list of the witnesses it proposes to call regarding the investigation and the adoption of reforms.  *Id.*

The *Edwards* case out of the Southern District of Texas notes another practical consideration in an analysis like this: "as a psychological matter, it seems very difficult, if not impossible, for a witness to compartmentalize his reliance on what he may have independently understood regarding the law and what he was told by attorneys."  2015 WL 4430998 at *2.   This is more than a theoretical problem in this case.  Here, Baylor's policymakers will inevitably rely on information conveyed by Pepper Hamilton to explain their knowledge and decision making.  The extensive record in this case indicates that many Regents—perhaps even a majority of them—relied entirely on Pepper Hamilton for their knowledge of relevant facts and for their ultimate policy decisions. That is why they hired the firm.  Indeed, the record indicates that Baylor's reforms came primarily or exclusively from Pepper Hamilton's advice.  The previously quoted excerpt from Regent William B. Robbins, Jr.'s deposition is but one example of this. Baylor's proposed motion in limine would require a Regent like Mr. Robbins to alter his testimony—falsely—as Robbins cannot explain his decision making about the implementation of reforms without reference to Pepper Hamilton. Baylor's attorneys may claim that they are not relying on the advice of counsel defense, but the entire Board of Regents will likely testify that *they* relied on Pepper Hamilton to help them understand and manage the situation at Baylor.[21]  *See Makula v. Sanwa Bus. Credit Corp.*, 1997 WL 460935, at *3 (N.D. Ill. Aug. 8, 1997) (defendant waived privilege because, while his attorney denied that

---

[21]  To think otherwise seems naive.  It is certain that the Plaintiffs will vigorously cross examine the Regents at trial, and press them to explain why their actions were reasonable.  To believe that any of the Regents—a group comprised of lawyers, bankers, doctors, and executives—are *not* going to defend their actions by pointing out that they hired and relied on Title IX legal experts is wishful thinking.

defendant would use the advice of counsel defense, defendant was clearly attempting to use it in his deposition).

Baylor's motion in limine would require witnesses to testify in half truths in order to pretend that Baylor conducted its own investigation and originated its own policy reforms. Baylor is effectively asking its witnesses to lie. Setting aside the problem that the proposed motion in limine would be asking the Court to permit—indeed, *require*—false testimony, prohibiting mention of Pepper Hamilton would also present significant logistical challenges for trial. To start, because Pepper Hamilton's work is factually central to many of Baylor's policy decisions, policing the parties for compliance with the motion in limine would require counsel and the Court's constant attention. The likelihood of a violation would be high. Additionally, jury selection, which is already going to be a challenge (due largely to Baylor's extensive PR campaigns), would be even more difficult, as the Court would have to select a jury that was unaware of Pepper Hamilton's substantial work for Baylor, while at the same time never mentioning Pepper Hamilton during the jury selection. This would likely lead to a contaminated jury pool.

In the end, this is a classic case of a party trying to use the work product doctrine as a sword and a shield. Baylor seeks to show that it responded properly to reports of student sexual assault and that it adopted policy reforms by pointing to "the objective verifiable actions that were taken, not that it received advice from its lawyers to [take those actions]." Dkt. 837 at 6:6-9. Baylor intends to rely on the fact that it conducted an investigation and the fact that it implemented reforms. The pleadings illustrate the centrality of Pepper Hamilton to Baylor's response to sexual assault claims. The words "Pepper Hamilton" have appeared hundreds, and perhaps thousands, of times in the briefing in this case. At the same time, throughout this litigation, Baylor has doggedly opposed every request for

31

discovery of any materials connected to Pepper Hamilton.[22] As the Court stated in the hearing, the reason this case is four years old is because Baylor wants to dramatically restrict the discovery of facts in this case by restricting discovery of Pepper Hamilton's work, but Baylor still wants to get the benefit of relying on the investigation and reforms that Pepper Hamilton carried out.  The court in *Doe v. USD* rejected this same effort:

> Defendants seek to use the investigation and Report to support their defense that they took corrective action in response (*i.e.* that they were not deliberately indifferent) to Plaintiffs' complaints, while at the same time invoking the privilege to deny Plaintiffs access to the Report to determine how Defendants' corrective action compares to [their attorney's] recommendations. But this is precisely the sword and shield approach that the courts have rejected.

*Doe v. USD No. 237*, 2019 WL 1925107, at *7.

Because Baylor cannot separate its investigation and reform efforts from Pepper Hamilton's, by relying on the investigation and reforms Baylor places Pepper Hamilton's work product at issue, and therefore has waived protection over that work product.  Baylor is explicitly relying on the *existence* of Pepper Hamilton's work product in the form of its investigation, findings and implementation of reforms. And Baylor has used work product as both a sword and shield by defending itself by pointing to the investigation and reforms, and claiming they were reasonable

---

[22] *See, e.g.*, Baylor's motion to prohibit discovery of Pepper Hamilton-related material from current and former employees (Dkt. 282), which the Court granted in part (Dkt. 582); Baylor's opposition to production of PR materials because they referred to Pepper Hamilton's work product (Dkt. 434), which the Court overruled because Baylor failed to identify any plausible work product (Dkt. 616);  Baylor's opposition to Plaintiffs' motion to compel Pepper Hamilton materials (Dkt. 332), which resulted in three rounds of highly contentious briefing, including Pepper Hamilton's Motion for Reconsideration (Dkt. 612), Baylor's Motion for Protection Regarding All Work Separate from the Investigation (Dkt. 621), and Plaintiff's Amended Motion to Compel and Motion for Sanctions (Dkt. 621), two hearings, and two detailed rulings by this Court (Dkts. 653, 667).  These examples do not include the many third parties who have filed motions to quash based in part on Baylor's assertion of attorney-client privilege and work product arising from Pepper Hamilton's work.

responses, while simultaneously restricting Plaintiffs' discovery of the facts underlying the very same investigation and reform efforts.

In the context of this case, this conclusion should not be controversial.  The primary rationale for granting qualified protection to attorney work product is to shield an attorney's case planning and strategy from his adversary in litigation.  "At its core, the work-product doctrine shelters the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case." *United States v. Noble*, 422 U.S. 225, 238 (1975).  As the Fifth Circuit explained it, "[t]he work product privilege . . . does not exist to protect a confidential relationship but to promote the adversary system by safeguarding the fruits of an attorney's trial preparations from the discovery attempts of an opponent." *Shields*, 864 F.2d at 382.  Determining when this protection has been waived is for all practical purposes a balancing of the interest of promoting the adversarial system against the interest of determining the truth in a given case. "When a party seeks a greater advantage from its control over work-product than the law must provide to maintain a healthy adversary system, the privilege should give way." *Pamida, Inc. v. E.S. Originals*, 281 F.3d 726, 732 (8th Cir. 2002). As has already been noted, though Baylor and Pepper Hamilton amended their engagement letter to state that they believed Pepper Hamilton's work was being done in anticipation of litigation, they appear to have known from the start that Pepper Hamilton would not be defending Baylor in any of that litigation.  As Leslie Gomez stated it, she and her partner Gina Smith "are not litigators. We don't sue schools. We don't defend schools. We exist in a policy, auditing, investigative, regulatory compliance space."  Dkt. 672 at 41. Given this, ordering the production of the "policy, auditing, or investigative" work Pepper Hamilton did for Baylor will do little to undermine the adversary system,

since the work the firm did was only tangentially related to the defense of any litigation, and did not involve case planning or strategy.

The Court is conscious that a finding of work product waiver has important policy implications.  Nothing in this ruling suggests that a university that hires outside counsel to investigate and assist with Title IX compliance waives all work product protection for that work; the waiver found here is based on the facts of this case.  Accordingly, a finding of waiver based on the narrow and unique facts of this litigation is not likely to discourage a university from relying on counsel for their Title IX compliance efforts.  Conversely, allowing Baylor to maintain work product protection in this situation would risk enabling universities to withhold materials with potentially embarrassing or incriminating facts, even when the university had placed them at issue, solely because the facts were gathered by outside counsel.[23]

## F.    Scope of the Waiver

This conclusion requires that the Court enter the fraught territory of identifying the information made discoverable by Baylor's waiver.  This is yet one more way in which this case stands out from others.  Discovery in this case has involved hundreds of gigabytes, if not terabytes,

---

[23] Pepper Hamilton's work product is also arguably discoverable under Rule 26(b)(3), as the record suggests Plaintiffs have a substantial need for it, and there is no other way for them to obtain it.  *See* FED. R. CIV. P. 26(b)(3).  As the Court has noted in the text, the information that Baylor and the Regents were aware of, and Baylor and the Regents' intentions, are central liability facts under both of Plaintiffs' Title IX claims.  The Plaintiffs have the burden of proof on these claims.  As is clear from this Order, the Regents obtained their factual information almost exclusively from Pepper Hamilton's investigation, and in making policy decisions they relied heavily on Pepper Hamilton as well.  To have a fair chance of proving their case, then, Plaintiffs arguably have a compelling need to obtain the Pepper Hamilton materials to demonstrate what the Regents knew, and how they made their policy decisions.  And—as discovery has demonstrated—Plaintiffs have been unable to obtain this information even through depositions of the Regents.  Thus, even if Baylor's reliance on the Pepper Hamilton investigation and reforms had not put the work at issue in the case, Plaintiffs arguably would be entitled to discover the information under Rule 26(b)(3).  Having said this, neither the Plaintiffs nor Baylor addressed Rule 26 and its application here, so the Court does not reach any conclusions on this point either.

34

of material, and this motion does not challenge the designation of any specific document or documents, but rather raises a global argument that Baylor has waived work product protection as to a whole class of documents.  In nearly every one of the cases the Court has reviewed on these issues, the universe of disputed documents was a fraction of the size at issue here, and in many cases the Court reviewed the records *in camera* to identify the scope of the waiver.  The Court does not have that luxury here, as such a review is impossible given the amount of material involved.  All of which means that the most the Court can do at this point is make general pronouncements regarding the scope of production that must follow from this order, and to give examples regarding types or categories of documents.

The scope of an "at issue" waiver depends on the facts of the case, and what has been put "at issue."  "[T]he scope of any waiver is defined by the context of the waiver and the prejudice to the other party that limiting the waiver would cause." *McGrath v. Nassau Cty. Health Care Corp.*, 204 F.R.D. 240, 243 (E.D.N.Y. 2001). Some courts have limited the scope of a waiver to the portion or category of material that a party would offer in evidence.  *See Nobles*, 422 U.S. at 240-41 (finding no abuse of discretion where court found waiver of "only the portion of the report that related to the testimony the investigator would offer.").  Others have found a broader waiver, based on what the discovering party fairly needs to assess and challenge the veracity of what the producing party intends to offer at trial. *Grigson v. Farmers Grp., Inc.*, 2019 WL 3781439, at *3 (W.D. Tex. Aug. 12, 2019) (finding waiver of work product for all insurance rate models prepared for litigation where defendant produced and relied on some of the rate models to attempt to show that plaintiffs were not damaged).  Whether that is only part of the attorney's materials underlying its communications to their client, or all of it, depends on the case. *See, e.g., Angelone v. Xerox Corp.*, 2011 WL 4473534,

at *2-3 (W.D.N.Y. Sept. 26, 2011) ("the clear majority view is that when a . . . defendant affirmatively invokes a . . . defense that is premised, in whole in or part, on the results of an internal investigation, the defendant waives the attorney-client privilege and work product protections for not only the report itself, but for all documents, witness interviews, notes and memoranda created as part of and in furtherance of the investigation.").

Importantly, an "at issue" waiver of work product is not confined to fact work product. Unlike when a party obtains work product based on a substantial need, when disclosure is ordered because the work product has been put "at issue," the waiver applies to everything that has been put "at issue," whether they be facts or opinions.  "Like the attorney client privilege, opinion work product may be disclosed when the holder waives the protection by placing the protected material 'at issue' in the litigation." *Mir*, 315 F.R.D. at 470.  *See also* RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 92(1)(a) (2000) ("[w]ork-product immunity is waived for *any* relevant material") (emphasis added); *In re Sealed Case*, 676 F.2d 793, 811 (D.C. Cir. 1982) (noting that opinion work product "need not be produced *unless the ... implied waiver doctrine[ ] appl[ies]*."); *McGrath,* 204 F.R.D. at 240 ("Parties may waive any work product protection by putting the privileged information at issue.").  Thus, in *Angelone v. Xerox* the court found that by putting its investigation and remedial efforts at issue, the defendant waived work product protection for "not only the report itself, but for all documents, witness interviews, notes and memoranda created as part of and in furtherance of the investigation." 2011 WL 4473534, at *2.

Baylor's defense is founded on the facts and advice it and its Regents received from Pepper Hamilton.  For a jury to decide whether Baylor's actions were reasonable, the jury has to know the facts and advice Baylor relied on, so it can determine whether Baylor's reliance on those facts and

advice was reasonable.  This is no different than the situation created when a defendant explicitly raises an advice of counsel defense, where the defendant is required to produce the work product demonstrating what the attorney's advice was.  *See, e.g., Simmons, Inc. v. Bombardier*, *Inc.*, 221 F.R.D. 4, 9-10 (D.D.C. 2004).  As one court has noted,

> It would be patently unfair for a party to assert that they relied upon the advice of counsel, yet deprive the opponent of the opportunity to understand why the advice was given, what other alternatives were looked at, why certain advice was rejected, and how the advice was interrelated to other business decisions. Plaintiffs are entitled to understand and ask questions about the validity of counsel's advice, and Defendants may not use the assertion of the privilege both "as a sword and a shield."

*In re Fresh & Process Potatoes Antitrust Litig.*, 2014 WL 1413676, at *6 (D. Idaho Apr. 11, 2014) (citation omitted).

Similarly, several courts have noted that in employment cases, where the employer defends itself by relying upon an investigation to demonstrate its response to the plaintiff's allegations was reasonable, "the adequacy of the employer's investigation becomes critical to the issue of liability." *E.g., Musa-Muaremi v. Florists' Transworld Delivery, Inc.,* 270 F.R.D. 312, 319 (N.D. Ill. 2010). Further, where the employer relies on remedial actions it took as a result of the investigation, "*the advice it received* and whether it followed that advice is in issue." *Pray v. New York City Ballet Co.*, 1997 WL 266980, at *3, n.4 (S.D.N.Y. May 19, 1997) (emphasis added).  In reaching this conclusion, the court in *Pray* rejected the employer's argument that only the factual substance of the investigation was discoverable.   In other words, where an employer asserts as a defense remedial actions based on the results of an investigation and the recommendations of its attorney, the waiver pertains to all work product—fact or opinion.  So the waiver here is not confined to facts.

What all of this means in this case is that Plaintiffs are entitled to discover the information that Pepper Hamilton conveyed to the Regents or other decision makers regarding (1) Pepper

Hamilton's investigation into Baylor's handling of sexual assault reports between 2012-2015, (2) its recommended reforms, and (3) the implementation of those reforms. *Doe v. USD No. 237*, 2019 WL 1925107, at *7 (finding that plaintiffs were entitled to "all documents reflecting the School District's investigation into their complaints and its remedial response, not only the documents Defendants think support their cause."); *Harding v. Dana Transport, Inc.*, 914 F.Supp. 1084, 1096, 1099 (D. N.J. 1996) (granting discovery of all investigation documents, including the attorney's interviews and reporting of those interviews). And where there is no written record of communications from Pepper Hamilton on these topics, then any other documentary evidence of what was conveyed is discoverable.[24]

But the waiver extends beyond just the facts and advice Baylor received from Pepper Hamilton. The scope of an "at issue" waiver extends also to the material on that subject matter necessary to litigate the issue fairly. One of the primary questions the jury is going to decide in this case is whether Baylor's actions regarding student reports of sexual assault were reasonable. Because Baylor's actions were based so heavily on Pepper Hamilton's work, to fairly litigate the reasonableness of Baylor's actions, Plaintiffs need the material underpinning Pepper Hamilton's work. As a court explained in another Title IX case, because the defendant placed its investigation and remedial actions at issue, the underlying work product was discoverable because it was "likely to speak directly to whether [the defendants] had actual knowledge of all of the circumstances

---

[24] Rule 26 refers to work product as "documents and tangible things." FED. R. CIV. P. 26(b)(3). But it is clear that work product also includes information that has not been reduced to writing. For example, Federal Rule of Evidence 502 defines work product to include "tangible material (or its intangible equivalent)." FED. R. EVID. 502(g)(2). And the case that first bestowed protection on work product specifically recognized that "recollections" were encompassed within the protection. *Hickman v. Taylor*, 329 U.S. 495, 510 (1947). Thus, there appears to be universal agreement that *Hickman* makes it clear that work product includes intangible material, such as conversations. *See, e.g. In re Cendant Corp. Sec. Litig.*, 343 F.3d 658, 662 (3rd. Cir. 2003).

surrounding the allegations and whether their response to such allegations was 'clearly unreasonable,' the two key elements in a Title IX claim." *Chivers v. Cent. Noble Cmty. Sch.*, 2005 WL 6567356, at *4 (N.D. Ind. Aug. 4, 2005).  This means that documents setting out the factual basis for Pepper Hamilton's conclusions and recommendations are discoverable.  Thus, if witness interviews were recorded, the recordings are discoverable.  If written reports or summaries of witness interviews were created and do not contain attorney comment, they are discoverable.[25]  If reports contain attorney commentary they are discoverable, with the attorney commentary redacted.

Likewise, records that cast light on the independence and integrity of the investigation and recommendations are discoverable.  So any documents or information indicating attempts by Baylor to influence Pepper Hamilton's work, or casting any doubt on its independence are discoverable. This could include things such as the drafts of findings, so that Plaintiffs can see if changes were made based on input from Baylor.  *See McGrath*, 204 F.R.D. at 246 (granting discovery of outside attorney's "incomplete report to [defendant], her handwritten investigative notes and any sections of her reports that were deleted or redacted").  It would also encompass emails, memos or other records of any communications between any Regent or Baylor representative on the one hand and a Pepper Hamilton attorney on the other (which frankly should already have been produced based on the Court's finding that Baylor had waived its attorney-client privilege).  Likewise with the implementation of reforms.  Materials that summarize the implementation work, or document what Pepper Hamilton encountered doing that work, are discoverable.  Records indicating the facts that formed the basis for the implementation report are also discoverable.

---

[25]As noted later, outlines or preparatory notes for interviews are not discoverable.

And though the waiver is not confined to fact work product, fact work product remains discoverable.  Baylor's position to date has been that its discovery responses have been faithful to the settled principle that "work product immunity protects only the documents themselves and not the underlying facts," *In re Int'l Sys. & Controls Corp. Sec. Litig.*, 693 F.2d 1235, 1240 (5th Cir. 1982), because "Plaintiffs either have or will have been provided *all* the underlying documents and facts." Dkt. 805 at 2 (emphasis original).  It is important to understand exactly what Baylor means by this.  As Leslie Gomez explained, and Baylor has told the Court numerous times, at the outset of its investigation, Pepper Hamilton gathered a huge amount of data, including a large volume of ESI. Dkt. 672 at 4 (Dunnam, summarizing Baylor's public and in-court statements on quantity of data gathered, which range from 27 terabytes to 280 gigabytes); *Id.* at 40 (Gomez, referring to "terabytes" and describing the types of information gathered).  But those are not actually the facts on which Pepper Hamilton *based* its advice.  Pepper Hamilton engaged an ESI consultant, and used search terms to identify which of the millions of documents it had assembled actually had something to do with the matters it was investigating.  Unsurprisingly, a huge amount of the raw data was completely irrelevant to, and played no part in, Pepper Hamilton's investigation or recommendations.  Yet Baylor has taken the position that it has not shielded the "underlying facts" from discovery because it has included all of the Pepper Hamilton raw data in the ESI it has allowed Plaintiffs to run search terms against.  But this is disingenuous, because the majority of the raw data was never even looked at by Pepper Hamilton.  Through this approach Baylor has been able to hide the ball, as it has refused to disclose to Plaintiffs what search terms Pepper Hamilton used, or the documents Pepper Hamilton culled out of the raw data—the documents Pepper Hamilton actually relied on in its investigation. Because Baylor has placed the investigation and reform work at issue in this case, Plaintiffs are

entitled to know the search terms Pepper Hamilton used and to have access to the smaller universe of factual data that Pepper Hamilton actually based its investigation and recommendations on.

To give another example, these conclusions make any materials documenting Pepper Hamilton's presentation to the Board of Regents on May 2, 11 and 12, 2015, discoverable.  Leslie Gomez, one of the attorneys who led the investigation, provided the Court a helpful description of these presentations, and some of the underlying work product that is now discoverable.  As related above, after Plaintiffs discovered records suggesting the existence of an investigative report, Gomez provided testimony to the Court to explain why, despite that evidence, no such report existed.  In that testimony, she explained references to a "report" in an email[26] from Gina Smith (Gomez's co-counsel) to Ray Cotton (Baylor's consultant), stating:

> So if we look at the particular correspondence dated May 21st of 2016, from my colleague, Gina Maisto Smith, to Ray Cotton copying me on that, indicating:
>
>> Time sensitive. As discussed, attached are the drafts of the overall findings and recommendations. These are shared for your review per David Iler, privilege counsel.
>>
>> Please call David to discuss any use of these beyond your review.  We will keep you updated in the progress of the narrative of the findings and recommendations.
>
> And this had two attachments to it. I don't know if you have those attachments here today.
>
> *Those two attachments would be our internal work-product documents that we gave the May 11th and May 12th presentation from.* Those were shared with the counsel for the board at the request of Baylor's outside privilege counsel.

Dkt. 672 at 42-43 (emphasis added).  As discussed in detail, in approving the public release of the 13-page Findings of Fact (drafted largely by Pepper Hamilton), and in deciding to adopt the reforms

---

[26] *See* Dkt. 618-3.

Pepper Hamilton recommended—the very reforms Baylor will rely on at trial—the Regents relied heavily on these presentations.  Baylor has repeatedly stated that there is no transcript, recording or other record of the presentations.  Thus, the documents from which the attorneys presented their investigative findings to the Board, the tabbed chronology and associated linked documents, along with any other documents that record in any way what the Regents were told at the presentation, are part of the work product Baylor has put in issue through its defense.  Baylor must produce all of this work product, whether it be PowerPoint slideshows, attorney outlines or notes for the presentation, chronologies, background documents and other similar materials.

These conclusions also mean that Baylor may no longer prevent witnesses from testifying about a matter, or redact information from a document simply because the information was provided to the witness by Pepper Hamilton.  Baylor's position has been "that Plaintiffs can ask Regents about the facts of which they were aware or on which they relied to form the basis of any specific findings, as long as they do not directly ask what PH attorneys presented to them as part of its presentation or use such questioning as a basis for arguing a broader waiver."  Dkt. 805 at 11. To the extent that position was ever correct, it no longer has any application.  In light of the conclusions reached in this order, the very fact that Pepper Hamilton was the source of information is discoverable, as is the underlying information.

Given that the attorney-client privilege and work product protection have been waived for Pepper Hamilton's investigative and reform work, the materials *not* subject to discovery on those two matters should be much smaller than that the materials that *are* discoverable.  Things not discoverable would be materials that were not considered by Pepper Hamilton in its investigation or reform work, internal emails or communications between Pepper Hamilton attorneys (not copied

to any Baylor representative),[27] legal research, materials Pepper Hamilton attorneys prepared to aid in conducting witness interviews (witness binders, chronologies, etc.), and notes taken by attorneys during interviews.

## G.      Closing Notes

As mentioned at the outset of the prior section, the Court is writing in a vacuum, as this discussion is not based on documents submitted to the Court, which means many of the Court's statements are necessarily general.  This leaves room for mischief in how the order is carried out. To mitigate that, the Court will strictly enforce the requirements of Rule 26(b)(5)(A) for any document that Baylor withholds on a claim that it falls outside the scope of this waiver.  Not only must the document be identified on a privilege log, but it must be identified with sufficient detail to allow the Plaintiffs to assess the claim that the document is not discoverable due to this order. Failure to do so will result in the waiver of work product protection.  The sheer size of the discovery database in this case will not permit the Court to referee the implementation of this order document-by-document.

Baylor's privilege log has been a moving target to date, shifting with the Court's rulings on waiver.  It is time to start over. The Court will therefore order that by July 15, 2020, Baylor shall serve on Plaintiffs a single privilege log that takes into account this and all previous orders regarding privileges, and contains only those documents Baylor continues to withhold based on a claim of privilege or immunity from discovery.  This is a one-time opportunity to log documents.  A privilege claim regarding any document not contained on this log will be waived.  And because there should

---

[27]In contrast, any email pertaining to either of the two relevant matters between one or more Pepper Hamilton attorney that includes a Baylor representative is discoverable—indeed, should already have been produced given the Court's attorney-client privilege waiver ruling.

not be any "new" documents at this late date, the log may not contain any document that has not previously been claimed as privileged, absent good cause. As mentioned, any privilege claim regarding a document inadequately logged will also be waived. In short, the Court will not permit or tolerate the sloppiness of the past on these issues.

In a further effort to reduce ongoing disputes, the Court reminds Baylor that this is a discovery order, and only a discovery order. Simply because a document is produced does not make it admissible at trial. The scope discussion has solely been one regarding the scope of discovery. *See, e.g.*, *In re Fresh & Process Potatoes Antitrust Litig.*, 2014 WL 1413676, at *5. ("Even if negative evidence contained in the attorney's files may not reflect upon the client's state of mind, and may not be admissible as evidence, the evidence may still lead to discovery of relevant and admissible evidence."). The battle over admissibility should be fought at trial, and not in discovery. For their part, the Court reminds the Plaintiffs not to let perfection be the enemy of good. At some point soon, Plaintiffs surely will have enough evidence to try these cases. One would hope we are close to that point. The Court will shortly be setting a final scheduling order for this case, and the remaining time allowed for discovery will not be long. And when it comes to trial, Judge Pitman does not intend to allocate the weeks and weeks the discovery to date suggests the parties will take to try the case. It is time to move beyond discovery.

Finally, the Court will not tolerate any more misreadings of a court order. Baylor has made a habit of avoiding discovery compliance by interpreting orders in its favor even when the order directs otherwise. On at least two occasions, Baylor has "accidentally" failed to produce court-ordered production, both involving Pepper Hamilton materials. Last spring, after Baylor had certified complete production of all Pepper Hamilton materials, Baylor "discovered" over a thousand

44

documents just days before Pepper Hamilton's production deadline. *See* Dkt. 653 at 33; Dkt. 667 at 3. And in the briefing on the instant motion, the Court learned that Baylor believed that the Court had "reconsidered" its order finding Baylor had waived attorney-client privilege for all Pepper Hamilton materials related to implementation of the 105 recommendations. Dkt. 805 at 13. This briefing revealed that Baylor had failed to comply with the Court's year-old order to produce those materials, which presumably number in the thousands or tens of thousands. *See* Dkt. 795 at 6. The Court addressed this briefly at the hearing on May 5th, 2020. Dkt. 837 at 68:13-70:23. Baylor dropped the argument at the hearing, apologized for its misunderstanding, and has since produced the materials. Dkt. 836 at 4. Regardless, this pattern is problematic. The Court warns Baylor it will impose sanctions if Baylor fails to comply in good faith with this Order.

### III.  MOTION FOR LEAVE TO AMEND THE ANSWER

After Plaintiffs filed their motion to compel, relying in part on statements in the answer Baylor filed in *Jane Doe 11 v. Baylor University*, Baylor filed a motion seeking leave to remove all references to Pepper Hamilton and its recommendations from that answer, stating that it would like to do so "to reinforce that it is not relying on the advice of Pepper Hamilton attorneys in its defense in this case." Dkt. 815 at 1-2. Plaintiffs oppose the amendment. Dkt. 817. Given the ruling on Plaintiffs motion to compel, this discussion is, to a large extent, academic.

### A.    Legal Standard

The Federal Rules of Civil Procedure permit a party to amend its pleading "once as a matter of course" within 21 days of service or certain motions under Rule 12, and afterwards "only with the opposing party's written consent or the court's leave." FED. R. CIV. P. 15(a)(1)-(2). Rule 15(a) "requires the trial court to grant leave to amend freely, and the language of this rule evinces a bias

in favor of granting leave to amend." *Lyn–Lea Travel Corp. v. Am. Airlines*, 283 F.3d 282, 286 (5th

Cir. 2002).  But leave to amend "is by no means automatic." *Davis v. United States*, 961 F.2d 53,

57 (5th Cir. 1991).  A district court may deny leave to amend if it has a "substantial reason" to do

so.  *Lyn–Lea Travel Corp.*, 283 F.3d at 286.

## B.    Discussion

Baylor argues that justice requires leave to amend its Answer because "[n]o scheduling order

has been entered in the Jane Doe 11 matter," no deadlines have been set for the amendment of

pleadings, expert designations, or the close of discovery, and Baylor is not adding any factual

allegations or defenses.  Dkt. 815 at 2.  Baylor contends that the amendment will not prejudice Jane

Doe 11 or any other plaintiff.  *Id.*

In light of the Court's ruling on waiver, Baylor's request for leave to amend the *Jane Doe*

*11* Answer would be futile and contrary to the interests of justice.  Amending the Answer does not

change Baylor's implicit reliance on Pepper Hamilton's work or the fact that Baylor cannot separate

its own work from Pepper Hamilton's.   Baylor's attempt to amend one of its Answers is a

concession, not a clarification of its position.   Indeed, Baylor states that it does not seek leave to

amend the answers in *Jane Doe 1-10* or *Jane Doe 12-15*, as none of them mention Pepper Hamilton

or its recommendations.  Dkt. 817 at 2 (citing *Jane Doe 1-10*, 6:16-CV-173 (Dkt. 88); *Jane Doe 12-*

*15*, 6:17-CV-236 (Dkt. 40)).   But Baylor is mistaken—Baylor *does* refer to the Pepper Hamilton

investigation and recommendations in its Answer to Jane Does 12-15 by repeatedly referring to "a

law firm," even though it does not refer to Pepper Hamilton by name.  *Jane Doe 12–15*, 6:17-CV-

236 (Dkt. 40 at 4, 6-7).  The amendment cannot cure Baylor's reliance on Pepper Hamilton's work

product in this litigation.  *See Doe*, 2019 WL 3996413, at * 3 (affirming the magistrate judge's ruling

and rejecting school district's attempt to amend its answer to withdraw its advice of counsel defense in order to preserve its work product protection in Title IX action); *cf. Inmuno Vital, Inc. v. Telemundo Grp., Inc.*, 203 F.R.D. 561, 564 (S.D. Fla. 2001) (denying motion to amend an answer to add an advice of counsel defense and stating that "[b]y blocking Plaintiff's attempt to obtain discovery on the legal advice rendered from outside counsel on the disputed issue, Defendants unfairly attempted to use the privilege as a sword to bolster and protect its advice of counsel defense.").

Moreover, Baylor added these statements to its answers after the Court specifically warned it that doing so would put its work product protection in peril:

> Although Baylor has impliedly connected the Pepper Hamilton investigation to this litigation, it has not directly invoked Pepper Hamilton's work as a defense. *Baylor's answer in this case, for example, includes no reference to the Pepper Hamilton investigation.* While Plaintiffs argue that Baylor will use the investigation as part of its defense in the future, such speculation is insufficient, at this time, to satisfy Plaintiffs' burden to show broad, subject-matter waiver. *Should Baylor directly invoke the Pepper Hamilton investigation as part of a substantive defense to Plaintiffs' claims in the future, the Court will entertain a motion by Plaintiffs re-urging waiver.*

Dkt. 168 at 17 (emphasis added, citation omitted).  To allow Baylor to amend the answers to withdraw its invocation of Pepper Hamilton's advice after it received this warning would be contrary to the interests of justice.  Baylor has had more than enough time to settle on a defense to this case, and allowing yet another change four years into the case is unwarranted.  Baylor was on notice of the impact relying on Pepper Hamilton's work would have, and it is too late for it to withdraw those references.

## IV.  CONCLUSION

For the reasons set forth above, Plaintiff's Motion to Compel Pepper Hamilton's Work Product for the investigation and implementation of reforms (Dkt. 795) is **GRANTED** on the terms detailed in this Order, and Baylor's Motion for Leave to Amend Answer in *Jane Doe 11 v. Baylor University* (Dkt. 815) is **DENIED**.

Baylor shall produce the Pepper Hamilton work product made discoverable by this Order, and shall serve on Plaintiffs the new privilege log described herein, **no later than July 15, 2020**.

SIGNED this 2nd day of June, 2020.

_____

ANDREW W. AUSTIN
UNITED STATES MAGISTRATE JUDGE