# EXHIBIT B

```
 1                  UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF TEXAS
 2                         WACO DIVISION

 3   JANE DOE 1, ET AL        ) Docket No. WA 16-CA-173 RP
                              )
 4   vs.                      ) Waco, Texas
                              )
 5   BAYLOR UNIVERSITY        ) December 6, 2019

 6
                       TRANSCRIPT OF STATUS CONFERENCE
 7              BEFORE THE HONORABLE ANDREW W. AUSTIN

 8

 9   APPEARANCES:

10   For the Plaintiff:       Mr. Chad W. Dunn
                              Brazil & Dunn
11                            4407 Bee Caves Road,
                              Building I, Suite 111
12                            Austin, Texas 78746

13                            Mr. James R. Dunnam
                              Ms. Eleeza N. Johnson
14                            Dunnam & Dunnam, LLC
                              4125 West Waco Drive
15                            Waco, Texas 76710

16

17   For the Defendant:       Ms. Julie A. Springer
                              Weisbart Springer Hayes, LLP
18                            212 Lavaca Street, Suite 200
                              Austin, Texas 78701
19

20

21   Transcriber:            Ms. Lily Iva Reznik, CRR, RMR
                              501 West 5th Street, Suite 4153
22                            Austin, Texas 78701
                              (512)391-8792
23

24

25   Proceedings reported by digital sound recording,
     transcript produced by computer-aided transcription.
```

```
 1            (Proceedings commence at 10:07 a.m.)

 2            THE CLERK:  The Court calls the following for a

 3   status conference: 6:16-CV-173, Jane Doe 1 and Others vs.

 4   Baylor University.

 5            THE COURT:  Counsel, if you want to make

 6   introductions or announcements for the record, please.

 7            MR. DUNN:  Chad Dunn, Jim Dunnam and Eleeza

 8   Johnson for the plaintiffs.

 9            MS. SPRINGER:  Julie Springer for Baylor.

10            THE COURT:  You're outnumbered.

11            MS. SPRINGER:  I am.  And I do want to say that

12   Ms. Brown would have driven up, but I told her it was not

13   necessary.

14            THE COURT:  Okay.  Appreciate that.

15            And thank you for the short notice of your being

16   able to be here on short notice.

17            What I would like to do this morning is,

18   basically I've -- as I promised, I went back after the

19   hearing Wednesday, and I re-looked at a lot of things.  I

20   looked at the pleadings that had been filed leading up to

21   the motions to compel pleadings, I should say, I guess,

22   and the related pleadings from the spring and summer that

23   led to the June and July hearings.  I reread the

24   transcripts of the hearings.  I reread the orders on --

25   for two purposes.  Primarily on the Pepper Hamilton data
```

 1  and what to do with the data that's at the third-party

 2  vendor, and then, secondarily, to look at the appropriate

 3  deadlines for the materials that had been ordered to be

 4  produced by Judge Pitman's July order.

 5        And having gone through all of that and kind of

 6  reached conclusions on these things, I decided that the

 7  most expeditious way to get my ruling out is right here

 8  and now.  So I'm going to explain basically, with the aid

 9  of some documents that will be put in the record, that

10  it's just our copies of pages of pleadings and

11  transcripts, and explain my reasoning and then, make my

12  rulings on the record so we don't have to wait for Ms.

13  Young and I to write that up and let you guys move

14  forward.

15        So starting with the starting point on these

16  issues was -- and I don't know.  You see that in front of

17  you?  Yeah.  You've got a flat screen.  Good.  That the

18  position that Baylor articulated Wednesday was that there

19  were two buckets, two categories of files that we needed

20  to be considered -- looking at that were in the

21  third-party vendor's hands.  There was the Pepper

22  Hamilton -- what I think, Ms. Springer, you referred to as

23  the Pepper Hamilton law firm electronic files.  The

24  investigative files is what I've also heard those referred

25  to.  And then, secondly, that there were the Project BEAR

1    files, I think is the term used on Wednesday, which were

2    described as being made up of 2.4 million pages of

3    material, and that contained the material that Pepper

4    Hamilton had culled from the much larger set of all of the

5    data gathered by Pepper Hamilton from Baylor during its

6    investigation.  And I think, as I recall, and I actually

7    did go back and listen to the audio of our hearing on

8    Wednesday, even though we don't have a transcript yet,

9    those were referred to as being on a hard drive that had

10   been just sitting at Pepper Hamilton's offices, which I

11   think, as we'll see, is actually not quite accurate.

12          So Baylor's position at -- on Wednesday was that

13   Judge Pitman -- that Baylor had argued to Judge Pitman in

14   June and July that Baylor should only have to address the

15   law firm files and not the bigger Project BEAR collection.

16   So my observations about that now and conclusions, first,

17   the claim that came from Wednesday's hearing that it was

18   clear that Judge Pitman had adopted Baylor's argument that

19   Pepper Hamilton only had to produce the log form file --

20   law firm files is not borne out by my review of all of

21   this material.  If we can pull up the first slide.

22          In the plaintiffs' motion, which is what -- you

23   know, starting with, you know, what relief was being

24   requested by the plaintiff in the motion to compel, we can

25   go to the second page, that material sought that by the

1   plaintiff and the relief it requested was that the Court

2   should order Pepper Hamilton to do one of the following

3   things:  Produce to the plaintiffs directly in electronic

4   form all of the materials that the subpoena asks for and

5   treat those as attorneys'-eyes-only and use clawback or

6   snapback procedure to deal with privilege.

7          Alternatively, Pepper Hamilton should have been

8   -- should be ordered to give those to a third-party vendor

9   for a deduplication process; and that then, once those

10  have -- the two data sets -- and, again, it was clear that

11  it was being requested, Baylor's produced documents to the

12  plaintiffs in this litigation, compare that against the

13  Pepper Hamilton and what I believed are -- is the culled

14  data that they had obtained out of the big data set,

15  compare those, see what's different, and then, Pepper

16  Hamilton would -- I'm sorry, that there would be

17  redactions or withholdings based on the prior orders in

18  the case, after which time, whatever was not -- had not

19  been previously produced by Baylor in this litigation

20  would go to the plaintiff.

21         Baylor -- if we can go to the next page -- in

22  their response, they op -- they opposed that relief.  It

23  primarily said two things.  Its primary argument was that

24  this was inconsistent with what Baylor -- what the

25  plaintiffs had agreed to do with regard to the Baylor

1  production; and that is, they had agreed in August 2017

2  that Baylor would only produce from the materials that had

3  actually been reviewed by Pepper.  That is the search

4  results that Pepper had run on their own, gathered

5  materials from Baylor, and what that smaller data set was.

6  And that what the plaintiffs were asking here was to get

7  into the much, much bigger data set, and that was going to

8  be a lot more work, and that was inconsistent with what

9  all the parties had agreed to.

10          Separately, Baylor filed their motion for

11 protective order, as well, in response, the same date, and

12 in that, sought -- mostly that was about the other legal

13 matters, which I don't think are at issue today nor were

14 they on Wednesday.  But among other things, the last bit

15 of relief on the protective order was to prohibit the

16 plaintiffs from seeking any discovery after June 15th,

17 2016 from Pepper Hamilton: and the reason for that and the

18 arguments in this brief were that we have already looked

19 at all of the investigative materials, we, Baylor, that

20 is, and we have looked at all of the Pepper Hamilton

21 culled material files, and we have produced 96 percent of

22 this, at least.  There's a few things we're still working

23 on, but we've given them already everything up through

24 this June 15th, 2016 date.  So why should we have to do to

25 -- do it all over again?  And that was the request that

1   Baylor made.

2        Going back to the opposition on the motion to

3   compel, which is the next page, there were a description

4   of the documents.  And this is just sort of a side note,

5   which is that one of the things I've struggled with for

6   the last few weeks, getting prepared for this and then,

7   through the hearing and then, up to today, is the multiple

8   descriptions we've received for the material that Pepper

9   Hamilton has and the responsive material from the Pepper

10  Hamilton subpoena.  It's been a moving target as far as

11  the titles that were used, including the Project BEAR

12  files.  That was not something I've seen anywhere before I

13  heard that on Wednesday.

14        But what was described by Baylor in the

15  opposition to the motion to compel were three categories

16  of documents, what is referred to as the Pepper Hamilton

17  collection, which as I understand it in this description

18  here on -- in the motion to compel response is the big

19  universe.  It's the stuff that all of those Pepper

20  Hamilton employees and investigators went out and grabbed

21  from Baylor employees' cellphones and separate electronic

22  devices, that big, big universe of stuff.

23        The second category listed was the, quote,

24  unquote, general ESI production.  That appears to be made

25  up of, I believe -- I'm not sure.  What's described here

1  is -- this was collection that supplemented the Pepper

2  Hamilton collection is what it said here, by grabbing

3  stuff after Pepper Hamilton had finished its

4  investigation.  And this was, I presume, gathered by the

5  Baylor team on this litigation.  That would be Thompson

6  Horton and Weisbart Springer and whoever else has been

7  working on this.  And that this is the material from which

8  Baylor did its production with the 64 custodians.

9       And then, third, they described the Pepper

10  Hamilton investigation materials collection, which appears

11  to be the materials that Pepper Hamilton itself generated

12  during its investigation on what I think we could call

13  matter two or what it called matter two.  So that's what

14  Baylor said in its opposition.

15       At the hearing on June 17th -- this is the

16  transcript of that -- there were only two collections of

17  materials argued about by Baylor.  The first -- and

18  they're set out here on -- what page is this?  Page 7 of

19  the transcript, Ms. Springer's describing those as the

20  Pepper Hamilton collection and noting that it's separate

21  from what Ms. Ham -- Ms. Springer says is going to be the

22  Pepper Hamilton investigative materials.

23       This time, though, the description of the Pepper

24  Hamilton collection is, I think, different because the

25  description here is that it's a subset of all of the raw

1  data given by Baylor to Pepper Hamilton.  They applied

2  search terms to the raw data.  That generated the Pepper

3  Hamilton collection.  I believe that's the same collection

4  that we were talking about on Wednesday.  And you go on to

5  say, Ms. Springer, that the particular batch of

6  information is what has been -- that intensive work,

7  you've done all that work.  We've done the FERPA

8  redactions, et cetera.

9        Later on, into page 14 of the hearing, you add to

10  the fact that in your production, Baylor's production in

11  this litigation, you've not only just relied on that data

12  set but -- the 2.4 million documents, but you also went

13  out and gathered documents directly from Pepper Hamilton

14  and described how you went to Cozen O'Connor, maybe

15  Thompson Horton did, and gathered all that material and,

16  again, went through that whole process of producing or

17  logging as privileged those materials.

18        And you, again, reiterate that on the next page

19  that this is -- investigative materials is separate from

20  the bigger collection and those are two different

21  categories.  And you add on page 16 that you were

22  satisfied that as to the pre-June 15th timeframe, the

23  documents from Pepper Hamilton had been produced and I

24  take that -- took that to mean, and I take it to mean

25  today still, that you were describing that Baylor had --

1    in this litigation gone through those two different

2    categories of documents as described in this hearing,

3    logged them or produced them with some minor exceptions.

4           At this same hearing -- well, actually, if we go

5    one more page in.  Go back.  Yeah.  There you go.  And

6    that's on page 36 of the transcript later in the hearing,

7    again, Ms. Springer is indicating that the information

8    from the Pepper Hamilton collection postdating June 15th,

9    that's not been produced, and that's what you looked at to

10   see whether you could produce -- Baylor could produce that

11   within 60 days.  No distinction's made there between the

12   investigative files and the bigger collection but -- and

13   that's where we maybe get some confusion.  And I'll

14   certainly give you a chance to talk here but I want to --

15   this is kind of my order.  So.

16          MS. SPRINGER:  Understood.

17          THE COURT:  Yeah.  Thank you.

18          So at this hearing, Bill Cobb testify -- I guess

19   he didn't testify, but he described what -- and he did so

20   in some pretty specific detail, what Pepper Hamilton had

21   and what they were going to be tendering to the

22   third-party vendor.  And this is how he described it and

23   I've summarized this, but it's in the transcript.

24          He first said there's a -- they used a file site

25   system iManage documents that were the documents of Pepper

1   Hamilton attorneys on this one database, which contained

2   about 11,000 documents that he described as being about

3   4.2 gigabytes.  He said they also were -- there were

4   Mdrive files of the individual attorneys and timekeepers

5   who worked on this investigation that had been gathered

6   separately, and that was 12 zip drives with seven

7   gigabytes.  Said there were SharePoint files, which are --

8   which is the shared database that multiple people can work

9   on the same documents at the same time, and those only had

10   427 files.  There were some group calendars and other

11   shared documents, again, about half a gigabyte.

12         He said there were data rooms with data from

13   Baylor personnel, 547 files, seven data rooms, 1.3

14   gigabytes.  And then, he said there were three databases

15   that are in the Relativity platform.  The first was

16   documents that Pepper Hamilton had culled through its

17   searches of Baylor material, which I believe is what is

18   being referred to, Ms. Springer, by you as the Pepper

19   Hamilton collection.  That is the big, big, big data set

20   that was reduced down by Pepper Hamilton search terms and

21   that Pepper Hamilton used for its work, about 282

22   gigabytes.

23         The matter two Pepper Hamilton documents he

24   refers to -- and he says, again, these are about 11,000

25   documents -- I think, are the same as item one above, the

 1  file site thing, given the number of documents and

 2  description, but a different file size of 8.6 gigabytes.

 3  That, of course, could be because Relativity -- it's in

 4  the Relativity platform, that might add a lot of data, I

 5  don't know, but I'm sure there's some explanation for

 6  that.

 7          And then, finally, he referred to this box that

 8  had been sitting in a work room, a Fed Ex box that was a

 9  hard drive.  The box had not even been opened, but they

10  opened it and determined it was every single document

11  Baylor had ever given Pepper Hamilton.  He referred to it

12  as massive.  They hadn't done anything with it.  I think

13  that is the data that you meant -- that you were

14  referencing on Wednesday that was a hard drive that was in

15  a box, but it's actually not the culled material.  It

16  sounds like, from his description, it was the bigger data

17  set that is what they started with before they got to

18  their narrower set, I believe.  I'm not sure.  This is his

19  description.

20          And then, finally, just in the -- earlier, there

21  had been a series of declarations filed by Pepper Hamilton

22  itself in its responsive documents that described the

23  process that it had gone through in transferring the

24  documents to Cozen O'Connor and the other things.  But

25  there was a summary of this by Thompson & Horton's

1    attorney, Ms. McIntush, where she indicates how they went

2    through all of those investigative materials, how Baylor

3    has already gone through all of that, they've labeled

4    them.  The vast majority of them are because they're

5    Pepper Hamilton's own work, the majority of it that

6    believes -- they believe to be work product or

7    attorney-client privileged, that they had logged that and

8    produced that.

9           And in fact, attached to this declaration is a

10   log of 43 or 44 pages, I believe, and it covers a

11   timeframe from the first date on that privilege log is

12   August the 27th of 2015, and the last date is May the 24th

13   of 2016, again, reflecting that this was the work that had

14   been done and produced through that June 15th, 2016 date,

15   in all likelihood.

16          We turn to Judge Pitman's order, and in that

17   order, among other things, he says that he's not going to

18   grant the motion for protective order, saying that Baylor

19   had not met its burden, and concludes that Pepper Hamilton

20   must produce all of the other matters -- again, I don't

21   think that's really anything that we need to fuss with --

22   but also, uses the date frame that goes all the way

23   through November 6th of 2017.

24          And remember going back in the motion for

25   protective order that Baylor had filed, one of the

1   requests was that Pepper Hamilton -- that the plaintiffs

2   not be permitted to get anything prior to June the 15th of

3   2016.  Just rejects that with that timeframe.  But more

4   specifically, if you look at the very end of his order,

5   this is when Judge Pitman says we're going to come back in

6   July, and I want the parties to be prepared to talk about

7   some things.

8           First, he says he wants to address this issue of

9   whether Pepper Hamilton can withhold materials prior to --

10  the stuff that you've already now -- the review and

11  logging of.  Again, this is looking at Baylor's argument

12  that we shouldn't have to redo everything we've done up

13  through that June 15th, 2016 deadline on these two

14  categories, the Baylor material that Pepper Hamilton had

15  used search terms on and had culled down to 2.4 million

16  pages.  And we shouldn't have to go through that all

17  again.  We should only have to produce things after June

18  15th, 2016 out of these databases.

19          And then, he said on second, for those materials

20  that Baylor was arguing should have to be produced, how

21  should we go about doing it?  And he had already suggested

22  the clawback procedure, had attached a proposed order on

23  that, and wanted to get input from Baylor, or anyone else,

24  I guess, for any proposed improvements by the parties.

25          We move forward to the July hearing, he heard

1   argument from both sides, including Mr. Weisbart's and

2   Baylor's argument that there should not be a clawback

3   order, that there should be a third-party vendor used.

4   And by the way, there's never any mention of a third-

5   party vendor by Baylor until this hearing.  Prior to that, they

6   were arguing that they shouldn't have to be using a vendor

7   at all.

8           And in his order, Judge Pitman says, first,

9   Pepper Hamilton is ordered to produce all materials

10  responsive to the subpoena from that early January date.

11  He rejected the argument at this point that Baylor should

12  not -- or, I should say, Pepper Hamilton did not have to

13  even produce anything before that June 15th date.

14          Second, he ordered that, ironically, by September

15  9th, Baylor was to produce privilege logs for all of the

16  materials produced by Pepper Hamilton to the third-party

17  vendor and certify that the production was complete.  And

18  noting that he was using that representation that 60 days

19  was a realistic deadline in adopting that deadline.  And

20  he ordered that you all keep him informed on what's

21  happening with the retention of a vendor.

22          And there was an advisory filed that was a joint

23  advisory by the parties in October -- I'm sorry, September

24  the 6th, and this is joint and it indicates we're working

25  on it.  We've got a vendor, they've got the material, and

1   then, it -- interestingly, this is what the joint parties

2   described as what was going to happen with that material,

3   which was, an amended deadline for Baylor to produce

4   and/or log the Pepper Hamilton material postdating June

5   15th, 2016, produced to the third-party vendor.  Again, no

6   distinction made between different universes of documents.

7   Just everything after June 15th.

8           So that leads me to these conclusions.  On the

9   files that Pepper Hamilton -- well, let me start with

10   this.  I believe what has been delivered to Pepper

11   Hamilton -- by Pepper Hamilton to the third-party vendor

12   is everything that was described by Mr. Cobb, which I

13   think includes this hard drive that has the huge universe

14   of everything that I don't even know how many documents it

15   is -- he didn't know -- that were gathered by Pepper

16   Hamilton in its investigation.  That's sitting on a hard

17   drive.

18           That there's also -- and I don't know if it's on

19   a hard drive or what form it was delivered to the

20   third-party vendor in, the materials that Pepper Hamilton,

21   using its search terms, spent most of its work on its

22   investigation using.  And I believe that's the same

23   universe of data -- and Ms. McIntush's declaration

24   indicates this -- that Baylor actually uses that very same

25   data set as part of the material it looked at when it

1    produced material to the plaintiff in this litigation.

2           That was part of it that Baylor supplemented that

3    with its own -- or this litigation team did with its own

4    investigation in its own gathering of materials that

5    postdated the investigation by Pepper Hamilton.  That

6    material, though, the culled material that Pepper Hamilton

7    used in its investigation, that was delivered to the

8    vendor.  And then, Pepper Hamilton's own internal files,

9    the investigative materials have been produced to the

10   vendor.

11          I also -- it's clear from Judge Pitman's orders

12   that he heard the argument that Baylor made that, look,

13   we've gone through, we used the exact same data set that

14   Pepper Hamilton has given to the third-party vendor.

15   We've already -- we used that data set.  We've been

16   through that data set.  We have logged it, we have

17   produced it.  We shouldn't have to do that again.  And we

18   shouldn't even have to like compare that data set to what

19   we have produced to the plaintiff in this litigation

20   because we've been acting in good faith and, you know,

21   we've already been through that.

22          And he heard that argument, but he didn't accept

23   that last part.  It's clear that -- and he says it on the

24   record, he says it in his order -- that there have been

25   problems and he thinks that justifies doing the

1   deduplication process that the plaintiffs were requesting

2   and that they reiterated on Wednesday.

3          And so, I read his order to say that.  I think it

4   makes sense in the context of everything I've just

5   described, and I believe this is what is supposed to

6   happen with that material.  The first step is that first

7   -- I mean, it's happened.  Pepper Hamilton's to deliver

8   that data set of the culled material, the material to

9   which -- on which they applied search terms and the

10  results of that search to the third-party vendor.  They

11  have it, they've logged it, I believe -- or, I mean,

12  Bates-labeled it and identified it.

13         That either Baylor or the plaintiffs, somebody is

14  -- needs to provide the third-party vendor with an

15  electronic copy of what has been produced to the

16  plaintiffs in this litigation from that data set.  And

17  then, there needs to be a comparison made of deduplication

18  and an identification then of non-duplicates, things out

19  of that data set that have not yet been produced to the

20  plaintiff or logged as privileged by Baylor.

21         Now, my understanding is that that shouldn't be a

22  very big group, whatever it is -- you know, shouldn't be

23  -- of the non-duplicates because if Baylor, as indicated,

24  has already used that exact same data set, has been

25  through it exhaustively, has produced responsive materials

1  that aren't privileged to the plaintiff, have logged the

2  privileged material, presumably there's some nonresponsive

3  material in there that has not been produced and that the

4  non-duplicate materials should be small.  It should be

5  primarily, I presume, the either privileged material that

6  had been logged or the nonresponsive material.

7          But once that -- the things that are not

8  duplicates are identified, we need to decide what happens

9  with that.  Judge Pitman had proposed the clawback order

10  to expedite things, but Baylor has resisted that.  So I

11  think that means that Baylor would then need to go through

12  whatever those non-duplicates are, produce or log them.

13  But it should -- it's not going back through the entire,

14  it shouldn't be, the whole 2.4 million documents.  That's

15  already been done, and that should be captured by the

16  production and be -- those will be duplicates.

17          On the investigative files, it appears to me that

18  the only thing that needs to be done -- and I think this

19  is already understood by Baylor -- is to review the

20  post-June 15th, 2016 Pepper Hamilton investigative

21  documents, and do the review for responsiveness or

22  privilege and produce those documents.  Those have never

23  been produced before.  Those haven't been by either Baylor

24  or by Pepper Hamilton.

25          On the hard drive of the huge universe, I don't

1  believe plaintiff is asking that that be looked at at this

2  point.  Am I correct on that, Mr. Dunn?

3           MR. DUNN:  Well, we have been asking for it,

4  Judge, but for this discrete reason because we have

5  observed, over the course of the case, shifting

6  descriptions of the materials.  We got to the point where

7  we said there ought to be some inspection on what this

8  hard drive is because we lack confidence in the

9  descriptions we've been given of what Pepper Hamilton has.

10          THE COURT:  What I would propose at this point at

11 least is that that hard drive remain where it is with the

12 third-party vendor and nothing be done to it at this

13 point.  No -- that we don't want to open that can of

14 worms.  I don't want to open that can of worms right now.

15          MS. SPRINGER:  Judge, may I please -- this is

16 very important.  We do know exactly what was -- all the

17 parties know exactly what was delivered to Pepper Hamilton

18 now.  And unfortunately, Pepper Hamilton didn't know what

19 they had and gave varying descriptions, including at the

20 hearing.  And in a letter sent to the parties --

21          THE COURT:  I'm already done.  Can we --

22          MS. SPRINGER:  Yeah.  I just there is no --

23          THE COURT:  -- I will hear you out.  But whatever

24 that hard -- whatever that material is, if it's sitting in

25 a box, whatever it is, I don't think we -- wherever that

1  huge universe of what was gathered by Pepper Hamilton in

2  its investigation before it applied any search terms, I

3  think it should stay put.  I don't want to start looking

4  at that all over again.  That's the only point I'm making

5  right now.  And I understand that you probably have some

6  very valuable information to share and I want to hear it.

7  But let me just get to the last part here and that's the

8  deadlines.

9       What do we do with the deadline that was coming

10 up for whenever the 10th is, what is that, Tuesday, and

11 the extension of that deadline?  And I just want to --

12 again, this is to explain the statements I made on

13 Wednesday and I'm -- I'm still pretty much of the same

14 view about we need to work more quickly than what Baylor

15 has proposed and has requested.

16      If you look at as early as the June hearing, in

17 that hearing, this was the -- sort of the statement that,

18 look, for the things in the post-June 15th world, we,

19 Weisbart Springer, are taking the lead.  We're going to

20 make sure that this gets done right.  And you specifically

21 talk about the very same things you were talking about on

22 Wednesday.  We need to narrow the scope of the search

23 terms.  We need to narrow the custodians, and I'm going to

24 work with the plaintiffs' counsel to get that done.  So

25 June 15th or 19th, I think this is, 17th, we're already

1  talking about that.

2          July comes, comes up again.  And again, they're

3  saying, I think our ESI cutoff date's November 6th.  We

4  sent a proposal.  We've been consumed with this matter

5  right now in our schedules.  We haven't gotten to it.

6  But, you know, we need to get those terms and custodians

7  worked out, and we need to reach agreement on that.  So

8  we're talking about it in July.

9          And then, there was an advisory submitted in

10  October saying, we've gotten everything done.  As far as

11  the -- what the Court ordered us, and then, indicating

12  that Baylor has begun the process of collecting additional

13  documents pursuant to the orders that had been entered in

14  June and July and October, and then, has also begun

15  collecting ESI related to the Jane Does 11 through 15,

16  their assailants and, again, notes that the parties are

17  currently negotiating and agreeing upon the search terms.

18          And then, we get to Wednesday's hearing, and I'm

19  told we can't meet this deadline because we haven't got

20  the search terms and the custodians identified, and until

21  we have those, I can't tell you how much time it's going

22  to take.  So my frustration is that this has been an issue

23  clearly that needed to be decided and needed to be

24  resolved as early as June and now, in December, and no

25  progress at all.  We're still at the point of, well, we

1  can't even start until -- and, you know, you probably are

2  both responsible for the lack of an agreement.  I'm sure

3  you are.

4         But if the work that needs to be done is by

5  Baylor, if that's holding up the work, you need to come to

6  the Court a lot sooner than six months to get a ruling on

7  that.  And I've already set up the process that we're

8  going to have something by the 17th of December, either

9  y'all have made that -- bridged that gap and gotten

10 agreement or I'm going to tell you what the search terms

11 and the custodians are.

12        But that just to give you the backdrop of my

13 frustration is, you know, that that can't work.  I mean,

14 that's why we are three years down the road and no closer

15 to getting the documents done than we were two years ago

16 is, it's just pushback, pushback, pushback, rather than

17 forced to a decision.

18        All right.  So that's my ruling about what I'm

19 ordering to be done.  You want to clarify what actually is

20 in the third-party vendor and what Pepper Hamilton

21 delivered.

22        MS. SPRINGER:  And, your Honor --

23        THE COURT:  Ms. Springer.

24        MS. SPRINGER:  What is in the new deadline, were

25 you going to?

1          THE COURT:  I haven't given you one yet.

2          MS. SPRINGER:  Okay.

3          THE COURT:  I was expressing my frustration and

4  it's probably not going to be a date you like, but that

5  probably won't surprise you from everything I've said so

6  far.  But I want to hear what you have to say on this.  I

7  want to hear from both of you on those issues.

8          MS. SPRINGER:  First of all, I anticipated this

9  issue might come up if you went back and reread the

10 transcript.  Unfortunately, Pepper Hamilton's counsel was

11 not fully aware and had been giving conflicting and

12 inconsistent information about what Pepper Hamilton

13 actually had.  It's reflected in the declarations they

14 filed ahead of time.  And when Mr. Cobb stood up and read

15 in open court what he had, he was wrong.  He subsequently

16 -- may I approach?  He subsequently --

17         THE COURT:  Give me a second.  Just for the

18 record, the PDF that I've gone through here, put up on the

19 screen, I'm going to make that a Court Exhibit to today's

20 hearing so it can be part of the record.  Go ahead.

21         MS. SPRINGER:  So following the hearing.

22         THE COURT:  And we're marking this as plaintiffs'

23 -- I'm sorry, Defendant's 1.

24         MS. SPRINGER:  Following the hearing, July 8th,

25 when he actually found out what they had, he states in

1  this letter at the hearing that he described this

2  Relativity database containing approximately 282 gigabytes

3  of data, he also separately described a hard drive that

4  they had received.  And he implied that the hard drive and

5  the 282 gigabyte Relativity database were separate and

6  distinct.  And I suggested the hard drive may contain some

7  larger set of data from which the 282 gigabyte data set

8  was pulled.  It does not.

9           So he clarified that on that list, the hard drive

10  was, in fact, the smaller set of materials that was pulled

11  from the larger universe.

12           THE COURT:  Okay.

13           MS. SPRINGER:  And that there was no electronic

14  copy of that 2.4 million pages.  Subsequent to that, we

15  actually got from the vendor -- I mean, the materials were

16  delivered to --

17           THE COURT:  Well, hang on.  I'm sorry.  Go back a

18  second.  You just said there was no electronic copy of the

19  2.4 million pages?

20           MS. SPRINGER:  That is correct at the time that

21  it was delivered.  The very last paragraph, he states to

22  clarify.

23           THE COURT:  He says it's a 282 gigabyte

24  Relativity database.

25           MS. SPRINGER:  And the only copy of that

1    Relativity database in Pepper Hamilton's possession is the

2    version that Pepper Hamilton understands to be actually on

3    the hard drive, received from PWC in March 2017.

4              THE COURT:  Okay.

5              MS. SPRINGER:  So then --

6              THE COURT:  Let me ask you now, then.  Let's go

7    back, Danielle, can you go back to McIntush declaration?

8    So -- the last paragraph.

9              In that paragraph 8 of Ms. McIntush's

10   declaration, she states that Pepper Hamilton's e-discovery

11   vendor made available to Baylor the database of what I

12   have understood from that paragraph to mean that same 2.4

13   million-page culled file and that Baylor used that as part

14   of its documents that it was reviewing for production in

15   this litigation.

16             Is that correct, as far as you know?

17             MS. SPRINGER:  Slightly.  One, it's Baylor's

18   e-discovery vendor, that's Price Waterhouse, not -- it was

19   not Pepper Hamilton's.  But yes, Judge Pitman ordered the

20   entirety of the 2.4 million produced or logged, and

21   nothing -- nothing's been withheld from that.  It's either

22   been produced or logged.

23             THE COURT:  Yeah.  And that -- that was

24   transmitted in some electronic form to Baylor's

25   e-discovery vendor in this litigation.

```
1          MS. SPRINGER:  That is correct.  That is correct.

2          THE COURT:  So I -- okay.  So go on with what you

3   were saying about Mr. Cobb and the letter from July.

4          MS. SPRINGER:  So that 2.4 million, though, that

5   database, which is only Baylor data, it's not any Pepper

6   Hamilton-created data --

7          THE COURT:  Correct.

8          MS. SPRINGER:  And it all cuts off at September

9   2015, so it all predates the June 15th, 2016.

10         THE COURT:  Correct.

11         MS. SPRINGER:  Because that's when they collected

12  the material.  It only exists on that -- or existed on

13  that hard drive.  So if --

14         THE COURT:  That's where I keep -- you keep

15  saying that, but it also exists in Baylor's e-discovery

16  vendor.

17         MS. SPRINGER:  Well, it does, yes, but I'm not --

18         THE COURT:  The copy of it.

19         MS. SPRINGER:  Now it does, correct.

20         THE COURT:  Correct.

21         MS. SPRINGER:  Yes.

22         THE COURT:  Okay.

23         MS. SPRINGER:  It does.

24         THE COURT:  Okay.

25         MS. SPRINGER:  It does.
```

```
1              THE COURT:  Okay.
2              MS. SPRINGER:  But I just want to be clear there
3    were two sets, a hard drive set and an electronic set of
4    that.
5              THE COURT:  Fair enough.
6              MS. SPRINGER:  As Mr. Cobb described.  So now we
7    do know from what was transmitted.  And again, we have
8    been communicating jointly with the vendor.  And I
9    apologize.  I don't -- I thought I had an extra copy of
10   this.  I'm looking.  But what was --
11             THE COURT:  Make sure you just show a copy of it,
12   if you would, to Mr. Dunn.  Mr. Dunn.
13             And can I, for purposes of this hearing.
14             MS. SPRINGER:  Absolutely.
15             THE COURT:  Can we make Defendant's 1 an exhibit
16   for this hearing?
17             MR. DUNN:  No objection.
18             THE COURT:  That will be admitted as Exhibit 1
19   of the defendant's.  We'll make this one Exhibit 2.  Any
20   objection to that, Mr. --
21             MR. DUNN:  No, your Honor.
22             THE COURT:  All right.
23             MS. SPRINGER:  So we now know what the vendor
24   actually has.  And what the vendor got were some loose
25   paper files, but then, it got the Relativity databases
```

1  that are reflected in that exhibit, Exhibit 2.  And what

2  the vendor has done is, they took the hard drive and they

3  restored it, okay?  They restored it into an electronic

4  database that does exist; it's there.

5          But one of the things -- so just clarifying on

6  what date is actually there.  We don't need to worry about

7  this giant universe.

8          THE COURT:  Okay.

9          MS. SPRINGER:  It's not there.

10         THE COURT:  And that is fine by me.  As I said, I

11 don't think I want to go there, but at this point, there's

12 no reason to.

13         MS. SPRINGER:  Yeah.  On the deadline, the 60

14 days, when I reread this transcript, there is a

15 typographical error on page 36, which you put up on this

16 screen, wherein I'm talking about the 60 days.

17         THE COURT:  This is the July -- or no, I'm sorry,

18 the June hearing?

19         MS. SPRINGER:  The June hearing.

20         THE COURT:  Okay.

21         MS. SPRINGER:  You see the information outside

22 from the Pepper Hamilton collection, that was aside from

23 the Pepper Hamilton collection that postdates the June

24 15th.  That's what we could do in 60 days.  And I had

25 conferred with Pepper Hamilton's counsel about the amount

1   of data that would have to be reviewed and logged and felt

2   very confident that we could get it done in those 60 days.

3   So --

4           THE COURT:  I knew that outside didn't make sense

5   to me and I understood that.  But I'm not sure that that

6   is dispositive of what I've --

7           MS. SPRINGER:  It's not but I just want --

8           THE COURT:  -- said.

9           MS. SPRINGER:  But I just want to be clear with

10  the Court that that representation that 60 days was

11  specific to the Pepper Hamilton investigative materials

12  aside from the Pepper Hamilton collection.  Anything that

13  postdated, that was the representation -- and there was a

14  discussion even with Mr. Cobb where I was saying can we

15  date -- can we sort it by date range because that was the

16  first time I'd heard that description.  And so, he said

17  yes.

18          When that joint advisory was filed and it said

19  produce and/or log materials that postdate the June 15th,

20  that was Baylor saying, we believe that is what our

21  obligations would be.  Now, I'm hearing something today on

22  -- and I want to make sure I really understand it on this

23  deduplication process because, to me, that's a little

24  different than what we're doing with the investigative

25  materials.  And so, our --

```
1            THE COURT:  Yes, it is.

2            MS. SPRINGER:  Are you -- and it would be Baylor

3   that would have to give the material because it is that

4   FERPA redactions, it has the privileged materials.  So it

5   would have to be Baylor.  But if what you're saying is,

6   all they need to do is account for anything in there that

7   has not at all been either produced or logged, I think we

8   might be able to do that.

9            Now, I will tell you, when we picked this vendor,

10  we discussed this vendor.  It was not a very -- in my

11  opinion, it is not a very sophisticated vendor.  And I

12  remember distinctly, we thought that it was just going to

13  be doing the Bates labeling, and the material would then

14  be turned back to Baylor for any sort of accounting.  It

15  has taken us four months -- your Honor noted when we filed

16  the advisory.  It has taken this vendor for months just to

17  Bates-label this material.

18           And so, Price Waterhouse is a big firm, and it's

19  going to be a lot more efficient if what we're trying to

20  do to push this thing forward to get it done quickly is to

21  turn it to them, and then, they account for it and dedup

22  it.  They're going to be able to do it much more quickly.

23           THE COURT:  Mr. Dunn.

24           MR. DUNNAM:  My recollection specifically because

25  this was an issue we were interested in -- this was an
```

1  issue that we were interested in from the start because

2  our -- as Mr. Dunn said, we've had issues with competence

3  and materials going back two years.  Things redacted in

4  white, for example, that we happen to have a client that

5  accidently has a copy, things that we think we have some

6  reason for some concern.

7          Early on, the issue of deduplication by the

8  third-party vendor was something that was discussed with

9  the vendor.  I could probably go back and get you a date,

10  but I remember specifically myself talking to the

11  gentleman who was a technical expert.  I want to

12  understand, if you get the unredacted materials, can you

13  do an exact match?  Can your system do it?  This was a --

14  you know, a 15-minute discussion we had on the phone.  Ms.

15  Johnson was on it, too.  So the idea that this vendor was

16  not going to be involved in duplication -- deduplication

17  from the start is something that we would disagree with.

18  There's really no point in just using them as a Bates

19  labeler if that's all they're going to do.

20          The vendor assured us that they had these

21  abilities.  We could talk, if you wanted to, and you

22  probably don't want to hear why it has taken so long.  We

23  believe it's not a reflection on the vendor.  We've think

24  it has to do with issues that we could discuss if you want

25  to talk about it.

1          THE COURT:  Yeah.  I understand what you're

2    saying, but I think that horse is -- the train's left the

3    station.  The horse is out of the barn.  Whatever bad

4    cliché you want to use.  But the parties have agreed on

5    this third-party vendor.  I don't want to start over with

6    trying to get to a different vendor.  I understand it

7    might slow it down.  You've given notice to that effect.

8          And -- but whoever does it, what I -- I think

9    we're all on the same page here is that those two

10   different data sets, the original unredacted materials

11   that Baylor had and the ones that were produced, I guess,

12   Pepper Hamilton had and those that were produced, let's

13   find out what the universe of non-duplicates is.

14         And like I said, it should be small.  Every

15   representation that you've made about what's been done

16   with that material through that date is, it's been

17   thoroughly reviewed and unless there's something -- some

18   mistake or problem made that the universe of things that

19   would then be left over should be small.

20         MS. SPRINGER:  Can I make one suggestion,

21   friendly suggestion?  Because we're not going to have any

22   control over what the -- how quickly the vendor gets this

23   done.  One of the things that has slowed down the process

24   is every communication with the vendor has to be blessed

25   and approved by the parties before we transmit the

1    instruction.

2         I would suggest that Price Waterhouse technical

3    people communicate directly with the third-party vendor.

4    They keep a log of those communications and just so the

5    plaintiffs aren't suspicious --

6         THE COURT:  Let me cut through all of that.  How

7    about we have Monday, the vendor bring a representative

8    here or get on the phone, and let's talk about it with the

9    parties and the vendor and me and figure out exactly what

10   needs to be done, how long it's going to take, and get it

11   done.

12        MS. SPRINGER:  We could do that.  My only concern

13   is, every time we've had to communicate about this data,

14   we've -- because it's been maintained and produced in a

15   way in Price Waterhouse's database for the comparison to

16   be made, it has to come -- there's text messages, for

17   instance.  I'm not a tekkie, but there's text messages

18   that had to be loaded and fields and all sorts of things.

19        And so, maybe we can have the Price Waterhouse

20   person here, as well.

21        THE COURT:  Y'all can bring whoever you want,

22   expert-wise, to consult with, but the goal is, let's not

23   slow it down.  Let's speed it up.  And I'm happy to be the

24   one to help speed it up.  And sometimes it seems to me

25   that in many cases, even in criminal cases, it's amazing

1  the difference of what a defendant says to his attorney

2  when he's in court as opposed to what he says to him back

3  in the jail.

4       And similarly getting people in the courtroom

5  tend to sharpen their focus, let's just put it that way.

6  And I think let's do that.  And if I have concerns after

7  what I hear and see from the vendor about their ability to

8  actually do this and they're treating it with enough

9  urgency, it will be apparent, I think, and we can then see

10 where we need to go with that.

11      MS. SPRINGER:  I'm fine with it.

12      THE COURT:  Okay.

13      MR. DUNN:  I'd like to respond to this Cobb

14 issue.

15      THE COURT:  Okay.

16      MR. DUNN:  Now is an appropriate time.

17      THE COURT:  Yeah.  With -- so we are clear on the

18 order with regard to the Pepper Hamilton materials, what

19 we're going to do next is get the vendor in, figure out

20 how they're going to accomplish it.

21      MS. SPRINGER:  The Pepper Hamilton collection.

22 The Project BEAR collection.

23      THE COURT:  And I'm going to ask that we only

24 pick one name for this material.  I don't care what it is.

25 But have an agreement that we all, all of us use whatever

1 name is it so that there's not this same confusion that

2 happens in the future.

3        MR. DUNN:  I think the way to do that -- this

4 isn't going to work with labels because that's the issue I

5 want to raise.  There's not -- what Ms. Springer's using

6 as a phrase, we still don't know what that is.  So let me

7 start with this.

8        Walking into the courthouse this morning, we got

9 the monthly invoice by e-mail from the third-party vendor

10 and by the terms of -- I can't remember if it's an order

11 or an agreement, the vendor has to copy us on the invoices

12 that they're sending.  And in it, it says that they have

13 about 1.8 gigabytes worth of material.  Terabyte.  No.

14 1.8 terabytes, that's right, of material.

15        THE COURT:  I was going to say, if it's

16 gigabytes.

17        MR. DUNN:  Sorry.

18        THE COURT:  Something's gone awry.

19        MR. DUNN:  It's written in gigabytes as

20 1,800-and-something.

21        THE COURT:  Yeah.  Okay.

22        MR. DUNN:  And so, that doesn't match, right,

23 with the drive and the box that's two-point --

24        THE COURT:  208 gigabytes.

25        MR. DUNN:  Right.  And, well, they also got the

drive and the box, right, and they uploaded it.  But the
numbers that we've all been given by everybody don't add
up to 1,800-and-something, okay?  And so, it seems like
what -- you know, I don't know how to do it at this point,
but talking generally about what's under this can or
what's under that can is what's gotten us here now.

So it seems like maybe when we get the vendor
here, we can have the vendor inventory what it is that
they have, what makes up the 1.8.  And one final comment
on that.  If it is the case that what's on this hard drive
is the grand scheme of materials that was then culled from
using search terms by Pepper Hamilton, the result of which
we're supposedly going to get in the 282, then taking
Baylor's production and deduping it against that hard
drive should come up with more or less a perfect match,
right?  And nothing more than that.  We should see a list
of what's on that hard drive that isn't in the 282.  And
we'll actually know the remainder that wasn't culled out
by Pepper Hamilton's search terms, and maybe we get into
that later or not.  I understand your Honor's putting that
off to another day.

Be we think all the comparison should be to the
whole pile, especially since we don't have a straight
answer of what was given to them.

THE COURT:  My concern with that is, as I

1  understand it -- and again, it may be misdescription.  It

2  may be that we're on a snake hunt for something that

3  doesn't exist.  But if this universe of, you know,

4  everything that Pepper Hamilton went and got during its

5  investigation, every cellphone, every device, every

6  laptop, every bit of data that they gathered from that, if

7  that exists still in a pristine form, if we dedup it

8  against what Baylor has produced to you, it could be a

9  huge universe of things that were never produced to you.

10 Because, as I understand it, what Pepper Hamilton says is

11 that they took that -- whatever that universe is, however

12 big that is, they did their search terms, and then, they

13 pretty much set it aside, and they just worked with the

14 2.4 million pages of documents that have been produced to

15 Baylor's e-discovery vendor and that Baylor has used as

16 the -- one of the main data sets to produce to y'all in

17 this litigation.

18        So those are the two that I think need to be

19 matched up to make sure that Baylor is -- you know, the

20 whole concern here is that Baylor has arguably not been

21 acting in good faith, or accurate, or whatever, in its

22 production to you from that data set.

23        I don't think there's evidence, I haven't heard

24 any, that Baylor ever even itself received back from

25 Pepper Hamilton the huge, big database.

1          MS. SPRINGER:  Only as part of this discovery, we

2    -- the vendor.  The vendor did.  PWC.

3          THE COURT:  Okay.  So if that exists somewhere,

4    I'm not sure I want to start with that because I think

5    what it might do is -- and this is one of the other things

6    -- one of the other things I wanted to say today, what it

7    might do is create another huge data set that has not been

8    looked really at by anybody, and could set us back even

9    further if -- you know, at some point, we've gotta trust

10   somebody who's run some search terms on this data set that

11   they've captured the things that need to be looked at in

12   this litigation.

13          And my fear is that there's a whole lot of stuff

14   that when they went out and started grabbing devices and

15   phones and that doesn't relate to this litigation.  And,

16   you know, I think one of the -- so the bigger point I

17   wanted to say that -- well, I'll go ahead and say it now.

18   I was going to say it later -- is I would urge the

19   plaintiffs to also look carefully at their requests and

20   their scope of this -- of their searches because that's

21   part of -- definitely driving part of the problems.

22          I mean, if we had an agreement to produce

23   directly to you and claw back, I wouldn't be as concerned

24   about that, but we don't have that agreement.  And the

25   flip side of that means that then, we're relying on Baylor

1   to have to go through everything first, and that has been

2   slow.

3          So to the extent you can, without compromising

4   your clients' interests and your interests in litigation,

5   help that process, I would urge you to do that.

6          MR. DUNN:  We'll absolutely take that to heart,

7   your Honor.

8          THE COURT:  And I know you -- I mean, I'm not --

9   it's just, you know, we're going to have to work, all of

10  us, to figure out ways to move this forward.  So.

11         MR. DUNN:  Here's what -- here's the scene that

12  we -- that I, in particular, but I think all of us have

13  been looking at:  Jury's in the box.  Baylor has at

14  various times said this is the best blue-ribbon Pepper

15  Hamilton investigation anybody's ever done at the

16  university.  At other times, they've said it's a disaster.

17  Their executives have said it was a mess, right?  So there

18  are going to be witnesses who ultimately testify about the

19  quality of the Pepper Hamilton findings.

20         Because as the Court's probably aware of by now,

21  the regents issued and findings, many of which, you know,

22  in my opinion, preclude summary judgment, for example, in

23  this case.  You have a finding by officeholders,

24  policymakers as to failures in Title IX.  So I think

25  Baylor strategy, as I've seen up until now, is to attack

1  those findings.  Well, the board was misinformed by Pepper

2  Hamilton.  It shouldn't have concluded that it violated

3  all these policies.

4        And so, what Pepper Hamilton got from Baylor that

5  Baylor thought was important enough to hand over to them

6  and what Pepper Hamilton decided to cull out of it, I

7  think, is going to end up being an issue that shows up in

8  trial.  That's the reason I raise it.  But I've heard your

9  Honor, and we'll sit down and figure out what we can do to

10  comply with the orders.

11        THE COURT:  Okay.  I appreciate that.  All right.

12        MS. SPRINGER:  Your Honor, just to clarify, one

13  more time, we have another inventory that was provided to

14  all the parties.

15        THE COURT:  Okay.  Got it.

16        MS. SPRINGER:  On the one back page, there's a

17  small entry that says the hard drive at the top.  And you

18  see, it's got the 283 gig or --

19        THE COURT:  Gigabytes.

20        MS. SPRINGER:  Gigabytes.  So this reference on

21  the invoice, I haven't looked at it today.  We all know

22  that's what they have.  This is part of their inventory

23  they gave us.  And so, I just want to -- I want to make

24  that clear.  There's not some big missing gap subset

25  there.

1          And as to the broader issue, Baylor's not

2     attacking the findings.  I just need to be very clear with

3     that.  We have not attacked -- in fact, we have embraced

4     them, and it's been part of what Baylor has been doing

5     implementing them in the last several years.  So I just

6     need to correct that statement for the record.

7          And I embrace having the vendors come, and we

8     will have somebody from PWC come, because these were very

9     technical with text messages, and there are slip sheets,

10    and we could give you a notebook of the communications

11    that have gone back just to be able to Bates-label it.

12    So.

13          THE COURT:  Okay.

14          MR. DUNN:  We have one another issue, your Honor.

15    So I don't want to use a trigger word, so to speak, but

16    what we're calling the Pepper Hamilton report, all right,

17    we had suggested during the summer that the Court review

18    that in camera.

19          THE COURT:  Uh-huh.

20          MR. DUNN:  It's going to end up being a central

21    issue in the case.  And in the interest of getting things

22    moving along, we suggest it get filed with your Honor so

23    you have some sense of what this report looks like, or

24    whatever it is, the PowerPoint, hyperlink to individual

25    documents.  And the reason we think that makes sense to do

1  now is for a variety of reasons, but on this point is, we

2  think it will help the Court understand better what it is

3  Pepper Hamilton culled from, what -- it may even describe

4  the search terms they use, otherwise, describe their

5  process.  It will only be the Court receiving it, so we

6  won't have it still.

7           THE COURT:  So as I recall at the hearing on

8  Wednesday, Ms. Brown said that they had listed that

9  somewhere on a privilege log.

10          MR. DUNN:  Which we still have.

11          THE COURT:  Identified the PowerPoint?

12          MS. SPRINGER:  No.  It has been -- it is there,

13 PowerPoint.  It's been identified for over --

14          THE COURT:  So would you make sure that, Ms.

15 Springer, that Mr. Dunn knows, or Ms. Johnson, or whoever

16 needs to know this, exactly where that is in the privilege

17 log?

18          MS. SPRINGER:  Yes.

19          THE COURT:  And then, what I would suggest you do

20 is, let's keep everything as per the process of you look

21 at that entry, I don't think it's going to make -- it will

22 be a very quick conversation, I have a feeling, about

23 whether there's any agreement about whether anything in

24 there could be produced without the Court intervention and

25 then, make a motion to -- for that to be produced.

1          The only grounds I have to review something in

2    camera is if it's being sought as not being privileged, or

3    challenged as not being work product, if that's the claim

4    that's been made by Baylor.  So that needs to be

5    challenged for me to even have a reason to look at it.

6    Okay.

7          So I am going to remain -- until we -- let's do

8    these two things.  I want to resolve the search terms and

9    custodians and talk to the vendor before I set this

10   deadline of when you need to produce things by, but it's

11   probably going to be, at the latest, in February and

12   probably maybe less than that.  So that's 60 days -- I'm

13   thinking 60 days when we get these issues resolved.

14         If in the deduplication process, we find some

15   huge universe of surprises, we'll have to revisit things.

16   But I'm anticipating, based on everything I've read and

17   understood and the representations made, that the universe

18   of non-duplicates is not going to be so huge that the work

19   that needs to be done to get that produced or logged is

20   going to be massive.

21         MS. SPRINGER:  Your Honor, I mean, ideally

22   there's just going to be nothing.  It's just going to be

23   accounted for.  Now, I'm looking at that as a different

24   deadline because the deadline -- December 10th deadline

25   was for complete production of everything in response to

1    106 requests.

2            THE COURT:  Yes.

3            MS. SPRINGER:  Okay.  And --

4            THE COURT:  But the concern you have with that

5    was really the dates from June 15th to February -- or, I'm

6    sorry, to November, whatever that end date is that the new

7    material and how much --

8            MS. SPRINGER:  Absolutely.

9            THE COURT:  How much quantity that is.

10           MS. SPRINGER:  But the December 10 deadline is

11   much broader than what we're talking about here.

12           THE COURT:  I understood.  I understand.

13           MS. SPRINGER:  Okay.  We have no problem with --

14   in fact, we've sent a draft e-mail already over to

15   plaintiffs to get it to the vendor to have it transmitted,

16   the post-June 15th Pepper Hamilton materials, so we can

17   get that done.  So we have no problem with that.

18           THE COURT:  And to be clear, that means not just

19   Pepper Hamilton's own internal documents but, also,

20   whatever postdates June 15th in the culled documents,

21   something that we need to give a name to that we know what

22   we're talking about.

23           MS. SPRINGER:  But there's nothing that's going

24   to be there in the culled documents because they all

25   predate June 15, 2016.  But if there's anything -- what I

1   think I'm hearing from you is, if there's just anything

2   that shows up that isn't accounted for, that's not a

3   problem.  But the December 10th deadline is much broader

4   than that subset, and so, I just -- I guess I just want to

5   make sure we're on the same page with you.

6          THE COURT:  We are.  But as I said, my

7   frustration is, it's been -- that's been the focus for

8   long time, and we're six months down the road and we're no

9   closer to --

10          MS. SPRINGER:  I -- I hear you.  I just want to

11  make sure I'm on the same page as which deadlines we're

12  talking about right now.

13          THE COURT:  Yeah.  And I haven't set any deadline

14  for the dedup process.  I want to hear from the vendor,

15  see what they say it's going to take.  But I do want to

16  set deadlines on that vendor so that we know we're moving

17  forward.

18          MS. SPRINGER:  Right.  And my deadline -- "my"

19  being Baylor, the investigative materials is 60 days and

20  we're on it.  So.

21          THE COURT:  All right.  Anything else we need to

22  address this morning?

23          MR. DUNN:  Nothing, your Honor.

24          MR. DUNNAM:  Would you care for an update of just

25  a few things from Wednesday?

1    THE COURT:  Sure.  And one of the things I do

2  intend to do, we have an order almost ready to be entered

3  today that mainly is focused on the third-party discovery

4  that will give a brief deadline for any of those third

5  parties if they want to update any of the material that's

6  already been submitted, do so by this date.  A week later,

7  responses by anybody who wants to update their side of

8  things, and then, I'll decide if I can rule on it, any of

9  those, or we need to have hearings.

10    MR. DUNNAM:  Yeah.  This is not really -- I mean,

11  I just want to let you know, I've talked to Mr. Nesbitt.

12  I think we'll either have or have -- I'm -- we drafted a

13  letter to Mr. Lanier about Judge Starr.  We think we have

14  an understanding of what, if anything, we need to do with

15  Mr. Alejandro.  I just want to let you know --

16    THE COURT:  Excellent.

17    MR. DUNNAM:  -- we've moved on that.  We did

18  send, last night -- Ms. Springer probably hasn't had a

19  chance to look at it.  We've removed 11 search terms from,

20  you know, what was disagreed upon.  One thing that, you

21  know, we would observe or see if we -- it could be done.

22  I understand these deadlines, but there have been

23  obviously agreed terms and agreed custodians for a long

24  time.  And it seems like the fact that we had -- we still

25  have some disputed terms is holding up the production of

1  what we've all agreed on, right?

2          And so, we would suggest that why can't that

3  other stuff just go ahead and be produced if we've gotta

4  spend time arguing about some other terms and custodians,

5  okay, but let's not use that as a reason not to go ahead

6  and get what we've all agreed upon.

7          MS. SPRINGER:  Can I address just a couple of

8  things?  One, taking to heart what your Honor said on

9  Wednesday, one lawyer for each side, I really feel like

10 had I known this conference would be going in so many

11 different directions, I probably would have had somebody

12 else with me because this case has a lot of moving parts.

13         THE COURT:  Right.

14         MS. SPRINGER:  So if we're going to do that, I

15 want to have some way we can give notice when we're going

16 to go on certain issues.  However, on the inside search

17 terms and this is merits, and we weren't going to be going

18 into merits, but I need to address it.

19         The old custodians and the old terms were picked

20 and agreed upon in the con -- back in 2017, when the only

21 issues predated June 15, 2016.  The custodians, the

22 general counsel is a custodian.  All of that made sense

23 back then because there was the waiver filed.  There were

24 various things.  But the waiver's just for things prior to

25 the issuance of the findings.

1           And so, now we're in a different era.  And so,

2   when we agreed to move, when we agreed to move the cutoff

3   date from June to November, our advisory specifically,

4   both parties wanted to retain the right to remove

5   custodians, to change search terms because there would be

6   new custodians that needed to be added, different terms,

7   and there would be custodians that did not need to be

8   there anymore.

9           THE COURT:  I get all that.  I think what I heard

10   Mr. Dunnam say is, there's some custodians, even in that

11   new timeframe, that Baylor agrees are appropriate.

12           MS. SPRINGER:  And we've started that.

13           THE COURT:  And there are search terms that --

14   you know, there's gotta be some universe of custodians and

15   search terms from the old group that Baylor itself agrees

16   yeah, these are still appropriate.  Start running that.

17           MS. SPRINGER:  We --

18           THE COURT:  Generate that -- those search terms,

19   generate those materials and start working.

20           MS. SPRINGER:  We have and we've done it for the

21   post-June 15th timeframe.  So on that we are.  But as I

22   understood what Mr. Dunnam was saying is, he wanted us to

23   run all of the agreed search terms from the old order and

24   on all of the custodians, and the problem is, the lessons

25   learned from the old order is some of those generated

1   massive amounts of hits.

2            THE COURT:  Well, I don't know if that's what he

3   was saying or not but --

4            MR. DUNNAM:  No.  We -- I think -- Ms. Johnson's

5   been working on this, too -- that we have a list of things

6   we've agreed proposed, and we might have some things that

7   we don't agree.  But why can't we go ahead and get the

8   stuff that we've agreed on.

9            MS. SPRINGER:  That's --

10            THE COURT:  That's what I'm saying.

11            MS. SPRINGER:  And --

12            THE COURT:  Whether he's saying it or not, what

13   I'm suggesting is, if there's stuff that you already have

14   agreed on that you're not going to ask me about and that

15   you don't even need to confer any further on, start that

16   work.

17            MS. SPRINGER:  Judge, even before Wednesday, we

18   had the Baylor people going in, collecting the data

19   through the November time period to do exactly that.

20            THE COURT:  Okay.

21            MS. SPRINGER:  So we are there on that.

22            I would say on the proposal we got yesterday, it

23   is just search terms.  It has no custodians, it has no

24   date ranges.  So we need to --

25            MR. DUNNAM:  We're going to do that.  We had

1   promised you, I think, that by tomorrow -- yesterday.  So

2   we --

3           MS. SPRINGER:  Okay.  I just --

4           MR. DUNNAM:  Yeah.

5           THE COURT:  My order today is going to give you a

6   deadline to give all of that to Baylor so that you all can

7   look at it and respond, and then, a deadline for you to

8   then submit stuff to me if you can't agree.

9           MR. DUNNAM:  Yeah.  I --

10          MS. SPRINGER:  Really, in the interest of going

11  forward, because I don't want to be in a position where

12  I'm not in a position to address things fully the Court

13  may want to hear or may be brought up, I'm going to

14  suggest that we try to agree on a process where we alert

15  each other of issues like that.

16          THE COURT:  I wouldn't worry about that.  This

17  was a hearing I called that, you know, I didn't give y'all

18  any notice of what was going to be talked about.  So yeah.

19  No harm, no foul at this point.

20          MS. SPRINGER:  Okay.  Because I have not been as

21  deeply involved in the prior years --

22          THE COURT:  Understood.

23          MS. SPRINGER:  -- in the case.

24          THE COURT:  Understood.  All right.

25          So you'll get an order from me today on the other

1  matters that were still lingering.  What I would ask you

2  to do is work with that vendor and communicate, if you

3  could, with Ms. Deichert, my courtroom deputy, about a

4  date.  Can we all agree in Austin, or do you need to do it

5  in -- I mean, I've just been doing stuff here without even

6  asking.

7          MR. DUNNAM:  Well, I think in this instance, I

8  think we have to do it by phone because I believe the

9  vendors person is -- I mean, obviously we can compel the

10 vendors person to come here but --

11         THE COURT:  No.  By phone is fine.

12         MR. DUNNAM:  Okay.  Yeah.  They're in New Jersey.

13         THE COURT:  Okay.

14         MR. DUNNAM:  So we'll get with the vendor and get

15 some available dates and get with Ms. Deichert, as I

16 understand.

17         THE COURT:  And the goal is to do this posthaste.

18 So next week at the latest.

19         MS. SPRINGER:  And the vendor and possibly a

20 representative of PWC --

21         THE COURT:  If you want to get a PWC

22 representative on the phone with y'all, that's fine with

23 me.  And if there's any IT folks that you want to have,

24 you know, on your side, that's fine, as well.

25         MS. SPRINGER:  They're going to know what --

1  PWC's going to know what the data looks like.

2           THE COURT:  Sure.  Makes sense.  Okay.  All

3  right.  Thank y'all.  You may be excused.

4           And just for the record, we're still on the

5  record, everything that was given to me, which is Exhibit

6  1, 2 and 3, are all going to be admitted for purposes of

7  this hearing.

8           Any -- that means that they'll be on the CM/ECF.

9  Anything about any of this that's -- needs to be sealed or

10 -- yeah.  I didn't think so.  All right.  Thank you.

11 Y'all may be excused.

12           (Proceedings conclude at 11:17 a.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                    REPORTER'S CERTIFICATE

4

5      I, LILY I. REZNIK, DO HEREBY CERTIFY THAT THE FOREGOING

6   WAS TRANSCRIBED FROM AN ELECTRONIC RECORDING MADE AT THE

7   TIME OF THE AFORESAID PROCEEDINGS AND IS A CORRECT

8   TRANSCRIPT, TO THE BEST OF MY ABILITY, MADE FROM THE

9   PROCEEDINGS IN THE ABOVE-ENTITLED MATTER, AND THAT THE

10  TRANSCRIPT FEES AND FORMAT COMPLY WITH THOSE PRESCRIBED BY

11  THE COURT AND JUDICIAL CONFERENCE OF THE UNITED STATES.

12

13  */s/Lily I. Reznik*                    November 4, 2020

14  LILY I. REZNIK, CRR, RMR               DATE
    Official Court Reporter
15  United States District Court
    Austin Division
16  501 W. 5th Street, Suite 4153
    Austin, Texas 78701
17  (512)391-8792
    SOT Certification No. 4481
18  Expires:  1-31-21

19

20

21

22

23

24

25