IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | | |
|---|---|---|
| JANE DOE 1, JANE DOE 2, | § | |
| JANE DOE 3, JANE DOE 4, | § | |
| JANE DOE 5, JANE DOE 6, | § | |
| JANE DOE 7, JANE DOE 8, | § | |
| JANE DOE 9, JANE DOE 10, | § | |
| JANE DOE 11, JANE DOE 12, | § | |
| JANE DOE 13, JANE DOE 14, AND | § | |
| JANE DOE 15 | § | Cause No. 6:16-cv-173-RP |
| | § | JURY TRIAL DEMANDED |
| *Plaintiffs*, | § | |
| | § | |
| vs. | § | |
| | § | |
| BAYLOR UNIVERSITY | § | |
| | § | |
| *Defendant.* | § | |

**PLAINTIFFS' BRIEF ON PRE-ASSAULT CLAIM ELEMENTS**

TO THE HONORABLE JUDGE PITMAN:

Pursuant to the Court's direction in ECF 916, Plaintiffs file this Brief setting out the elements they argue are applicable for their pre-assault claims:

### BACKGROUND

Plaintiffs allege two theories of liability for Baylor's conduct that occurred before each Doe's sexual assault. First, Plaintiffs allege Baylor maintained intentional policies and customs that subjected Plaintiffs to a discriminatory educational environment, which included, but was not limited to, rendering them vulnerable to sexual assault. As articulated by the Fifth Circuit in *Pederson v. Louisiana State Univ.,* 213 F.3d 858, 880-881 (5th Cir. 2000), this claim exists when: "it is the institution itself that is discriminating." Second, Plaintiffs allege that Baylor's intentional policies and customs heightened the risk of sexual assault on campus, that Baylor had notice of this and was deliberately indifferent, and therefore the school is liable for the acts of harassment each Plaintiff was subjected to. The Court

1

has already recognized these two pre-assault theories in its Orders on Motions to Dismiss.  ECF 78 at 15-17;  Case No. 6:17-cv-00228-RP, ECF 14 at 14-21;  Case No. 6:17-cv-236-CV, ECF 35 at 18-24.

Below, Plaintiffs lay out the elements for each of these claims of liability.  Plaintiffs also suggest potential jury questions matching these elements.

**ARGUMENT**

**I.    Intentional Official Policy or Custom**

Although a sports funding case, the Fifth Circuit has given direction on the test to consider when a Plaintiff alleges that a federally funded institution intentionally provided a discriminatory education environment in violation of Title IX: "The proper test is not whether it knew of or is responsible for the actions of others, but is whether Appellees intended to treat women differently on the basis of their sex by providing them unequal athletic opportunity…" *Pederson* 213 F.3d at 882.  Because *Pederson* focused on sports funding, this sentence necessarily left out the rest of the applicable statutory language from Title IX: "…be excluded from participation in, be denied the benefits of, or be subjected to discrimination…" 20 U.S.C. § 1681(a).  To rephrase the *Pederson* language for the context of the present case: "The proper test is not whether Baylor knew of or is responsible for the actions of others, but is whether Baylor intended to exclude from participation in, deny the benefits of, or subject to discrimination, female students, on the basis of their sex."  Using this framework, the claim elements are: (1) a federally funded educational institution [Baylor] (2) intended (3) to exclude from participation in, deny the benefits of, or subject to discrimination (4) female students (5) from any education program or activity (6) on the basis of sex.  These claim elements come directly from the statute.

This Court has already noted the application of *Pederson* to this case and held that the intentional policy framework is different when the allegation is that the school is discriminating separate and apart from whether or not a student assaulted or harassed another student in a sexual

2

manner.  The Court explained: "If a university makes a decision to enforce disciplinary rules selectively because of 'stereotypical assumptions' about male students' conduct based on their gender, which has the effect of denying access to certain university opportunities and benefits for female students because of 'stereotypical assumptions' about women's conduct, it is plausible that that institution intended to treat women differently because of their sex." *Lozano v. Baylor Univ.*, No. 6:16-CV-403-RP, 2019 U.S. Dist. LEXIS 171827 at *19 (W.D. Tex. Sept. 27, 2019).

As for a possible jury question on the claim, the *Pederson* case was tried to the Court and therefore it provides no specific direction.  Plaintiffs argue that the framework adopted by the Supreme Court in the seminal case of *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 270 (1977) on detecting discriminatory animus, should be utilized to craft jury instructions on this claim.  "Title IX's protections are narrower in some respects and broader in others" than the Equal Protection clause.  *Fitzgerald v. Barnstable Sch. Committee*, 555 U.S. 246, 257-258 (2009).  Nevertheless, "… it is well established that the *Arlington Heights* factors also provide one way for a plaintiff who alleges statutory discrimination to establish discriminatory intent. *See Gallagher v. Magner*, 619 F.3d 823, 833 (8th Cir. 2010)(applying the *Arlington Heights* factors to discern whether a county acted with discriminatory intent in the FHA context); *Hallmark Developers, Inc. v. Fulton Cty., Ga.*, 466 F.3d 1276, 1283–84 (11th Cir. 2006) (same); *Tsombanidis v. West Haven Fire Dep't*, 352 F.3d 565, 579 (2d Cir. 2003)(same in FHA and ADA contexts)." *Pacific Shores Properties, LLC v. City of Newport Beach*, 730 F.3d 1142, n.21 (9th Cir. 2013)(citations and parentheticals in original).

In another context, Judge Prado explained "Courts have categorized allegations of discrimination according to two analytical frameworks: intentional discrimination and disparate impact discrimination. Claims of intentional discrimination require plaintiffs to prove that the defendant had a discriminatory motive behind his actions. Disparate impact outlaws unjustifiable practices that are facially race neutral but that fall more harshly on certain minorities." *GI Forum v. Texas Educ.*, No. SA-

3

97-CA-1278-EP, 1999 WL 33290624, at *4-5 (W.D. Tex. Jul. 27, 1999). Here, Plaintiffs' claims focus in on their proof that Baylor maintained, over decades, intentional policies and customs of gender discrimination. In short, Plaintiffs intend to prove that Baylor intentionally violated Title IX. "Factors that a plaintiff might rely upon in demonstrating intent include a disparate impact of the government action on [female students]; a history of discriminatory official actions; procedural and substantive departures from the norms generally followed by the decision-maker; and discriminatory statements in [Board of Regents] or administrative history. *See id.* at *2 (citing *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. at 266). Plaintiffs in the present case intend to demonstrate compelling evidence on such factors.

> Thus, a jury question/instruction for this claim would look something like the following:
>
> Do you find, based on the preponderance of the evidence, that Baylor[1] intended, prior to the assaults of Jane Does 1-15, to exclude from participation in, deny the benefits of, or subject to discrimination, under any education program or activity, female students on the basis of their sex?
>
> You are to consider the following factors in determining whether Baylor intentionally provided a discriminatory environment to its female students. Plaintiffs need not show every factor and no factor is more important than another. Discrimination need only be one purpose, and not even a primary purpose of an official action for a violation to occur. Rather, in considering all the evidence and all of these factors, how do you answer this question, yes or no, for each of the Jane Does listed below?
>
> Factors to consider:
>
> (1) the impact of Baylor's management decisions (whether they disproportionately impacted one gender);
>
> (2) the historical background of decisions under the official action, particularly if unequally applied in situations involving gender;
>
> (3) the specific sequences of events leading up to the policies challenged in the case, including departures from normal procedures in making decisions and substantive departures, (i.e., if the decision maker would have made a different choice had the applicant been male, then gender was the deciding factor); and

---

[1] There is no dispute that Baylor is a federally funded educational institution therefore that issue need not be placed before the jury.

(4) the deliberative history where there are contemporary statements made by the governing body or administrator who created the official action.

If the jury answers "Yes" to this question, the jury would then proceed to a damages question. (Also, the Court would consider, post-trial what, if any, injunctive relief Plaintiffs are entitled to in light of the jury's factual findings). The question on damages would ask the jury to determine what amount of money each of the Plaintiffs is entitled to that the jury found were subjected to an education environment in violation of Title IX. This question could allow for separate damage categories and would allow the jury to determine what compensation a Plaintiff was entitled to for the statutory violation. Baylor's position throughout this litigation has been that one or several of Plaintiffs are either lying and making up their assault allegation or that a Doe invited it, through their own actions and appearance. Indeed, Baylor seeks to turn this litigation into multiple rape trials. While Plaintiffs strongly disagree with Baylor's position, submitting the case in the manner suggested by Plaintiffs above allows a jury finding on whether or not Baylor had intentional policies and customs to discriminate against female students while also allowing the jury to award levels of damages, if any, based upon the harm the jury concludes that individual Plaintiffs suffered as a result of the intentional policies it found.

The harm to Plaintiffs for the liability the jury may find under this claim includes rendering them vulnerable to sexual assault, but also includes a myriad of policies that affect the day to day educational environment these female students were subjected to (regardless of whether or not Baylor's policies made their assault more likely and regardless of whether or not the jury is convinced a particular Doe was in fact assaulted). Whether or not the jury chooses to award damages for the increased risk of assault, it could nevertheless determine that a Plaintiff is entitled to some relief for having been deprived the full benefit of the educational environment. Jurors may connect damages to school funding decisions such as compensation paid to parties it publicly deemed responsible for

its admitted failures, or funding to a program or division. The jury may also consider the amount of funds a Plaintiff paid to Baylor only, and/or paid to another institution post-Baylor to complete or remedy her education. Cost and co-pays for counseling and medical treatment may also be considered as but one other example.

Baylor's conduct negatively impacting Plaintiffs before they were assaulted is extensive: (1) Baylor's failure to educate and prepare the male students to behave in a manner that did not interfere with the female student's educational environment (2) Baylor's failure to train faculty and staff to be supportive of a sexual assault reports, (3) Baylor's actions in subjecting female students to an environment where they knew that if they were assaulted, they should not report it and would not receive support, (4) Baylor's failure to train and assist in coordination in the reporting and investigation of sexual assaults with local law enforcement authorities, (5) Baylor's failure to prepare and implement substantial physical and electronic prevention and security measures to assist in reducing the instances and opportunities for sexual assault occurrences, and (6) the harm that results to a student who has, through perseverance and intelligence, gained access to an institution of higher education only upon registration to learn she is treated with less value than the male students.

Importantly, this pre-assault policy claim would exist whether or not the Fifth Circuit ultimately recognizes the heightened risk framework as it should.[2] And, to prepare the Court's judgment to avoid a retrial however the circuit rules on that issue, the damages question can separate out damage elements such that heightened risk damages can or cannot be included in a judgment upon any post-trial remand. Whether or not heightened risk damages are allowed, each of these Plaintiffs

---

[2] In a recent unreported opinion, the Fifth Circuit declined to adopt a "general 'heightened risk'" theory under the unique facts of that case that had to do with physical education exercise but it did not foreclose forever doing so. *Poloceno v. Dallas I.S.D.,* 826 Fed. Appx. 359, 363 (5th Cir. Sep. 10, 2020). The circuit acknowledged that sister circuits had adopted this framework in contexts involving sexual assault.

did not receive a non-gender discriminatory education as mandated by federal law. Even setting aside heightened risk damages, the jury could award damages to compensate for the educational environment these Plaintiffs did receive as compared to the one they should have received had federal law not been intentionally flouted. Lastly, even in the absence of any compensatory damage the jury might consider, it would be free to award nominal damages for the important and intentional violation of federal law that was proven.[3]

The *Arlington Heights* test is a widely accepted standard across a large spectrum of cases where the focus is proving discriminatory intent of an organization. *E.g., Hodgens v. General Dynamics Corp.*, 144 F.3d 151 (1st Cir. 1998)(applying *Arlington Heights* factors in ADA/FMLA lawsuit); *Martin v. International Olympic Committee*, 740 F.2d 670, 678 (9th Cir. 1984)(applying *Arlington Heights* factors in the context of an Equal Protection Act claim); *Forman v. Cnty. of Suffolk*, No. 13-CV-2977 (JFB) (SIL), 2015 U.S. Dist. LEXIS 99435, *10-11 (E.D.N.Y. Jul. 29, 2015)(applying factors in the ADA context); *Santamaria v. Dallas Indep. Sch. Dist.*, No. 3:06-CV-692-L, 2006 U.S. Dist. LEXIS 83417, *107-109, (N.D. Tex. Nov. 16, 2006)(applying *Arlington Heights* factors in the context of an Equal Protection Act claim); *Inclusive Cmtys. Project, Inc. v. Tex. Dep't of Hous. & Cmty. Affairs*, 749 F. Supp. 2d 486, 506 (N.D. Tex. Sept. 28, 2010)(applying *Arlington Heights* in FHA case); Brown v. Northrop Grumman Corp., No. 12-CV-1488(JS)(GRB), 2014 U.S. Dist. LEXIS 116188 (E.D.N.Y. Aug. 19, 2014)(applying *Arlington

---

[3] Plaintiffs can offer compelling evidence regarding Baylor's intentional discrimination over an extended period of time, from far predating the first Plaintiffs' assault and extending to and beyond the cover-up involving Pepper Hamilton. *See, e.g., Bennett v. Reynolds*, 315 S.W.3d 867, 877 (Tex. 2010)("This cover-up evidence shows 'deliberateness and culpability' and can enhance exemplary damages given its 'nexus to the specific harm suffered by the plaintiff.' We have previously held that certain cover-up efforts can show reprehensibility, as when a manufacturer of asbestos-containing products continues selling what it knows is dangerous."). See also *United States v. Mena*, 933 F.2d 19, 25 n.5 (1st Cir. 1991)("Even if the touchdown were not a 'forced landing,' appellant's argument would nonetheless fail. After all, events that occur after an offense has been perpetrated may be relevant in an assessment of what transpired at the earlier time. *See, e.g., Tierney*, 760 F.2d at 387-89 (subsequent events may be probative as to motive at time of earlier action); *Freeman v. Decio*, 584 F.2d 186, 197 n.44 (7th Cir. 1978)(similar).")(citations in original)(emphasis added).

*Height*s in ADA case). The Court should adopt its use here when the gender dissemination alleged is widespread in its scope and impact.

Unless Baylor changes course, Plaintiffs expect that it will argue that an intentional policy claim must follow the *Monell* framework employed in Section 1983 constitutional claims.[4] The Court should reject this argument. The Supreme Court has already held that municipal liability for violation of constitutional rights is not "wholly congruent" with statutory liability under Title IX. *Fitzgerald v. Barnstable Sch. Committee*, 555 U.S. 246, 257 (2009). Moreover, the Fifth Circuit has treated statutory nondiscrimination claims differently than Equal Protection claims on the same facts. *Fennell v. Marion Indep. Sch. Dist.*, 804 F.3d 398 (5th Cir. 2015)(analyzing Title VI claim for intentional race discrimination under the Title IX deliberate indifference standard and addressing Section 1983 Equal Protection claim separately). *Monell* simply has no application to these cases but even were the Court to find that it does, it has nothing to do with the discriminatory intent claim described in this section.

## II.     Pre-Assault Notice and Deliberate Indifference

While the intent claim described above focuses on Baylor's policies and customs and all the myriad of ways those policies and customs impacted Plaintiffs' educational environment, this claim focuses on the heightened risk for sexual assault. For this claim, Plaintiffs argue that the Court should follow the framework set out in *Karasek v. Regents of the Univ. of Cal.*, 948 F.3d 1150 (9th Cir. 2020). Under this framework, the claim requires these elements of proof: "(1) a school maintained a policy of deliberate indifference to reports of sexual misconduct, (2) which created a heightened risk of sexual harassment (3) in a context subject to the school's control, and (4) the plaintiff was harassed as a result." *Id.* at 1169.

---

[4] Even though Plaintiffs oppose the *Monell* framework for this case, it is worth noting that the Fifth Circuit Pattern Jury Instructions at 10.5 (page 98) provide a proposed instruction for a *Monell* official policy or custom constitutional claim against a city/county. *See* https://www.lb5.uscourts.gov/juryinstructions/Fifth/2020civil.pdf

Thus, the jury question for this claim would look something like the following:

Do you find, based on the preponderance of the evidence, that Baylor maintained a policy of deliberate indifference to reports of sexual misconduct which created a heightened risk of sexual harassment in a context subject to the school's control, and the plaintiff was harassed as a result.

How do you answer this question, yes or no, for each of the Jane Does listed below?

One way of looking at this claim is analogizing to criminal offenses. This claim is a lesser and included claim to the broader intent claim described above. In cases where there is not widespread evidence of the school's intentional gender discrimination policies and customs, a plaintiff might only have this claim. For example, a public school district that otherwise had adopted meaningful Title IX policies and made good faith attempts to apply those policies across campuses, might nevertheless be liable under this claim for specific policies or customs that amounted to deliberate indifference to reports of sexual assault.

Thinking through appellate review of a Plaintiffs' jury verdict in this case, were the Fifth Circuit to deviate from the circuit consensus that allows the heightened risk theory, and should that decision not be disturbed by the Supreme Court, upon remand, this Court would adjust the judgment to exclude damages related to the heightened risk of sexual assault. There is no downside analyzing both of these described claims and submitting them to the jury. They are well supported in the law and submitting both accommodates appellate review.

## CONCLUSION

In closing, the Court should continue to reject Baylor's arguments that this be decided utilizing the Section 1983 *Monell* framework. Instead, Plaintiffs have pleaded intentional policy claims that should be submitted as argued above.

Respectfully submitted,

 /s/ Chad W. Dunn
**BRAZIL & DUNN, L.L.P.**
Chad W. Dunn

9

State Bar No. 24036507
4407 Bee Caves Road, Suite 111
Austin, Texas 78746
Telephone: (512) 717-9822
Facsimile: (512) 515-9355
chad@brazilanddunn.com
K. Scott Brazil
State Bar No. 02934050
13231 Champion Forest Drive, Suite 406
Houston, Texas 77069
Telephone: (281) 580-6310
Facsimile: (281) 580-6362
scott@brazilanddunn.com

**AND**

**DUNNAM & DUNNAM, L.L.P.**
Jim Dunnam
State Bar No. 06258010
jimdunnam@dunnamlaw.com
Eleeza Johnson
State Bar No. 24058690
eleezajohnson@dunnamlaw.com
Andrea Mehta
State Bar No. 24078992
andreamehta@dunnamlaw.com
4125 West Waco Drive
Waco, Texas 76710
Telephone: (254) 753-6437
Facsimile: (254) 753-7434

AND

**SOMMERMAN, MCCAFFITY, QUESADA & GEISLER, L.L.P.**
George (Tex) Quesada
State Bar No. 16427750
Laura Benitez Geisler
State Bar No. 24001722
Sean J. McCaffity
State Bar No. 24013122
Jody L. Rodenberg
State Bar No. 24073133
Alexandria Risinger
State Bar No. 24095215
3811 Turtle Creek Blvd, Suite 1400
Dallas, Texas 75219

Telephone: 214-720-0270
Facsimile: 214-720-0184
quesada@textrial.com
lgeisler@textrial.com
smccaffity@textrial.com
jrodenberg@textrial.com
arisinger@textrial.com

ATTORNEYS FOR PLAINTIFFS

## **CERTIFICATE OF SERVICE**

This is to certify that a true and correct copy of the above and foregoing has been filed by ECF and sent to counsel of record via electronic notification on December 4, 2020.

/s/Chad W. Dunn
CHAD W. DUNN